**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| ARROWPAC INCORPORATED; UNIVERSAL CONTAINER LINE, INC.; ATEC SYSTEMS, LTD.; BAXTER HEALTHCARE CORPORATION; THE CENTRAL AMERICAN BOTTLING CORPORATION (AS SUCCESSOR IN INTEREST TO PEPSIAMERICAS, INC.); THE COCA-COLA COMPANY; CARIBBEAN REFRESCOS, INC.; CONAGRA FOODS, INC.; GRAYLION HOLDINGS LLC (AS SUCCESSOR IN INTEREST TO INTERNATIONAL TRANSPORT LOGISTICS, INC.); NESTLÉ USA, INC., NESTLÉ PURINA PETCARE COMPANY; NESTLÉ PUERTO RICO, INC.; PAYCO FOODS CORP.; PAYLESS SHOESOURCE, INC.; PEPSICO, INC.; PEPSICO CARIBBEAN, INC.; FRITO-LAY, INC.; FRITO-LAY NORTH AMERICA, INC.; PEPSICO PUERTO RICO, INC.; PEPSI-COLA MANUFACTURING INTERNATIONAL, LTD.; STOKELY-VAN CAMP, INC.; THE QUAKER OATS COMPANY; TROPICANA MANUFACTURING COMPANY, INC.; THE PROCTER & GAMBLE COMPANY; THE PROCTER & GAMBLE DISTRIBUTING, LLC; SEARS, ROEBUCK AND CO.; SEARS LOGISTICS SERVICES, INC.; KMART CORPORATION; SOUTHEASTERN FREIGHT LINES, INC.; TRANSNOW, INC.; NEW YORK EXPORT CO., INC.; YRC WORLDWIDE INC.; NEW PENN MOTOR EXPRESS, INC.; USF REDDAWAY, INC.; YRC INC.; YRC ENTERPRISE SERVICES, INC.; AND YRC LOGISTICS SERVICES, INC., | Case No. 3:12-cv-11 80-J-34JBT  COMPLAINT JURY TRIAL DEMANDED |
| PLAINTIFFS, | |
| v. | |
| SEA STAR LINE, LLC; SALTCHUK RESOURCES, INC.; TOTEM OCEAN TRAILER EXPRESS, INC.; AND LEONARD SHAPIRO, | |
| DEFENDANTS. | |

# TABLE OF CONTENTS

*Arrowpac Incorporated; et al. v. Sea Star Line, LLC; et al. Complaint*

PAGE

NATURE OF THE CASE ............................................................................. 2

JURISDICTION AND VENUE .................................................................... 4

PLAINTIFFS ............................................................................................. 21

DEFENDANTS.......................................................................................... 37

CONSPIRATORS ..................................................................................... 43

      (a)     Admitted Co-Conspirators ........................................................ 43
      (b)     Agents and Other Co-Conspirators ......................................... 52

CLASS SETTLEMENTS ........................................................................... 57

INTERSTATE TRADE AND COMMERCE................................................ 57

GOVERNMENT CRIMINAL ANTITRUST INVESTIGATION ...................... 58

      Guilty Plea of Gabriel Serra (Horizon)................................................ 59
      Guilty Plea of Kevin Gill (Horizon) ...................................................... 61
      Guilty Plea of Greg Glova (Horizon)................................................... 63
      Guilty Plea of Peter Baci (Sea Star) .................................................. 65
      Guilty Plea of Alexander Chisholm (Sea Star)................................... 68
      Guilty Plea of Horizon Lines .............................................................. 71
      Guilty Plea of Sea Star Line ............................................................... 73
      Guilty Plea of Crowley Liner............................................................... 76
      Indictment of Frank Peake (Sea Star) ............................................... 79
      The Department of Justice's Investigation is Ongoing ...................... 80

AFFIDAVITS OF ALEXANDER CHISHOLM (SEA STAR)........................... 81

ADDITIONAL ALLEGATIONS REGARDING THE CONSPIRACY ............. 83

      (a)     The Structure of the Puerto Rico Cabotage Market
               Facilitated the Conspiracy ...................................................... 83
      (b)     Further Allegations of Anti-Competitive Behavior ................... 88
               Sea Star/TOTE/Saltchuk and Horizon Agreements at

the Park Hotel ............................................................ 89
"The Illegal Operational Agreement" between Sea Star
    and Horizon ................................................ 91
Crowley's Admitted Participation in the Conspiracy................ 94
Further Allegations re Saltchuk's Active Participation
    in the Conspiracy ........................................ 110
Further Allegations regarding the Implementation and
    Documentation Of the Conspiracy ............................. 122
Monitoring and Enforcement of the Conspiracy...................... 132
Further Examples of Rate Fixing ........................... 134
Fixing of Bunker Fuel Surcharges .......................... 135
Fixing of Intermodel Fuel Surcharges..................... 137
Fixing of Port Security Charges.............................. 138
Further Allegations re Customer Allocation ........................... 139
Further Allegations regarding Capacity Manipulation and/or
Suppression and Maintaining Stable Market Shares............. 140
Further Allegations re Opportunities to Conspire
    (that were used)........................................... 143
(c)   Antitrust Injury—Effect of the Conspiracy ............................... 146
Before the Conspiracy ......................................... 146
During the Conspiracy ........................................... 148
After the Conspiracy Came to Light........................ 158

FRAUDULENT CONCEALMENT ............................................... 159

CLAIMS        ............................................................................. 171

COUNT ONE ............................................................................. 171

JURY TRIAL DEMAND.............................................................. 172

RELIEF SOUGHT ...................................................................... 172

Plaintiffs bring this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demanding a trial by jury, and complaining and alleging as follows:

## NATURE OF THE CASE

1.      The United States Department of Justice Antitrust Division ("Department of Justice") stated on January 13, 2012 that "[f]rom 2002 until 2008, Puerto Rico was the singular focus of one of the largest domestic price-fixing conspiracies ever investigated by the United States.  The Puerto Rico conspiracy systematically targeted companies located in the continental United States and companies located in Puerto Rico that shipped freight by water between the continental United States and Puerto Rico.  Billions of dollars of Puerto Rico freight services were affected by the conspiracy."

2.      Defendants and their co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition in the market for freight transportation services between the United States and Puerto Rico ("Puerto Rican cabotage") beginning at least as early as May 2002 and continuing until at least April 2008 (the "conspiracy period"), by agreeing to allocate customers, rig bids to customers, and fix rates, surcharges, and other fees (sometimes collectively referred to herein as "prices") charged to customers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Because of the unlawful conduct of the Defendants and their co-conspirators, Plaintiffs paid artificially inflated, "collusive and noncompetitive rates and surcharges," and

other fees for Puerto Rican cabotage and, as a result, have suffered antitrust injury to their businesses or property.

3.    The three largest Puerto Rico cabotage carriers, Defendant Sea Star Line LLC ("Sea Star"), co-conspirator Horizon Lines, and co-conspirator Crowley Liner Services, and four former executives of Defendant Sea Star Line and Horizon Lines, have pled guilty to felony violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, for participating in this illegal price-fixing conspiracy.  In addition, one former executive of Defendant Sea Star has pled guilty to obstruction of justice by attempting to cover up the existence of the illegal conspiracy by destroying key records and documents.  *See*, United States v. Sea Star Line LLC, No. 3:11-cr-00511, *Judgment* (D.P.R. Dec. 19, 2011); United States v. Horizon Lines, LLC, No. 3:11-cr-0071, *Second Amended Judgment* (D.P.R., Apr. 28, 2011); United States v. Crowley Liner Services, Inc., No. 3:12-cr-00590, *Judgment* (D.P.R. July 31, 2012);  United States v. Alexander G. Chisholm, No. 08-cr-00353, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. Gabriel Serra, No. 08-cr-00349, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. Gregory Glova, No. 08-cr-00352, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); United States v. R. Kevin Gill, No. 08-cr-00351, *Plea Agreement* (M.D. Fla., Oct. 20, 2008); and United States v. Peter Baci, No. 08-cr-00350, *Plea Agreement* (M.D. Fla., Oct. 20, 2008).

4.    Plaintiffs initially filed their action and claims herein in the United States District Court for the District of South Carolina (Charleston Division) on

April 12, 2012.  On October 29, 2012, Plaintiffs voluntarily dismissed without prejudice their Complaint filed in South Carolina under Rule 41(A)(1)(a)(i) of the Federal Rules of Civil Procedure (as no answers had been filed by Defendants) and, concurrently on the same day, re-filed their claims in this Complaint before this Court.

## JURISDICTION AND VENUE

5.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, and for permanent injunctive relief against Defendants for the injuries sustained by Plaintiffs by reason of the Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      Subject matter jurisdiction is conferred upon this Court by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and by 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d) because the Defendants resided, transacted business, were found, or had agents in this District.  Part of the events giving rise to Plaintiffs' claims occurred, and/or a substantial portion of the affected interstate trade and commerce described below, was carried out in this District.

8.      This Court has personal jurisdiction over each Defendant because, among other things, each: (a) transacted business throughout the United States, including in this District; (b) participated in cabotage services in the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) resided in this District; and/or (e) engaged in a scheme and conspiracy in violation of Section 1 of the Sherman Act that was directed at and had the intended effect of causing injury to persons, including Plaintiffs, residing in, located in, or doing business throughout the United States, including in this District.

9.      Each Defendant is subject to personal jurisdiction pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, the Florida long-arm statute, and/or Rule 4(k)(2) of the Federal Rules of Civil Procedure.  Personal jurisdiction exists over each Defendant under the Florida long-arm statute because, as part of and in furtherance of their conspiracy, Defendants and their co-conspirators: engaged in substantial activity, including continuous and systematic general business contacts, within Florida; operated, conducted, engaged in, or carried on a business or business venture; and/or committed tortious acts within Florida and/or committed tortious acts outside of Florida that were intended to and did cause injury to persons or property within Florida, including several Plaintiffs herein.

10.      Defendant Sea Star Lines LLC, admitted co-conspirators Crowley Liner Services, Inc. and Crowley Maritime, Inc. (collectively "Crowley"),

and co-conspirator Trailer Bridge, Inc., are all headquartered and have their principal places of business in Jacksonville, Florida. All of the Puerto Rico Jones Act carriers conduct substantial business operations in the District, including at the Port of Jacksonville. Admitted co-conspirator Horizon Lines has sales offices, warehousing and terminal facilities, and conducts substantial business in Jacksonville, including at the Port of Jacksonville. Jacksonville, Florida is the principal port used by the Puerto Rico Jones Act carrier conspirators for the shipping of price-fixed cargoes between the U.S. and Puerto Rico.

11.      Admitted conspirators Peter Baci and Alexander Chisholm, former Sea Star Vice President of Yield Management and Assistant Vice President of Yield Management, respectively, work and reside in Jacksonville, Florida. Indicted co-conspirator Frank Peake, the former President of Sea Star, resided and worked for Sea Star in Jacksonville. Alleged conspirators Tom Farmer, Rob Grune, and Tom Crowley Jr., of Crowley, and David Miskowiec, of Trailer Bridge, also worked and resided in Jacksonville.

12.      The initial grand jury investigating this six-year conspiracy to fix prices, rig bids, and allocate customers on the freight trade between Jacksonville (and other U.S. ports) and San Juan, Puerto Rico was empaneled by the Department of Justice in Jacksonville from at least 2008 to at least 2009. Search warrants on the Jacksonville headquarters of Sea Star and Crowley were authorized in this District and served by the Federal Bureau of Investigation on April 17, 2008. Four executives of Sea Star and Horizon Lines entered pleas

admitting their guilt for felony violations of the Section One of the Sherman Act, 15 U.S.C. § 1, for their roles in this conspiracy before the Honorable Timothy J. Corrigan in this District and were sentenced by Judge Corrigan.

13.     Through their knowing approval, joinder, and participation in this admitted six-year conspiracy, as alleged in detail below, the Defendants are all subject to personal jurisdiction in Florida.  Defendant Sea Star, co-conspirator Horizon Lines, and co-conspirator Crowley Liner have all pled guilty to participating in this conspiracy to fix rates and surcharges, rig bids, and allocate customers for freight between the U.S., in particular Jacksonville, and Puerto Rico.  Defendants agreed to and did, by their actions in furtherance of this conspiracy, fix the rates and surcharges on freight originating in, passing through, or destined for Jacksonville, Florida at "collusive and noncompetitive" levels per Sea Star's guilty plea.  Defendants Sea Star, Saltchuk Resources, Inc. ("Saltchuk"), Totem Ocean Trailer Express, Inc. ("TOTE") a Saltchuk subsidiary, and Leonard Shapiro ("Shapiro") also agreed with Horizon Lines to manipulate and limit the number of vessels and vessel sailings on the trade between Jacksonville and Puerto Rico and further agreed to divide the volume of freight between Jacksonville and Puerto Rico on a 50/50 basis in violation of Section One of the Sherman Act.

14.     Saltchuk, TOTE, and Shapiro all did business in and acted in furtherance of the conspiracy in or around Jacksonville, Florida.   These Defendants also engaged in acts and communications in furtherance of the

conspiracy which they intended would target customers and trade in this District and which injured customers and trade in this District, including several Plaintiffs.

15.        Shapiro spent significant amounts of time in Sea Star's Jacksonville office on a regular and periodic basis.   Sea Star personnel understood Shapiro wore two hats on these visits, i.e., that Shapiro was there both as TOTE's Vice-President of Pricing and as an owner and director of Saltchuk. TOTE's corporate filings with the State of Alaska list Shapiro as its Vice President of Pricing from before 1998 through at least 2004.

16.        Shapiro conducted business at Sea Star's headquarters in Jacksonville from the time of Sea Star's formation in 1998 through at least 2003. Shapiro came to Sea Star on a regular basis (at least every 2-3 months for several days at a time), as a Saltchuk owner and director and as an officer of TOTE.  Shapiro had dozens of meetings with Sea Star's Vice President of Yield Management, Peter Baci, in Jacksonville, the primary focus of which was to direct Sea Star pricing, but also to direct Sea Star's processes and technology.

17.        Shapiro and at least 8 TOTE employees were at Sea Star in force and full time for many months in 2002 and into 2003 to aid assimilation of the Navieras assets, containers, cargoes, and customers acquired by Sea Star/Saltchuk.

18.        During the conspiracy period, Shapiro visited major Sea Star customer Caribbean Shipping Services in Jacksonville and gave their

management his business card which identified Shapiro as "Principal and Director" for "Saltchuk Resources, Inc." (Exhibit A)

19.     Shapiro and Everett ("Ev") Trout ("Trout"), also an agent, director, and founding owner of Saltchuk, met on at least one occasion during the conspiracy period with management of Plaintiff International Transport Logistics, Inc. ("ITL") in Jacksonville, Florida to discuss ITL's relations with Sea Star.  ITL managers understood Shapiro and Trout visited with them on behalf of Saltchuk as customer relations for a major Sea Star customer.   Trout presented ITL management with his "Saltchuk Resources, Inc." business card. (Exhibit B)

20.     In a press release dated February 10, 2004, Sea Star stated that it had presented "Leonard Shapiro – Totem Ocean Trailer Express" with its Navigator Award as an individual "who through performance and assistance . . . had a positive impact on the development and growth of the company.  The award's name signifies the concept that the awardee helps Sea Star 'Navigate' and 'Stay on Course' as it endeavors to achieve its Goals and Objectives."  Sea Star acknowledged that Shapiro was very involved in Sea Star's operations.

21.     Former Sea Star Senior Vice President of Yield Management, and admitted conspirator, Peter Baci, has stated in filings before this Court that Leonard Shapiro, an officer, director, agent, and founding owner of Saltchuk and TOTE, initiated the conspiracy with Horizon Lines and other carriers in Jacksonville and indicated to Baci and others that he wanted them to conspire with Horizon and other competitors on rates, market division, and market

allocation.   These communications by Shapiro occurred while he was in Jacksonville.  As an officer, director, and agent of TOTE and Saltchuk, Shapiro repeatedly travelled to Jacksonville in at least 2001, 2002, and 2003 to directly manage and oversee Sea Star's pricing and the conspiratorial activities of Baci. Shapiro was sent to oversee Sea Star's pricing by TOTE and Saltchuk.  Baci kept Shapiro's phone numbers (both at work at TOTE and his cell) handy in his personal spiral notebooks as well as the email addresses of Shapiro and Robert Magee (TOTE's Chairman and CEO) at totemocean.com.

22.      Shapiro facilitated the price-fixing conspiracy on behalf of TOTE (for which he was the Vice President of Pricing) and Saltchuk (of which he was a founding owner, director, and agent) through many years' worth of actions in Jacksonville and/or intentionally targeting trade in Florida and, in particular, this District, including, but not limited to, the following:

(a)      Leonard Shapiro, an agent, officer, and director of both TOTE and Saltchuk, came into the Jacksonville office of the Sea Star's Vice President of Sales, Bill Stallings, shortly after Stallings was hired in August 2001, and began lamenting the rate erosion on the Puerto Rico trade.  Shapiro told Stallings to find "someone at Horizon to work with" on rates.  Stallings said he did not know how to do what Shapiro was asking.  Nevertheless, Shapiro asked Stallings on at least three separate visits to Sea Star's Jacksonville offices to find an executive at Horizon to partner with to discuss increasing rates.  Shapiro intimated that this was also done on the Alaskan trade between TOTE and

Horizon.  After being rebuffed each time, Shapiro finally said, "If you're too damn stupid to figure it out, I'll find someone else."

(b)      Shapiro thereafter directed and/or manipulated Baci during their conversations in Jacksonville to fix prices with Horizon and the other carriers.  Shapiro communicated with Baci on this topic at least once a month.

(c)      Shapiro directed Baci to set up lunch meetings so that Shapiro could meet with Baci's counterparts at the other carriers.  Shapiro had meetings with Baci and David Miskowiec (Trailer Bridge's Vice President of Sales) and Baci and Tom Farmer (Crowley's Vice President and General Manager, Sales & Marketing) in Jacksonville.  Shapiro met Baci's counterpart at Horizon, Kevin Gill, at the April 24, 2002 Park Hotel meeting.

(d)      While in Jacksonville, Shapiro told Baci that he had entered into an agreement with Gabe Serra of Horizon to divide the Florida-Puerto Rico vessel freight volume with Horizon Lines on a 50/50 basis.  When Shapiro told Baci that Baci had to implement this market division agreement, Shapiro was in Jacksonville.

23.      Saltchuk's Mark Tabbutt (President and Chairman of Saltchuk) and Robert ("Bob") Magee (Chairman and CEO of TOTE and agent for Saltchuk) not only knew of and encouraged the conspiracy between Sea Star and the other Puerto Rico carriers, but, upon information and belief, they directly participated in conspiratorial communications with executives from Horizon Lines and Crowley, including meetings in and around the Jacksonville area.  For example,

(a)     Magee, Tabbutt, and Shapiro of Saltchuk and TOTE arranged with Horizon CEO Raymond to set up a meeting at the Park Hotel in Charlotte, NC across the street for Horizon's headquarters on April 24, 2002 to discuss and enter into an agreement between Horizon and Sea Star to reduce capacity of the Puerto Rico trade.  This agreement involved, among other things, limiting the number of ships and sailings to/from Jacksonville and Puerto Rico.

(b)     William Pennella, Vice Chairman and Executive Vice President of Crowley Maritime, had two meetings in Jacksonville, Florida restaurants with Bob Magee, Chairman and CEO on TOTE and an agent for Saltchuk, on May 8, 2003 and June 19, 2003.  Also present at the meetings was Sea Star Vice President, Carl Fox, who had worked at Crowley prior to April 2003. (Fox later returned to Crowley in 2010 as a Senior Vice President).

(c)     Magee, Chairman and CEO on TOTE and an agent for Saltchuk, made a presentation on August 21, 2003 at the "Puerto Rico Summit" hosted by the Port of Jacksonville.  In his presentation, Magee bemoaned the rate declines on the Puerto Rico trade over the past ten years (since 1992) and strongly urged the other carries to get their rates up by almost 50%.

(d)     On October 26, 2005, Saltchuk's President Tabbutt and TOTE's Chairman Magee met with Horizon's senior officers Raymond and Keenan at the resort in Ponte Vedra, FL to discuss market division, capacity manipulation, rates, and Saltchuk's plan to introduce a third ship for Sea Star (the

El Faro) into the Puerto Rico trade (and how this affected the 50/50 allocation scheme).

(e)     During that same trip, Tabbutt and Magee were in the St. Augustine area to attend the JAXPORT Puerto Rico Summit II at the Renaissance World Golf Village Resort.  Magee had a group photograph taken with co-conspirators Gabe Serra (Horizon), Rob Grune (Crowley), and John McCown (Trailer Bridge) at this event.

(f)     On April 12, 2008, Saltchuk's new President, Tim Engle, met with Rob Grune of Crowley in Ft Lauderdale, Florida.

24.     Horizon's Serra convinced Horizon's CEO Raymond to talk to Magee and Tabbutt (TOTE/Saltchuk) to intercede with TOTE and Saltchuk by having Raymond contact Magee and Tabbutt to prevent Sea Star's introduction of a third ship in the Puerto Rico trade.  Magee and Tabbutt sought to assure Raymond that Horizon and Sea Star could avoid a rate war by coming to terms over El Faro's deployment.  Saltchuk actively controlled Sea Star as Magee and Tabbutt were calling the shots regarding the deployment of the El Faro.

25.     Mark Tabbutt (President and later Chairman of Saltchuk) visited Sea Star's offices at least once a year for various kick-off sales meetings and mid-year or quarterly Sea Star departmental performance reviews, and he made multiple presentations to Sea Star's management.  Tabbutt also came to Jacksonville to direct and discuss management changes at Sea Star.  For example, Tabbutt and Magee fired Mike Shea as President of Sea Star in

December 2002. Later, in July 2003, Magee announced that Frank Peake (a senior officer of Horizon who formerly ran Horizon Lines' Alaska Division in "competition" with TOTE) was taking over as Sea Star COO. Saltchuk made the decisions to fire Shea and hire Peake. Tabbutt attended a number of major Sea Star social events in the Jacksonville area including the Puerto Rico Summit II hosted by the Port of Jacksonville on October 25-26, 2005.

26.     Others from Saltchuk who came to Sea Star's Jacksonville offices included Chairman Mike Garvey, Director/Owner Fred Goldberg, Director/Owner Everett Trout, and President Tim Engle.

(a)     In 2002, Saltchuk affiliate TOTE sent at least 8 of its employees to take "semi-permanent" positions at Sea Star in Jacksonville for a number of months to help handle/digest the acquisition of Navieras assets.

(b)     Tim Engle, who became president of Saltchuk, spent at least a month at Sea Star in late 2007 or early 2008 in Jacksonville working in various Sea Star departments to familiarize himself with Sea Star's business.

(c)     Mike Garvey, Chairman of Saltchuk, visited Jacksonville during the conspiracy period on at least two occasions and made at least one presentation to Sea Star management.

(d)     Bill Deaver, President of TOTE (who would later state that both Saltchuk and TOTE had engaged in illegal activity under government investigation), also attended various meetings/presentations at Sea Star in Jacksonville during the conspiracy period.

27.      Tom Cowan, a former Senior VP for the Pacific-North America operations of CSX Lines (the predecessor of Horizon Lines), then Senior VP Marketing of CSX Lines, who had had responsibility for the Alaska trade lane of CSX Lines (in supposed "competition" with TOTE and Shapiro), was retained by TOTE and Saltchuk as an agent and a consultant to and "facilitator" for communications between them and Horizon on both the Alaska and Puerto Rico trade lanes.  Simultaneously, Cowan was also retained by Chuck Raymond, Horizon's CEO, as a consultant to facilitate communications with TOTE and Saltchuk.  Cowan, as agent for TOTE and Saltchuk, made frequent visits to this District.

28.      For example, in May 2004, Cowan participated in a meeting in Orlando, Florida as an agent for Saltchuk/TOTE, along with Peake, Baci, and Bates of Sea Star, to discuss with Horizon executives Kevin Gill, Gabe Serra, and Neil Perlmutter, the status of negotiations between Sea Star and Horizon for slot charter agreements.  These agreements (starting with the Park Hotel agreement) were designed to and enabled the companies to manipulate rates and limit capacity on the trade, including the trade from/to Jacksonville.  Cowan also made at least three visits to Sea Star's Jacksonville offices to have strategy meetings with Sea Star.

29.      Cowan continued to be used as an "effective facilitator" between Magee and Tabbutt as their agent with Raymond and Keenan of Horizon to discuss pricing and capacity issues on the Puerto Rico trade.  Cowan met with

Magee and Tabbutt on November 14-15, 2005 to discuss Horizon's continuing and vehement concerns that Saltchuk's adding a third vessel to the Puerto Rico trade would lead to Horizon cancelling their capacity sharing agreement, "result in market share shifts," "require market share incursion and a strong potential for rate instability/erosion," and "trigger traditional and historical price pressures from other carriers in the trade."

30.      Cowan, as agent for TOTE and Saltchuk, met in Orlando with Peake and Serra to try to continue to address the third ship issues and TSA contracts on November 22, 2005.   Cowan participated at the request of Bob Magee (TOTE/Saltchuk) and John Keenan (Horizon).

31.      Jurisdiction and venue for Defendants Saltchuk and TOTE are proper in this District based upon the acts of its owners, officers, directors, and agents in furtherance of the conspiracy within this District as alleged herein.   In addition, the acts of Sea Star are attributable to Saltchuk for jurisdictional and venue purposes because Saltchuk made or controlled all material management, financial, strategic and operational decisions for Sea Star, Sea Star is Saltchuk's agent and alter ego, and Saltchuk/Sea Star effectively functioned as a single entity.

32.      Saltchuk was heavily engaged in directing and/or making operational decisions for Sea Star.   Examples of such decisions (and funding) by Saltchuk include, but are not limited to, the following: (1) deciding on and directing Sea Star to acquire the assets of the fifth carrier on the Jones Act trade

Navieras de Puerto Rico ("Navieras" or "NPR") in April 2002, (2) negotiating the purchase price and funding the Navieras asset acquisition; (3) directing Sea Star to enter into discussions and an agreement with CSX/Horizon at the Park Hotel in Charlotte, NC on April 24, 2002 to reduce the number of vessels and vessel sailings in the Puerto Rico trade and to agree on the number of ships and the number of sailings the two companies would offer; (4) Shapiro attended the Park Hotel meeting as Vice President of Pricing of TOTE and owner, agent and director of Saltchuk; (5) directing Sea Star to sell one of the recently acquired Navieras vessels to CSX/Horizon; (6) directing the transfer of a TOTE vessel (the Northern Lights) to Sea Star in 2005; (7) directing the conversion of that TOTE vessel (renamed El Faro) from a ro-ro vessel for at least $10 million and paying the funds for same; (8) directing the introduction of the El Faro as a third ship for Sea Star into the Puerto Rico trade; (9) discussing in emails, telephone calls, and meetings the potential market disruption and rate erosion caused by introducing the El Faro with Horizon Lines senior management, including a meeting in October 2005 in Ponte Vedra, Florida; (10) the subsequent removal of the El Faro from the Puerto Rico trade in 2006; (11) the firing of Sea Star President Mike Shea in December 2002; (12) the hiring of Frank Peake, a senior executive of Horizon Lines, in July, 2003 as Chief Operating Officer and later President of Sea Star; (13) Sea Star stated for many years on its web site that one of its owners was "Totem Ocean Trailer Express, the largest carrier between the United States and Alaska;" (14) upon information and belief, Saltchuk and TOTE

guaranteed Sea Star's debt; (15) directing in February 2004 that Baci collect detailed Puerto Rico market share information regarding vessel versus barge and Sea Star versus Horizon for a meeting with Saltchuk; (16) in a quarterly meeting in April 2004, discussing, through Magee, with Sea Star management the corporate philosophy of Saltchuk and made clear that Sea Star needed to increases its rates at least 20%; (17) directing Sea Star to contract with its affiliated companies under Saltchuk for ship management, marine terminal services, stevedoring, and ship charters (all of those services would have been rendered in Jacksonville); (18) upon information and belief, during the conspiracy period, Saltchuk directed Sea Star to pay out tens of millions of dollars to Saltchuk, siphoning off critical capital from Sea Star; and (19) controlling volume discounts offered by Sea Star.

33.     As detailed further below, many dozens of conspiratorial meetings and communications between executives and agents of Sea Star, TOTE, Saltchuk, Horizon, Crowley, and Trailer Bridge took place in and around Jacksonville and the Middle District of Florida.  For example,

(a)     Serra of Horizon communicated on a regular basis with Peake, Sea Star's President, who was in Jacksonville, to coordinate the conspiracy.

(b)     Gill and Glova of Horizon exchanged emails daily with Sea Star's Baci by sending emails to Sea Star located in Jacksonville.

(c)     Glova visited Tom Farmer of Crowley in Jacksonville to discuss the conspiracy from time to time, including breakfast and dinner meetings with Farmer at restaurants in Jacksonville.  Glova talked to Farmer, who was located in Jacksonville, at least weekly via telephone (cell or office) beginning in January 2006.

(d)     On February 28, 2003, Serra told Gill that he needed to set up another meeting in mid-March in Florida where Serra could meet with Saltchuk and Sea Star executives to discuss rate and trade practice issues.

(e)     Sea Star's Baci met with Gill to discuss "yield plans" in 2005 at the Hyatt Hotel in the Orlando, Florida airport.  As discussed below, the yield plans were detailed written plans agreed upon by the conspirators to raise rates and surcharges in the following year.

(f)     Peake, Baci, Serra and Glova met in Orlando, Florida in August 2006 to discuss the 50/50 market allocation agreement.

(g)     Peake, Baci, Serra, and Glova met on October 24, 2006 at the Hyatt Hotel at the Orlando, Florida airport to discuss the conspiracy.  In connection with this meeting, Horizon's Sam Raymond sent an "urgent" fax to Greg Glova at the Hyatt Orlando Airport Hotel on October 24.

(h)     In December 2006, Baci and Frank Peake of Sea Star met in Orlando, Florida with Horizon's Gabe Serra and Greg Glova to discuss and agree upon the rates and surcharges for 2007.

(i)     In September 2007, Baci met with Glova to discuss 2008 "yield plans" at the World Golf Village near St. Augustine, Florida.

(j)     Serra and Grune met at a Starbuck's coffee shop in Orlando, Florida for 2-3 hours on April 1, 2008 to discuss the conspiracy, including the Nestlé and Kraft accounts. Upon information and belief, Serra and Grune met several other times in Jacksonville, in addition to this April 2008 meeting.

(k)     Peake and Grune of Crowley routinely met for meals in Jacksonville during the conspiracy period.

34.     In addition to the numerous conspirators who reside in and the numerous conspiratorial acts committed in or directed at Florida, a number of Plaintiffs located in Florida were targeted and injured by this six-year conspiracy. Plaintiff ATEC Systems, Ltd. is a Florida limited partnership with its principal place of business in Altamonte Springs, Florida.  Plaintiff GrayLion Holdings LLC is a Florida limited liability company and assignee of International Transport Logistics, Inc., a Florida corporation with its principal place of business in Jacksonville, Florida.  Plaintiff Tropicana Mfg. Co. has its principal place of business in Bradenton, Florida.  Plaintiff Arrowpac, Inc. has a terminal in Jacksonville.  Plaintiffs Sears Roebuck and Kmart, Inc. have a major distribution facility in Ocala, Florida and retail stores throughout the District.

35.     Saltchuk appeared for all purposes and did not contest jurisdiction when it was sued in the Circuit Court for Duval County, Florida for this same illegal conspiracy under Florida law. <u>Caribbean Shipping Services, Inc.</u> v.

Sea Star Line, LLC, Saltchuk Resources, Inc., Leonard Shapiro, and Frank Peake, No. 16-2008-CA-008795, Division CV-G.

## PLAINTIFFS

36.     This Complaint is filed on behalf of the companies described below (collectively referred to herein as "Plaintiffs") for a single overarching conspiracy in violation of the federal antitrust laws by the Defendants named herein and their co-conspirators.  Consistent with Rule 20(a) of the Federal Rules of Civil Procedure, the claims of the Plaintiffs are properly joined in this Complaint because their claims (1) are related and arise out of a common series of transactions, occurrences, and practices, that is, the conspiracy to fix rates, surcharges and other fees, to rig bids, and to allocate customers for Puerto Rico cabotage services in which the Defendants participated, and (2) raise questions of fact and/or law common to all Plaintiffs.  Plaintiffs generally were all damaged in the same manner by this single continuous conspiracy between Defendants and their co-conspirators to fix rates, rig bids, and allocate customers for Puerto Rico cabotage services because they were all similarly denied the benefits of vigorous competition by the conspirators and all paid higher prices for Puerto Rico cabotage services than they otherwise would have paid in a competitive market.  The joinder of the claims of these Plaintiffs will promote the interests of judicial economy, expedition, and convenience.

37.     Plaintiff Arrowpac Incorporated (hereinafter "Arrowpac") is a New Jersey corporation with its principal place of business in Secaucus, New

Jersey.   Arrowpac is a Non-Vessel Operating Common Carrier or "NVO." Arrowpac is a leading freight forwarder offering Less-Than-Containerload ("LTL") and containerload door-to-door service to its customers between the Continental U.S. and Puerto Rico.  During the conspiracy period, Arrowpac purchased Puerto Rican cabotage directly from Horizon, Sea Star, Crowley, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by Arrowpac to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, Arrowpac suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

38.       Plaintiff Universal Container Line, Inc. (hereinafter "UCL") is a New Jersey corporation with its principal place of business in Secaucus, New Jersey.  During the conspiracy period, UCL purchased Puerto Rican cabotage directly from Sea Star, Horizon, and their co-conspirators under Arrowpac contracts as an affiliate of Arrowpac.   The prices for Puerto Rico cabotage services paid by UCL to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, UCL suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

39.      Plaintiff ATEC Systems, Ltd. (hereinafter "ATEC") is a Florida limited partnership with its principal place of business in Altamonte Springs, Florida.    During the conspiracy period, ATEC (an acronym for Associated Transportation Expediting and Consolidation Company) purchased Puerto Rican cabotage directly from Crowley, Horizon, Sea Star, and Trailer Bridge, for transportation of restaurant equipment, supplies, and refrigerated food.   The prices for Puerto Rico cabotage services paid by ATEC to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, ATEC suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

40.      Plaintiff Baxter Healthcare Corporation (hereinafter "Baxter") is a Delaware corporation with its principal place of business in Deerfield, Illinois. Baxter is a medical therapy manufacturer with manufacturing facilities in Puerto Rico.   During the conspiracy period, Baxter purchased Puerto Rican cabotage directly from Crowley, Sea Star, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by Baxter to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.   Consequently, Baxter suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

41.     Plaintiff The Central America Bottling Corporation ("Cabcorp") is incorporated and operating in accordance with the laws of the British Virgin Islands, with its principal place of business in Guatemala City, Guatemala.  The Central America Bottling Corporation brings this action on its own behalf and on behalf of its subsidiaries, affiliates, and other owned or controlled entities and predecessors-in-interest, including: Pepsi-Cola Puerto Rico Distributing, LLC, a limited liability company organized under the laws of Puerto Rico and a wholly-owned subsidiary of Cabcorp (and former subsidiary of Cabcorp's predecessor-in-interest, PepsiAmericas, Inc. [PepsiAmericas"]), with its principal place of business in Toa Baja, Puerto Rico.  (Two former operating divisions of Cabcorp and PepsiAmericas -- Pepsi-Cola Puerto Rico Manufacturing, LLC and Beverage Plastics, LLC -- are merged with Pepsi-Cola Puerto Rico Distributing, LLC.)

42.     Cabcorp, the aforementioned entities, and their respective subsidiaries, affiliates, and other owned or controlled entities, and their predecessors-in-interest are collectively referred to hereinafter as "Cabcorp."  An "anchor" bottler for PepsiCo, Inc., in Central America, Cabcorp, through its subsidiaries, manufactures, ships, distributes, and sells Pepsi-Cola products throughout Central America and the Caribbean, including Puerto Rico.  During the conspiracy period, Cabcorp purchased Puerto Rican cabotage directly from Crowley, Horizon, Sea Star, and their co-conspirators under the name and contracts of PepsiAmericas.  The prices for Puerto Rico cabotage services paid by Cabcorp to Defendants and their co-conspirators were fixed, stabilized, and/or

increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, Cabcorp suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

43.     Plaintiff The Coca-Cola Company is a Delaware corporation with its principal place of business in Atlanta, Georgia.  The Coca-Cola Company manufactures and sells soft drink syrups and beverages made therefrom throughout the United States, its territories, and the world, through its licensed bottlers.  Caribbean Refrescos, Inc. is a Delaware corporation and wholly-owned subsidiary of The Coca-Cola Company.  Caribbean Refrescos produces soft-drink concentrate in Puerto Rico and transfers all of the concentrate for the U.S. market to Coca-Cola North America, an unincorporated division of The Coca-Cola Company.  During the conspiracy period, The Coca-Cola Company and Caribbean Refrescos (hereinafter collectively "Coca-Cola") purchased Puerto Rican cabotage services directly from Horizon, Crowley, Sea Star, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by Coca-Cola were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  As a result, Coca-Cola suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

44.     Plaintiff ConAgra Foods, Inc. (hereinafter "ConAgra") is a Delaware corporation with its principal place of business in Omaha, Nebraska.

ConAgra is a diversified consumer and commercial food products company that produces and ships to and from Puerto Rico brand name food products, such as Chef Boyardee, Hunt's, Egg Beaters, Peter Pan, Hebrew National, Healthy Choice, and Marie Callender's.  During the conspiracy period, it purchased Puerto Rican cabotage for itself and its subsidiaries directly from Crowley, Horizon, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by ConAgra to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, ConAgra suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

45.      Plaintiff GrayLion Holdings LLC is a Florida limited liability company and the assignee of and successor-in-interest to the claims of International Transport Logistics, Inc. (collectively hereinafter referred to as "ITL"), a Florida corporation with its principal place of business in Jacksonville, Florida.  ITL is an NVO and freight forwarder serving customers' shipping needs from the U.S. to Puerto Rico and elsewhere.  During the conspiracy period, ITL purchased Puerto Rican cabotage directly from Sea Star, Horizon, and their co-conspirators.  ITL was directly targeted by Sea Star and Horizon, and their executives including Gabriel Serra and Frank Peake, and other co-conspirators, as part of their admitted customer allocation and rate-fixing conspiracy.  The rates, surcharges, and other fees for Puerto Rico cabotage services paid by ITL

to Sea Star, Horizon, and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.   Consequently, ITL suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

46.     Plaintiff Nestlé USA, Inc. ("Nestlé USA") is a Delaware corporation with its principal place of business in Glendale, California.   Nestlé USA is a diversified consumer food products company, with manufacturing facilities, distribution centers, and corporate and sales offices across the U.S., and ships a variety of food products to Puerto Rico.   Nestlé USA and its below listed separately incorporated affiliates, bring this action on their own behalf and on behalf of their subsidiaries, affiliates, and other owned or controlled entities and predecessors in interest (collectively referred to hereinafter as "Nestlé"):

(a)     Nestlé Purina PetCare Company ("Nestlé Purina") is a Missouri corporation with its principal place of business in St. Louis, Missouri. One of the world's largest producers of pet food, Nestlé Purina ships a wide variety of pet products to Puerto Rico;

(b)     Nestlé Puerto Rico, Inc. ("Nestlé P.R.") is a Puerto Rico corporation with its principal place of business in San Juan, Puerto Rico.   Nestlé P.R. imports and distributes a variety of Nestlé brand products in Puerto Rico and the U.S. Virgin Islands.   In 2005, Nestlé P.R. integrated its operations with Plaintiff Nestlé Purina;

(c)     Payco Foods Corp. ("Payco Foods") is a Puerto Rico corporation with its principal place of business in Bayamon, Puerto Rico.  Payco Foods imports into and distributes in Puerto Rico a variety of ice cream and frozen dessert products.

During the conspiracy period, Nestlé purchased Puerto Rican cabotage directly from Horizon, Crowley, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by Nestlé to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, Nestlé suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

47.     Plaintiff Payless ShoeSource, Inc. (hereinafter "Payless") is a Missouri corporation with its principal place of business in Topeka, Kansas. Payless is a family footwear retailer that ships a full line of footwear to the retail shoe stores it owns and operates and to other retail outlets in Puerto Rico. During the conspiracy period, it purchased Puerto Rican cabotage directly from Crowley and its co-conspirators.  The prices for Puerto Rico cabotage services paid by Payless for freight carriage to and from Puerto Rico were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.     Consequently, Payless suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

48.    Plaintiff PepsiCo, Inc. is a North Carolina corporation with its principal place of business in Purchase, New York.  PepsiCo, Inc., brings this action on its own behalf and on behalf of its subsidiaries, affiliates, and other owned or controlled entities, including:

(a)    The Quaker Oats Company ("Quaker"), a New Jersey corporation and a wholly-owned subsidiary of PepsiCo., Inc., with its principal place of business in Chicago, Illinois, along with its respective subsidiaries and affiliates;

(b)    Stokely-Van Camp, Inc., an Indiana corporation and a wholly-owned subsidiary of Quaker with its principal place of business in Chicago, Illinois, along with its respective subsidiaries and affiliates;

(c)    Pepsi-Cola Manufacturing International, Ltd., a Bermuda company with its principal place of business in Puerto Rico, along with its respective subsidiaries and affiliates;

(d)    Tropicana Manufacturing Company, Inc., a Delaware corporation and a subsidiary of Tropicana Products, Inc., and Tropicana Products Sales, Inc., which are in turn wholly-owned subsidiaries of PepsiCo, Inc., with its principal place of business in Bradenton, Florida, along with its respective subsidiaries and affiliates;

(e)    Frito-Lay North America, Inc. ("Frito Lay North America"), a Delaware corporation and wholly-owned subsidiary of PepsiCo, Inc., with its

principal place of business in Plano, Texas, along with its respective subsidiaries and affiliates;

(f) Frito-Lay, Inc. ("Frito Lay"), a Delaware corporation and a wholly-owned subsidiary of Frito-Lay North America, with its principal place of business in Plano, Texas, along with its respective subsidiaries and affiliates;

(g) PepsiCo Puerto Rico, Inc., which is a Delaware corporation and a wholly-owned subsidiary of PepsiCo, Inc., with its principal place of business in Guaynabo, Puerto Rico, along with its respective operating divisions (including Frito-Lay Snacks Caribbean, Inc.), subsidiaries and affiliates; and

(h) PepsiCo Caribbean, Inc., a Puerto Rican corporation and a wholly-owned subsidiary of PepsiCo, Inc., with its principal place of business in Guaynabo, Puerto Rico, along with its respective subsidiaries and affiliates.

49. PepsiCo, Inc., the aforementioned entities, and their respective subsidiaries, affiliates, other owned or controlled entities, and predecessors-in-interest are collectively referred to hereinafter as "PepsiCo."  PepsiCo produces and ships a large variety of consumer snack foods to Puerto Rico under the Frito-Lay and Quaker brands.  PepsiCo also has a large beverage concentrate facility in Puerto Rico that ships concentrate and other products to the United States for PepsiCo beverage brands, including Pepsi, Gatorade, and Tropicana.  During the conspiracy period, PepsiCo purchased Puerto Rican cabotage directly from the Defendants and their co-conspirators, including Crowley, Horizon, and Sea Star. The prices for Puerto Rico cabotage services paid by PepsiCo to Defendants and

their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, PepsiCo suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

50.        Plaintiff The Procter & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio. The Procter & Gamble Company brings this action on its own behalf and on behalf of its subsidiaries, affiliates and other owned or controlled entities, including The Procter & Gamble Distributing, LLC (f/k/a The Procter & Gamble Distributing Company) a Delaware company with its principal place of business in Cincinnati, Ohio (collectively, hereinafter referred to as "P&G"). P&G is a diversified consumer products company that produces and ships a wide variety of brand name products to Puerto Rico, such as Charmin, Tide, Bounty, Pampers, Gillette, Duracell, Crest, and Head and Shoulders. P&G also produces Olay skin care products in Puerto Rico which are shipped to the United States. During the conspiracy period, P&G purchased Puerto Rican cabotage directly from Horizon, Sea Star, Crowley, and Trailer Bridge. The prices for Puerto Rico cabotage services paid by P&G to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, P&G suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

51.     Plaintiff Sears, Roebuck and Co., a New York corporation, its wholly-owned subsidiary Sears Logistics Services, Inc., a Delaware corporation, and its affiliate Kmart Corporation ("Kmart"), a Michigan corporation, all with their principal places of business in Hoffman Estates, Illinois, bring this action on their own behalf and on behalf of their parent, subsidiaries, affiliates, and other owned or controlled entities.   These entities are hereinafter collectively referred to as "Sears."   Sears is one of the largest retailers in the United States.   Sears sells a wide range of home merchandise, apparel, automotive products, services, and proprietary brands such Kenmore, Craftsman, Diehard, Joe Boxer, and Jaclyn Smith through its stores located throughout the United States and in Puerto Rico. Sears ships a full array of merchandise to its stores in Puerto Rico.   During the conspiracy period, Sears purchased Puerto Rican cabotage directly from Crowley, Sea Star, and their co-conspirators.   The prices for Puerto Rico cabotage services paid by Sears to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.   Consequently, Sears suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

52.     Plaintiff Southeastern Freight Lines, Inc. (hereinafter "SEFL") is a South Carolina corporation with its principal place of business in Lexington, South Carolina.   SEFL is a trucking company that ships containers of freight to and from Puerto Rico.   During the conspiracy period, it purchased Puerto Rican

cabotage directly from Horizon, Sea Star, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by SEFL to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, SEFL suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

53.      Plaintiff Transnow, Inc. (hereinafter "Transnow") is a New York corporation with its principal place of business in Beacon, New York.  As a full service logistics provider and domestic NVO, Transnow (as well as under its previous corporate name, TranSnow CO2, Inc., hereinafter collectively, "Transnow") offers refrigerated and dry logistics services, including between the United States and Puerto Rico, for a wide variety of products ranging from chemicals to food.  During the conspiracy period, Transnow purchased Puerto Rican cabotage directly from Horizon, Sea Star, Crowley, and their co-conspirators.  The prices for Puerto Rico cabotage services paid by Transnow to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, Transnow suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

54.      Plaintiff New York Export Co., Inc. (hereinafter "NY Export") is a New York corporation with its principal place of business in Beacon, New York.

NY Export exports a full line of fresh fruits and vegetables to Puerto Rico. During the conspiracy period, NY Export purchased Puerto Rican cabotage directly from Horizon, Sea Star, Crowley, and their co-conspirators under Transnow's contracts (as an affiliate) and/or its own contracts. The prices for Puerto Rico cabotage services paid by NY Export to Defendants and their co-conspirators were fixed, stabilized and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, NY Export suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

55.     Plaintiff YRC Worldwide Inc. ("YRCW") is a Delaware corporation with its principal place of business in Overland Park, Kansas. YRCW brings this action on its own behalf and on behalf of its subsidiaries, affiliates and other owned or controlled entities, including (collectively referred to hereinafter as "YRCW"):

(a)     New Penn Motor Express, Inc., a Pennsylvania corporation and a wholly-owned subsidiary of YRC Worldwide Inc., with its principal place of business in Lebanon, Pennsylvania;

(b)     USF Reddaway, Inc., an Oregon corporation and a wholly-owned subsidiary of YRC Worldwide Inc., with its principal place of business in Clackamas, Oregon;

(c)     YRC Inc. (YRCW's wholly-owned subsidiaries f/k/a Yellow Transportation and Roadway Express, Inc. were integrated under YRC Inc., in

2009), a Delaware corporation and a wholly-owned subsidiary of YRC Worldwide Inc., with its principal place of business in Overland Park, Kansas;

(d)     YRC Enterprise Services, Inc. (f/k/a YRC North American Transportation Inc., which was, in turn, f/k/a YRC Worldwide Enterprise Services, Inc.), a Delaware corporation and wholly-owned subsidiary of YRC Worldwide Inc., with its principal place of business in Overland Park, Kansas;

(e)     YRC Logistics Services, Inc. (and its predecessor-in-interest, USF Logistics Services (Puerto Rico), Inc., f/k/a USF Logistics, Inc. or Meridian Logistics) an Illinois corporation and a wholly-owned subsidiary of YRCW Worldwide, Inc., with its principal place of business in Overland Park, Kansas.

56.     YRCW, the aforementioned entities, and their respective subsidiaries, affiliates, and other owned or controlled entities, are collectively referred to hereinafter as "YRCW."  YRCW comprises trucking and logistics companies that contract to ship containers of freight to and from Puerto Rico. During the conspiracy period, YRCW purchased Puerto Rican cabotage directly from Sea Star, Horizon, Crowley, and Trailer Bridge.  The prices for Puerto Rico cabotage services paid by YRCW to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators.  Consequently, YRCW suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

57.     Upon information and belief, as discussed below, the rates and surcharges of all of these Plaintiffs were discussed and targeted by the Defendants and their co-conspirators as part of this conspiracy.

58.     Each of the above Plaintiffs purchased Puerto Rico cabotage services from Defendants and/or their co-conspirators during the conspiracy period pursuant to contracts which they (or their parents/affiliates) entered into directly with one or more of the Defendants expressly providing that they were entered into under §14101(b) of the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. §14101(b).   As provided for by §14101(b)(1) of the ICCTA, these contracts expressly waived in writing Plaintiffs' rights and remedies under Section B of the ICCTA, including their right to file complaints with the Surface Transportation Board ("STB").   Sea Star's contracts with Plaintiffs provided as follows:

> Pursuant to 49 U.S.C.A. §14101(b), CARRIER and SHIPPER waive all rights and remedies specified in 49 U.S.C., Subtitle IV, Part B, except for provisions governing registration, insurance, and safety fitness.   CARRIER and SHIPPER further expressly and irrevocably waive their respective rights to challenge the foregoing waiver of rights and remedies.

As a result, the STB has no regulatory authority over any aspect of the Plaintiffs' contracts, including the rates, surcharges, and other fees set forth in Plaintiffs' contracts.   Plaintiffs' "exclusive remedy" under §14101(b)(2) for the fixing of rates, surcharges, and other fees, bid rigging, and customer allocation by Defendants and their co-conspirators in violation of the federal antitrust laws is an action in federal court.

59.     Horizon Lines—one of Sea Star's admitted co-conspirators—has repeatedly stated in its securities filings with the U.S. Securities and Exchange Commission that the confidential contracts used on the Puerto Rico trade are exempt from STB regulation and, therefore, the filed rate doctrine could not possibly apply.   "Our rates in the Puerto Rico and Alaska markets are predominantly contained in negotiated transportation service contracts which are exempt from STB rate regulation."     (Horizon Lines' May 19, 2006 S-1 Registration Statement, at 103.)   "[I]n the case of our Puerto Rico and Alaska trade routes, we primarily ship containers on the basis of confidential negotiated transportation service contracts that are not subject to rate regulation by the STB."  (Horizon Lines', February 6, 2008 10-K at 42.)

## DEFENDANTS

60.     Defendant Sea Star Line, LLC ("Sea Star") is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.  Sea Star is a privately held limited liability company now owned and managed by TOTE Inc. (f/k/a as the American Shipping Group, Inc., which is wholly-owned by Saltchuk Resources, Inc.) and Taino Star, Inc.   Sea Star provides integrated transportation services to and from the United States and Puerto Rico.  Sea Star accounts for approximately 21 percent of the Puerto Rican cabotage market.  Sea Star marketed and sold Puerto Rican cabotage in the United States and this District from at least as early as 1998 and continuing through the present.  Sea Star uses steamships/liners to carry cargo to Puerto Rico and offered sailings

from Jacksonville, FL and Port Everglades, FL (Fort Lauderdale) on its own ships.

61.     Sea Star was formed in late 1998 when two west coast Jones Act carriers, Matson Navigation Company (which serves Hawaii/Guam) and Saltchuk Resources Inc. (then called Totem Resources Corp. [which serves Alaska]), as a joint venture, decided to enter the Puerto Rican cabotage market, agreed to buy a company called Sea Barge, and converted Sea Barge from a tug/barge carrier to a liner carrier using two Matson ships.  Saltchuk Resources (initially Totem Resources) directly owned and controlled Sea Star from 1998 to 2005 (when American Shipping Group/TOTE Inc. was formed) and continued to do so up through the present.

62.     On May 7, 2008, Sea Star disseminated a press release stating that it was cooperating with the Department of Justice's investigation and that it had placed a number of employees on indefinite administrative leave for violations of company policy.  Sea Star issued a statement on October 1, 2008 confirming that two former officers/employees – Peter Baci and Alexander Chisholm – agreed to plead guilty for their involvement in the conspiracy and that those two officers/employees had been relieved of their responsibilities on May 5, 2008.  Sea Star has admitted that it participated in the six-year conspiracy underlying this Complaint.

63.     On November 17, 2011, the Department of Justice issued a press release announcing that Sea Star had entered into an agreement to plead

guilty to a one count felony violation of the Sherman Act for engaging "in a conspiracy to fix rates and surcharges for water transportation of freight between the continental United States and Puerto Rico from at least as early as May 2002, until at least April 2008."   Sea Star agreed to pay a criminal fine in the amount of $14.2 million.

64.      Anthony Chiarello, President of American Shipping Group, Inc. (now TOTE, Inc.) and Manager of Sea Star, admitted in a November 17, 2011 press release that "[u]nder antitrust law Sea Star is responsible for the acts of its employees . . . and [that] Sea Star employees engaged in price fixing."   On December 19, 2011, Sea Star entered its plea of guilty in federal court in Puerto Rico to a felony violation of Section 1 of the Sherman Act for its active participation in this six-year conspiracy.

65.      Prior to July 2003, Frank Peake ("Peake") was Vice President and General Manager for the Alaska trade lane of Horizon Lines and then Vice President of Strategy and Planning for Horizon Lines.   In July 2003, Peake left Horizon to become the Chief Operating Officer of Sea Star.   Peake was promoted to be Sea Star's President in November 2004.  Based upon information provided by admitted conspirators and documentary evidence, Peake was knowledgeable of, approved, and actively participated in the conspiracy at Sea Star, including through direct communications and agreements with competitors at Horizon and Crowley.   On November 17, 2011, Peake was indicted by a

federal grand jury in San Juan, Puerto Rico for his participation in this conspiracy between late 2005 and April 2008.

66.      Defendant Saltchuk Resources, Inc. ("Saltchuk") is a privately held Washington corporation with its principal place of business at 1111 Fairview Avenue North, Seattle, Washington.   Saltchuk owns approximately sixteen predominately maritime/transportation businesses, including defendant Jones Act carriers Sea Star and Totem Ocean Trailer Express, Inc. ("TOTE" – Alaska trade).   Saltchuk, from 1998 through 2005 and thereafter through its wholly-owned subsidiary American Shipping Group ("ASG")/TOTE Inc., has a direct ownership interest in and is the managing partner of Sea Star.  In 1998, Saltchuk (then called Totem Resources) and Matson Navigation, both carriers on west coast Jones Act trade lanes, jointly acquired Sea Barge to enter into the Puerto Rico trade.   Sea Barge was renamed Sea Star.   Over the 2002-2004 period, Matson sold its ownership interest in Sea Star to Saltchuk so that Saltchuk eventually owned 90%.

67.      Upon information and belief, and for the reasons stated herein, including, but not limited to, the statements of Peter Baci and other admitted conspirators and documentary evidence obtained to date, Saltchuk participated in this conspiracy at a minimum through its principals, officers, directors, and/or agents (actual and apparent), including, but not limited to, Leonard Shapiro (an officer of TOTE and an agent, principal, and director of Saltchuk), Robert P. Magee (an officer, director, and agent of TOTE, American Shipping Group, and

Saltchuk), and Mark Tabbutt (Saltchuk President since 1999 then Chairman of Saltchuk since 2007).    Other Saltchuk and TOTE executives were knowledgeable of the conspiracy, including Tim Engle, President of Saltchuk, and Bill Deaver, President of TOTE.   Upon information and belief, Saltchuk officers, directors, principals, and/or agents directly discussed and agreed with their co-conspirators on such matters as rate levels, joint reduction in and management of trade lane capacity and sailings, fuel surcharges, market allocation, price philosophy (including no competition on rates), and other competitive matters.

68.    Upon information and belief, (a) Saltchuk used Sea Star for the wrongful purpose of engaging in conduct in violation of the federal antitrust laws; (b) Sea Star was undercapitalized; (c) Saltchuk exercised extensive and pervasive control over Sea Star; (d) Saltchuk intermingled properties and accounts with Sea Star and siphoned funds from same; and, (e) Saltchuk disregarded the corporate form and separateness of Sea Star, the officers and directors of which did not function independently.  For example, Saltchuk officers and agents made major business decisions for Sea Star including, but not limited to, vessel deployment, vessel sailings, slot charters with Horizon, capital expenditures, and personnel changes.

69.    Defendant Leonard Shapiro ("Shapiro"), upon information and belief residing at 7830 80th Place, S.E., Mercer Island, Washington 98040, was a founder, principal, agent, and director of Saltchuk Resources, Inc.  Shapiro was

also during the conspiracy period the Vice President of Pricing for Defendant Totem Ocean Trailer Express, Inc. ("TOTE"), another Saltchuk subsidiary and an affiliate of Sea Star.  Shapiro was an active participant in this conspiracy during at least 2002-2003 and likely through 2008.  Shapiro was not an employee of Sea Star when he conspired with the other carriers on the Puerto Rico trade lane.   Upon information and belief, Shapiro participated in this Puerto Rico conspiracy as an owner, officer, director and agent for Saltchuk and TOTE. Saltchuk and TOTE sent Shapiro from Seattle, WA to Jacksonville, FL to manage market development and pricing of Sea Star before and during the conspiracy. Peter Baci essentially reported to Shapiro and followed Shapiro's direction; including implementing Shapiro's market allocation agreement with Gabriel Serra of Horizon and overall fixing of rates and surcharges.  Shapiro also pressured Sea Star's Alex Chisholm and others within Sea Star to collude with Sea Star's Puerto Rican co-conspirators on rates.  In his motion to stay the proceedings of MDL1960 (filed June 22, 2009-Docket No. 364), which motion was denied, Shapiro admitted that "he has been informed that he is a target" of a "live" criminal investigation by the Department of Justice of the Puerto Rico cabotage conspiracy.

70.	Defendant Totem Ocean Trailer Express, Inc. ("TOTE") is an Alaska corporation with its principal place of business in Federal Way, Washington.  TOTE is owned by Saltchuk and is an affiliate of Sea Star Line, LLC.   TOTE's business is ocean shipping on the Jones Act trade between

Washington and Alaska in competition with the Alaska Division of Horizon Lines. However, TOTE officers and agents, including Leonard Shapiro (TOTE's Vice President of Pricing through at least 2003, among other positions within Saltchuk) and Robert P. Magee (during the relevant period, Magee served as Chairman, President, CEO, and Director of TOTE, among other positions within Saltchuk), acting on TOTE's behalf and on behalf of Saltchuk as agents with actual and apparent authority for each, were directly involved in the creation and implementation of the conspiracy on the Puerto Rico trade lane as detailed below.  TOTE is responsible for the conduct of its officers, including Shapiro and Magee, detailed below, in fomenting and implementing the conspiracy on the Puerto Rico trade lane involving its affiliate Sea Star at issue in this Complaint.

### CONSPIRATORS

#### (a)    Admitted Co-Conspirators

71.    Various other persons, firms, limited liability companies, corporations, and other entities not named as Defendants in this Complaint have participated as co-conspirators with Defendants in this conspiracy, and have aided, abetted, and performed acts and made statements in furtherance of this conspiracy.

72.    Horizon Lines, Inc. ("Horizon Inc.") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  It has operated as a holding company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC; (ii) Horizon Logistics Holdings, LLC ("Horizon Logistics"); and (iii)

Horizon Lines of Puerto Rico, Inc. ("Horizon Puerto Rico").  Horizon Lines Inc., Horizon Lines, LLC, Horizon Logistics, and Horizon Puerto Rico are all collectively referenced in this Complaint as "Horizon" or "Horizon Lines."

73.      Horizon holds itself out as the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total U.S. maritime container shipments from the continental United States to Puerto Rico, Hawaii, Alaska, Guam and Micronesia, and approximately 35 percent of the Puerto Rican cabotage market.  Horizon (or its predecessors) marketed and sold Puerto Rican cabotage in the United States and in this district from before May 2002 and continuing through to the present.  Horizon operated steamships/liners and offered customers sailings on its own ships from Jacksonville, FL, Elizabeth, NJ, and Houston TX.  Horizon has admitted that it participated in this illegal conspiracy.

74.      During the admitted conspiracy period, from before May 2002 through February 2003, Horizon Lines LLC was formerly known as CSX Lines LLC ("CSX Lines").  CSX Lines was the domestic container ocean shipping unit of CSX Corporation.  On February 28, 2003, the name CSX Lines was changed to Horizon Lines LLC, when CSX Corporation sold most of its interest in CSX Lines to a new venture formed with The Carlyle Group.  Horizon Lines was again sold on July 7, 2004 to the private equity firm Castle Harlan, Inc. and thereafter it became a publicly owned company.   When Horizon is referred to in this Complaint, it includes its predecessor CSX Lines.

75.      On April 17, 2008, Horizon issued a press release revealing that it was served with search warrants and a grand jury subpoena in connection with an investigation by the Antitrust Division of the United States Department of Justice into the pricing practices of carriers operating in the Puerto Rico trade. Horizon issued another press release on May 28, 2008 announcing that it placed six employees involved in Puerto Rico trade on administrative leave as a result of its review of issues raised by the Department of Justice's investigation.   A subsequent October 1, 2008 press release confirmed that three former Horizon officers and managers agreed to plead guilty for their participation in this conspiracy.

76.      On February 24, 2011, Horizon and the Department of Justice issued press releases indicating that Horizon had entered into an agreement to plead guilty to a one count felony violation of the Sherman Act for engaging "in a conspiracy to fix rates and surcharges for water transportation of freight between the continental United States and Puerto Rico from at least as early as May 2002, until at least April 2008."   Horizon agreed to pay a criminal fine in the amount of $45 million.   At the March 15, 2011 sentencing hearing before the federal court in Puerto Rico, Horizon entered its guilty plea and admitted its role in the 6-year conspiracy to fix rates and surcharges.

77.      Crowley Maritime Corporation ("Crowley Maritime") is a privately owned Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida.   Crowley Liner Services, Inc. ("Crowley

Liner") is a Delaware corporation with its principal place of business at 9487 Regency Square Boulevard, Jacksonville, Florida. Crowley Liner is a wholly-owned subsidiary of Crowley Maritime. These companies are hereafter collectively referred to as "Crowley."

78. Crowley provides scheduled marine transportation services between the continental United States and ports in the Caribbean and Central America, including Puerto Rico. Crowley accounts for approximately 31 percent of the Puerto Rican cabotage market. Crowley marketed and sold cabotage in the United States and in this District from at least as early as May 2002 and continuing through the present. Crowley uses tugs and barges and offers sailings between Jacksonville, FL and Pennsauken, NJ and San Juan, Puerto Rico.

79. In its guilty plea agreement filed July 31, 2012 in the United States District Court for the District of Puerto Rico, Crowley Liner admitted that "[d]uring the relevant period, [Crowley], through at least one of its officers, within high-level personnel of [Crowley], participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the base rates charged to non-government customers in particular contracts for certain Puerto Rico freight services. In furtherance of the conspiracy, [Crowley], through at least one of its officers, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services. During these discussions and

meetings, agreements were reached to fix the base rates to be charged to non-government customers in particular contracts for certain Puerto Rico freight services"

80.     Crowley engaged in this conspiracy through the conduct, detailed below, of its officers, executives, and agents, including, but not limited to, through the collusive conduct of Tom Crowley, Jr., its Chairman, President, and CEO; Robert Grune, Crowley's Senior Vice President and General Manager of the Puerto Rico trade (Robert Grune's LinkedIn page identifies him, as of April 12, 2012, as Senior VP and GM at "Crowley Maritime"); and, Tom Farmer, Crowley's Vice President of Yield Management (Tom Farmer's LinkedIn page as of April 12, 2012, identifies him as "VP at Crowley Maritime").

81.     Thomas Farmer ("Farmer") was, during the conspiracy period, the Vice President and General Manager, Sales & Marketing for Crowley's Puerto Rico liner services business, and then the Vice President, Pricing and Yield Management.  Based upon the statements of admitted conspirators and documentary evidence, as detailed further below, Farmer participated from at least May 2002 through April 2008 in this conspiracy to rig bids, allocate customers, and fix rates and surcharges on the Puerto Rico trade lane by meeting, communicating, and agreeing with executives of Sea Star, Horizon, and Trailer Bridge in person, over the phone, by facsimile, and by email.  Upon information and belief, Greg Glova taped a telephone call with Farmer in

furtherance of the conspiracy on April 17, 2008 at the behest of agents of the FBI.

82.     In June 2005, Robert ("Rob") Grune ("Grune") was appointed Senior Vice President and General Manager of Crowley's Puerto Rico and Caribbean liner services business unit, a position he held through the end of the conspiracy.  On June 20, 2005, Tom Crowley, Jr., Chairman and CEO of Crowley Maritime, announced that Rob Grune would take over as "senior vice president and general manager of the Puerto Rico and Caribbean Services business unit" and that Grune "will continue to report to me."  Crowley Jr. stated that moving Grune to this position "strengthens the 'One Crowley' approach to our diverse customer base."  Crowley Jr. noted that Grune's team would include Tom Farmer.  During this time, Grune reported directly to Tom Crowley, Jr., the Chairman, President and CEO of Crowley Maritime.  Crowley Maritime, on its web site, identified Rob Grune as a member of the "Executive Staff" and the "Senior Leadership" of Crowley Maritime.

83.     Upon information and belief, and as detailed further below, including information provided by admitted conspirators and documentary evidence, from June 2005 through April 2008, Grune actively participated in the conspiracy, and he had direct communications and agreements with his counterparts at competitors, including Sea Star's Frank Peake and Horizon's Gabriel Serra.  Grune also knowingly directed and encouraged his subordinate, Tom Farmer, to continue to engage in and to increase the level of his anti-

competitive activity with Farmer's co-conspirators at competing carriers, including Baci and Gill/Glova.  In their internal communications, co-conspirators expressed pleasure that, under Grune's leadership, Crowley further ramped up its active participation in the conspiracy, and they repeatedly lauded Crowley's "responsible" pricing under Grune.

84.      Gabriel Serra ("Serra") is an individual residing in San Juan, Puerto Rico.  During the conspiracy period until at least February 2003, Serra was the Vice President and General Manager of the Puerto Rico division of CSX Lines LLC, the predecessor of Horizon Lines.  After the corporate name change in late February 2003, Serra was the Senior Vice President and General Manager of Horizon's Puerto Rico Division.

85.      On October 20, 2008, Serra's guilty plea agreement was filed in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

86.      R. Kevin Gill ("Gill") is an individual residing in Charlotte, North Carolina.  During the conspiracy period through February 2003, Gill was the

Marketing and Pricing Director for the Puerto Rico Division of CSX Lines.  From February 2003 until December 2005, Gill was the Marketing and Pricing Director for Horizon's Puerto Rico Division.  Gill reported to Serra.  From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible, among other things, for marketing Horizon's Puerto Rican cabotage services.

87.     On October 20, 2008, Gill's guilty plea agreement was filed in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued through April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

88.     Gregory Glova ("Glova") is an individual currently residing in Charlotte, North Carolina.  From late December 2005 until at least April 2008, Glova was the Marketing and Pricing Director for Horizon's Puerto Rico Division.  Glova reported to Serra.

89.     On October 20, 2008, Glova's guilty plea agreement was filed in the United States District Court for the Middle District of Florida to a criminal information stating that he and his co-conspirators engaged in a combination and

conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.  Glova admits he joined in the conspiracy on or about December 2005 and continued as an active participant through April 2008.

90.      Peter Baci ("Baci") is an individual residing in Jacksonville, Florida.   During the conspiracy period, Baci was the Senior Vice President of Yield Management for Sea Star and was involved with determining Sea Star's pricing for Puerto Rican cabotage.

91.      In his guilty plea agreement filed on October 20, 2008, in the United States District Court for the Middle District of Florida, Baci pled guilty to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, which began at least as early as May 2002 and continued until as late as April 2008, by agreeing to allocate customers, agreeing to rig bids submitted to government and commercial buyers, and by agreeing to fix the prices of rates, surcharges, and other fees charged to customers.

92.      Alexander G. Chisholm ("Chisholm") is an individual residing in Jacksonville, Florida.   Starting in April 2003, Chisholm was employed by Sea

Star as a Director of Pricing and then, in July 2006, as the Assistant Vice President of Yield Management.  Chisholm previously had been employed by Crowley.  Chisholm reported to Peter Baci at Sea Star.

93.     On October 20, 2008, Chisholm's guilty plea agreement was filed in the United States District Court for the Middle District of Florida to a criminal information stating that, after he became aware of an investigation by a grand jury sitting in the Middle District of Florida, assisted by the Department of Justice and the Federal Bureau of Investigation ("FBI"), into possible federal antitrust offenses in Puerto Rican cabotage, on April 17, 2008, Chisholm corruptly altered, destroyed, and concealed records and documents and attempted to do so with the intent to impair the availability of the records and documents for use in the investigation.

**(b)     Agents and Other Co-Conspirators**

94.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability company, the allegation means that the corporation or limited liability company engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability company's business or affairs, including, but not limited to, Frank Peake, Peter Baci, Alexander Chisholm, Mark Tabbutt, Robert Magee, Gabriel Serra, Kevin Gill, and Gregory Glova.  The corporate Defendants are liable for the conduct of their officers,

directors, agents, employees, consultants, principals, and/or representatives in furtherance of the conspiracy.

95.      Charles G. Raymond ("Raymond") is an individual who resides in Charlotte, North Carolina.   From before December 2000 through February 2003, Raymond was the Chief Executive Officer of CSX Lines (the predecessor of Horizon Lines).   During that period, Raymond was also an employee and an executive officer of CSX Corporation.   After February 2003 and throughout the conspiracy, Raymond was the Chairman and Chief Executive Officer of Horizon.

96.      During the period 2000 through April 2008, Raymond was actively involved in monitoring, setting, and/or controlling the rates that Horizon bid and contracted to sell cabotage services to Plaintiffs and others and with the customer contract renewals on the Puerto Rico trade.   Upon information and belief, for the reasons stated herein, including through the criminal sentencing record of Serra, Gill, and Glova, and documentary evidence, Raymond knew and approved of, encouraged and participated in the conspiracy herein, including, but not limited to, through his direct participation in meetings and communications with senior executives of Sea Star, TOTE, Saltchuk, and Crowley.   Moreover, upon information and belief, Raymond communicated regarding rates and/or surcharges with the most senior executives at Crowley, Sea Star, and Saltchuk. Horizon admitted in SEC filings that it paid in excess of $2,500,000 in legal fees incurred by Raymond in connection with the Department of Justice investigation through fiscal year 2010.

97.     On February 24, 2011, Horizon issued a press release on its guilty plea agreement.  In that release, Horizon stated that the Department of Justice agreed that it would not bring criminal charges against any then current director or officer of Horizon, but that the agreement did not extend to Chuck Raymond or John Keenan.  Upon information and belief, Raymond and Keenan remain targets in the criminal investigation by the Department of Justice.

98.     John V. Keenan ("Keenan") is an individual residing in Lewisville, Texas.  Keenan served as Vice President, Sales and Marketing for Horizon from December 2000 to July 2003, as Senior Vice President and Chief Operating Officer of Horizon from 2003-06, as Senior Vice President and Chief Transportation Officer from 2006-07, as President and Chief Operating Officer from 2007-10, and as Senior Vice President and Chief Operating Officer from January 2010 until he took leave in conjunction with Horizon's guilty plea in March 2011.

99.     Upon information and belief, Keenan knew of, encouraged, and participated in the conspiracy, including through meetings with competitors. Horizon has admitted to paying Keenan's legal fees, incurred because of the Department of Justice criminal investigation, in excess of $1 million.   The Department of Justice has specifically reserved the right to prosecute Keenan for felony antitrust violations committed while he was an officer of Horizon Lines.

100.     The Department of Justice stated that Gabriel Serra was only a mid-level or "middle management" player in the conspiracy and that "there are

others higher than Mr. Serra." (5/12/09 Sentencing Hearing Tr. 30-31.) The Department of Justice stated further that Serra had "direct communications" regarding the conspiracy "with a number of other senior executives" within Horizon and other companies. (Id. at 28.)

101.     Trailer Bridge, Inc. ("Trailer Bridge") is a Delaware corporation with its principal place of business in Jacksonville, Florida. Trailer Bridge offers integrated freight shipping services between the continental United States and Puerto Rico. Trailer Bridge accounted for approximately 14 percent of the Puerto Rican cabotage market during the conspiracy period. Trailer Bridge marketed and sold Puerto Rican cabotage in the United States and in this district from at least as early as May 2002 and continuing until the present. Trailer Bridge offers tug and barge service from Jacksonville, FL to Puerto Rico. Upon information and belief, and for the reasons detailed herein including the admissions of Baci, Trailer Bridge participated in the conspiracy at issue herein, including through its Vice President of Sales David Miskowiec.

102.     On April 17, 2008, Trailer Bridge was served with a grand jury subpoena from the Department of Justice seeking documents and information relating to a grand jury investigation of pricing practices among Puerto Rico ocean carriers. In its August 14, 2008 Form 10-Q Trailer Bridge stated that it had made several document submissions in response to the subpoena.

103.     As noted above and detailed below, Frank Peake, Robert Magee, Mark Tabbutt, and Tom Cowan also actively participated in this conspiracy on behalf of the Sea Star, Saltchuk, and TOTE defendants.

104.     As noted above and detailed below, upon information and belief, Tom Farmer, Rob Grune, and Tom Crowley, Jr. actively participated in this conspiracy for Crowley.

105.     Upon information and belief, the pricing directors and managers at Horizon that reported to Gill and Glova (including Karen Haines, Lorenzo Thomas, and Adriano Conti), the pricing directors and managers at Sea Star that reported to Baci and Chisholm (Ed Pretre and Mike Nicholson), and the pricing directors and managers at Crowley that reported to Tom Farmer, were fully aware of the conspiracy and actively participated in the conspiracy by knowingly using competitor-supplied pricing data in preparing and authorizing rate proposals, rate/contract bids, and related rate actions.

106.     At all relevant times, each Defendant and co-conspirator was an agent of each of the remaining Defendants and their co-conspirators and, in performing the acts alleged in this Complaint, was acting within the course and scope of such agency.  Each Defendant and co-conspirator ratified or authorized the wrongful acts of each of the other Defendants and their co-conspirators. Defendants are individually and collectively sued as participants, co-conspirators, and aiders and abettors in the improper acts and transactions that are the subject of this action.

107. Discovery may reveal facts identifying additional co-conspirators (whether corporate or individual) who may later be named as Defendants.

## CLASS SETTLEMENTS

108. On July 21, 2010, Sea Star entered into a settlement agreement with the class action plaintiffs in MDL 1960. The MDL Court preliminarily approved the Sea Star class settlement on August 25, 2010. Notice was sent to class members, including Plaintiffs, on September 15, 2010. Plaintiffs timely excluded themselves from the Sea Star settlement class. Plaintiffs also timely excluded themselves at the same time from the Horizon Lines, Crowley, and Chisholm class settlements

## INTERSTATE TRADE AND COMMERCE

109. The activities of the Defendants and their co-conspirators that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce, including trade and commerce to, from, and within this District.

110. From at least as early as May 2002 and continuing until at least April 2008, Defendants and their co-conspirators marketed and sold substantial quantities of Puerto Rican cabotage in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States and Puerto Rico, including within this District.

111. The market for Puerto Rican cabotage is estimated to be worth in excess of $780 million dollars annually on average during the conspiracy.

112.      Defendants and their co-conspirators, and each of them, have used instrumentalities of interstate commerce to market and sell Puerto Rican cabotage, including in this District.

## GOVERNMENT CRIMINAL ANTITRUST INVESTIGATION

113.      On information and belief, in February 2008, the Department of Justice, using (at that time) a grand jury empanelled in the United States District Court for Middle District of Florida, began a criminal investigation into possible antitrust violations involving Puerto Rico cabotage.  These antitrust violations are believed to have been first reported to the Department of Justice by a senior executive of Sea Star, who thereafter assisted in covertly obtaining further evidence of the conspiracy.

114.      On April 17, 2008, the Department of Justice and the FBI executed search warrants on the offices of Horizon, Sea Star, and Crowley regarding Puerto Rican cabotage.

115.      On October 1, 2008, the Department of Justice announced that Baci, Gill, Glova, and Serra had "agreed to plead guilty for their roles in a conspiracy that began at least as early as May 2002 and continued until as late as April 2008, the object of which was to eliminate competition and raise prices for the movement of goods in the U.S. to Puerto Rico shipping lane.  The Department [of Justice] charged that the executives sought to eliminate competition and raise prices by agreeing not to compete for one another's customers; agreeing to rig bids submitted to government and commercial buyers;

and agreeing to fix the prices of rates, surcharges and other fees charged to customers."

116.     In its February 24, 2011 press release announcing Horizon's guilty plea, the Department of Justice stated that "three former Horizon Lines LLC executives, R. Kevin Gill, Gregory Glova, and Gabriel Serra, and another former shipping executive, Peter Baci, pleaded guilty to a wide-ranging conspiracy to rig bids, fix prices, and allocate customers transporting goods between the continental United States and Puerto Rico by ocean vessel."

### Guilty Plea of Gabriel Serra (Horizon)

117.     In his plea agreement filed on October 20, 2008 in the United States District Court for the Middle District of Florida, Serra pled guilty to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, by:

> (a) participat[ing] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agree[ing] during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agree[ing] during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agree[ing] during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) s[elling] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accept[ing] payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorize[ing] or consent[ing] to the participation of subordinate employees in the conspiracy; and

(h) conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts[.]"

118.      The Department of Justice stated in its May 4, 2009 pre-

sentence memorandum as to Serra that

"[Serra] was one of the leaders and organizers of the charged conspiracy and, in fact, was one of the principal architects of the illegal agreement underlying the charged conspiracy." (at 6)

"[Serra] is presently the highest-ranking executive from his company cooperating in this investigation. Given his senior position at his company and integral role in dealing with other senior executives involved in the conspiracy, the information provided by defendant has been useful in building cases against co-conspirators who remain to be charged for their roles in the charged conspiracy and other offenses." (at 7)

119.      Serra's May 5, 2009 pre-sentence memorandum stated that

"Mr. Serra has provided significant information regarding individuals not otherwise implicated in the conspiracy which likely will lead to further prosecutions.   Such information could not have been provided by any of the other defendants already charged in the conspiracy . . . ." (at 5)

"Mr. Serra identified numerous individuals and pointed out those whom he believed were involved in activities that may have violated the antitrust laws." (at 7)

"Had Mr. Serra not entered into his Plea Agreement, he would likely not have had criminal charges brought against him at this point. Rather, it is likely that he would be in the same position as his counter-parts at **Sea Star and Crowley** who have not been charged.  Although, based on information provided by Mr. Serra, there appears to be sufficient basis for the DOJ to have already filed charges, these individuals remain at work, drawing pay checks."  (at 8; emphasis added.)

120.     The Department of Justice stated that Serra was only a mid-level or "middle management" player in the conspiracy and that "there are others higher than Mr. Serra."  (5/12/09 Hearing Tr. 30-31.)  The Department of Justice stated further that Serra had "direct communications" regarding the conspiracy "with a number of other senior executives" within Horizon and at other companies.  (Id. at 28.)  The only "higher" or more "senior" executives at Horizon were Raymond and Keenan.  The "senior executives" with whom Serra conspired at Sea Star included Frank Peake and at Crowley Robert Grune.

121.     At the May 12, 2009 sentencing hearing before Judge Corrigan in the United States District Court for the Middle District of Florida, Judge Corrigan sentenced Serra to serve 34 months in a federal penitentiary for his felony violation of the U.S. antitrust laws.   Serra served his sentence at the Pensacola Federal Prison Camp in Florida.

### Guilty Plea of Kevin Gill (Horizon)

122.     In his plea agreement filed on October 20, 2008 in the United States District Court for the Middle District of Florida, Gill pled guilty to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate

competition in the market for cabotage between the United States and Puerto Rico, by:

> (a) "participat[ing] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agree[ing] during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agree[ing] during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agree[ing] during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;
>
> (e) s[elling] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;
>
> (f) accept[ing] payment for Puerto Rico freight services at collusive and noncompetitive prices;
>
> (g) authorize[ing] or consent[ing] to the participation of subordinate employees in the conspiracy; and
>
> (h) conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts[.]"

123.    The Department of Justice stated in its May 4, 2009 pre-sentence memorandum (at 7) as to Gill that

> "[Gill] was integral to the formation of the conspiracy, and he has provided the United States with contemporaneous documents evincing his and others' involvement therein.  In addition, defendant has provided evidence, in the form of statements and documents, against his superiors within Company B [Horizon], including presently uncharged coconspirators."

Gill's uncharged superiors within Horizon are Raymond and Keenan.

124.     At the May 12, 2009 sentencing hearing, the Court [Judge Corrigan] noted (from a letter by Gill's counsel) that Gill provided incriminating information regarding "lots of people," i.e., other participants in the conspiracy. (Tr. 61.)  Gill's counsel called the list of the persons that Gill had implicated at Horizon and the other carriers "extensive."  (Tr. 66.)  Gill "felt something [was] not right" during the conspiracy so he retained a large volume of business records reflecting the conspiracy.  (Tr. 67.)  Gill has voluminous documentation on the conspiracy back to 2002.  The Department of Justice said those documents were helpful regarding "the early days of the conspiracy" (Tr. 63), and that while he implicated a number of people, Gill "has proved more helpful with a smaller set of conspirators whom the government is likely to pursue."  (Tr. 62.)

125.     At the May 12, 2009 sentencing hearing before Judge Corrigan in the United States District Court for the Middle District of Florida, Judge Corrigan sentenced Gill to serve 29 months in a federal penitentiary for his felony violation of the U.S. antitrust laws.  Gill served his sentence at the Morgantown Federal Correctional Institution in West Virginia.

## Guilty Plea of Greg Glova (Horizon)

126.     In his plea agreement filed on October 20, 2008 in the United States District Court for the Middle District of Florida, Glova pled guilty to a criminal information stating that he and his co-conspirators engaged in a combination and conspiracy in violation of Section 1 of the Sherman Act to

suppress and eliminate competition in the market for cabotage between the

United States and Puerto Rico, by:

> (a) "participat[ing] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

> (b) agree[ing] during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

> (c) agree[ing] during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

> (d) agree[ing] during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

> (e) s[elling] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

> (f) accept[ing] payment for Puerto Rico freight services at collusive and noncompetitive prices; and

> (g) conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts[.]"

127.    The Department of Justice stated in its May 4, 2009 pre-

sentence memorandum (at 6-7) as to Glova that

> "[Glova] acted as a manager within this conspiracy and was integral to the implementation of it.  As such, the defendant had a working knowledge of all key aspects of the illegal agreement.  Given his position at his company and his indispensable role in dealing with senior executives involved in the conspiracy, the information provided by [Glova] has been useful in building cases against individual and corporate co-conspirators who remain to be charged for their roles in the charged conspiracy and other offenses."

> "[Glova] also made and recorded several consensual telephone calls to co-conspirators in his own company, as well as other co-

conspirators at other companies. The telephone calls yielded incriminating evidence that proved useful in the government's investigation."

128.     At the May 12, 2009 sentencing hearing, the Department of Justice stated that Glova was confronted by the FBI at his home at 7AM on April 17, 2008 before the search warrants were served on the Horizon corporate offices. (Tr. 84-85.) Glova then made five (5) phone calls from his home, with the FBI present, to others at Horizon and at competitors. Upon information and belief, Baci and Tom Farmer were among the persons called. These calls were taped. (Tr. 80-81, 85-86.) The Department of Justice believes these taped phone conversations were of "great help" and provided "significant evidence." (Tr. 81.) Upon information and belief, Glova taped telephone calls with Baci and Farmer as well as with other Horizon executives. In addition, Glova provided evidence against his superiors at Horizon and at other companies.

129.     At the May 12, 2009 sentencing hearing before Judge Corrigan in the United States District Court for the Middle District of Florida, Judge Corrigan sentenced Glova to serve 20 months in a federal penitentiary for his felony violation of the U.S. antitrust laws. Glova served his sentence at the Edgefield Federal Correctional Institution in South Carolina.

### Guilty Plea of Peter Baci (Sea Star)

130.     In his plea agreement filed on October 20, 2008 in the United States District Court for the Middle District of Florida, Baci pled guilty to a criminal information stating that he and his co-conspirators engaged in a combination and

conspiracy in violation of Section 1 of the Sherman Act to suppress and eliminate competition in the market for cabotage between the United States and Puerto Rico, by:

(a) "participat[ing] in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

(b) agree[ing] during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agree[ing] during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agree[ing] during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) s[elling] Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accept[ing] payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorize[ing] or consent[ing] to the participation of subordinate employees in the conspiracy; and

(h) conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts[.]"

131.    In Baci's January 26, 2009, pre-sentencing memorandum filed in the United States District for the Middle District of Florida, Baci admitted to the following facts (including his anticipated testimony), among others:

(a) "Baci participated in a serious antitrust conspiracy that continued for many years."  (at 4)

(b)  "Baci's cooperation will include not only the companies involved with antitrust violations including **Sea Star, Horizon, Crowley and Trailer Bridge,** but also those individuals responsible for supervising and implementing the criminal violations."  (at 8; emphasis added.)

(c)  "Mr. Baci was a participant at the inception of the illegal agreement.  **He is familiar with every participant, whether at Sea Star, or at Horizon, Crowley and Trailer Bridge.**  Moreover, because he has contemporaneous notes contained in his personal notebooks maintained by Mr. Baci from 2002 through 2008, his testimony is completely documented with his notebooks and with an enormous collection of emails substantiating the conspiracy. . . . Mr. Baci has provided information about meetings and travel, he has alerted the government to additional evidence (i.e. travel vouchers and airline and hotel records) that will corroborate his extensive testimony."  (at 12-13; emphasis added.)

(d)  Baci was "instructed" by his superiors to engage in the conspiracy.  "Peter Baci did not originate the idea; create the concept or hatch the plan.  Peter Baci, like Gill, was ordered to implement the illegal agreement after the operational agreement between Shapiro and Serra.  Peter Baci (Sea Star) and Kevin Gill (Horizon) IMPLEMENTED the illegal agreement with Shapiro and Serra."  (at 9)

(e)  "Mr. Baci . . . is particularly useful since he is aware of the entire conspiracy from its inception.  The inception is important. Although Leonard Shapiro was never an elected officer of Sea Star, because he was one of the major shareholders of Saltchuk, and an officer of TOTE, he was someone of massive authority who inserted himself into the operations of Sea Star.  Mr. Shapiro was powerful; he threatened and directed the termination of employment of others at Sea Star and he significantly intimidated Mr. Baci. . . .  Shapiro ordered him to collude with his counterpart at Horizon (Gill and, later, Glova) to participate in the antitrust conspiracy AFTER Shapiro and Serra reached an illegal operational agreement."  (at 8)

132.      At the January 30, 2009 sentencing hearing for Baci in the

United States District Court for the Middle District of Florida, the Department of

Justice stated that the crime Baci committed "was large, extensive and had an

enormous impact."  (January 30, 2009 Hearing Tr. 17.)   The Department of Justice stated further that there are "hundreds of documents evidencing [Baci's] participation in the conspiracy, tape-recordings evidencing his participation in the conspiracy . . . .  "(Id. at 24.)  The Department of Justice also stated that it has "knowledge of the participation of people both above Mr. Baci and below Mr. Baci who were involved in participating in the conspiracy."  (Id. at 31.)

133.      At his sentencing hearing, Baci admitted "I recognize I am totally guilty of participating in this conspiracy."  (Id. at 72.)  Baci "was the guy that ran the email system where they actually agreed to do this stuff" and Baci called Chisholm during the FBI raid and "told him to shut down the email system."  (Id. at 51, 55.)  "Also at the time of [Baci's] cooperation, they [the Department of Justice] said they needed evidence against **Crowley and Trailer Bridge**.  And [Baci was] able to provide them with specific instances of conduct against the two companies . . . ."  (Id. at 56; emphasis added.)

134.      On January 30, 2009, Baci was sentenced to forty-eight (48) months in prison.  According to the Department of Justice, this was "the longest jail term ever imposed for a single antitrust violation."  Baci served his sentence at the Pensacola Federal Prison Camp in Florida.

## Guilty Plea of Alexander Chisholm (Sea Star)

135.      In a plea agreement filed on October 20, 2008 in the United States District Court for the Middle District of Florida, Chisholm pled guilty to a criminal information stating that, after he became aware of an investigation by a

grand jury sitting in the Middle District of Florida, assisted by the Department of Justice and the FBI, into possible federal antitrust offenses in Puerto Rican cabotage, on April 17, 2008, Chisholm corruptly altered, destroyed, and concealed records and documents and attempted to do so with the intent to impair the availability of the records and documents for use in the investigation.

136.     The Department of Justice stated in its May 4, 2009 pre-sentence memorandum as to Chisholm that

> "[Chisholm's] cooperation has been useful to the United States in as much as [Chisholm] was one of the key implementers of the charged conspiracy and, therefore, has detailed insight regarding the nature, scope, and functioning of the conspiracy and the illegal activity of the participants.  In this regard, [Chisholm] provides important corroboration of the other defendants who are pleading guilty for their participation in the illegal scheme.  Although he does not add to the evidence the United States has regarding other uncharged individuals, he is a significant source of information regarding corporate conspirators that remain to be charged for their roles in the charged conspiracy and other offenses."  (at 6)

137.     Chisholm stated in his May 5, 2009 pre-sentence memorandum that

> "Mr. Chisholm did not join the conspiracy any earlier than April 21, 2003, when he accepted employment at Sea Star as a Director of Pricing."  (at 4)

> "The government suspects that anti-competitive behavior in the coastal shipping industry between the United States and Puerto Rico had gone on for years, but Mr. Chisholm was not a participant in any of those activities until after his employment at Sea Star began."  (at 4)

> "Mr. Chisholm's role in the underlying conspiracy to violate the antitrust laws was that of a numbers cruncher. The government has described Mr. Chisholm as one of the key implementers, and that description is apt if one means by it that, as one of the three

Directors of Pricing, he put into action plans made by others.  **Mr. Chisholm received pricing information about Sea Star's competitors from Baci, who was in direct communication with his counterparts at Horizon and Crowley.**  Using the competitors' pricing information and following directions from Baci, Mr. Chisholm would re-do the bid for his customers."  (at 5; emphasis added.)

138.     At the May 12, 2009 sentencing hearing, the Department of Justice stated that Baci called Chisholm on April 17, 2008 (the day of the FBI raid) and told him to "take down" Baci's Google email account and that Chisholm did so.  (May 12, 2009 Hearing Tr. 102.)  Baci used this gmail account to communicate directly with competitors in furtherance of their conspiracy. Chisholm, after being confronted by the FBI, went home and deleted files off his personal Mac computer.  (Tr. 102.)

139.     Chisholm did play a role as "Baci's right hand man and essentially the number cruncher for Mr. Baci."  (Tr. 104.)  Chisholm admitted he also has "direct knowledge of the participation of certain corporate co-conspirators who have yet to be charged."  (Tr. 104.)  Chisholm and the Department of Justice indicated that much of the implementation and "policing" of the conspiracy was done by email circulation of spreadsheets containing "detailed" customer specific contract data.  "This was a conspiracy that was conducted in significant part through emails and spreadsheets."  (Tr. 104-105.) Conspirator's rate data provided by and to Chisholm made the conspiracy work. "Based on the numbers in those spreadsheets, the decision makers made the decisions about the steps that the conspiracy would take . . . . [and Chisholm]

provided the information that allowed the decision makers to operate and make informed decisions." (Tr. 105.)

140.    At the May 12, 2009 sentencing hearing before Judge Corrigan in the United States District Court for the Middle District of Florida, Judge Corrigan sentenced Chisholm to serve 7 months in a federal penitentiary for his felony conviction of obstruction of justice aimed at concealing the conspiracy from the Department of Justice.  Chisholm served his sentence at Pensacola Federal Prison Camp in Florida.

## Guilty Plea of Horizon Lines

141.    On February 24, 2011, Horizon and the Department of Justice issued press releases indicating that Horizon had entered into an agreement to plead guilty to a one count felony violation of the Sherman Act for engaging "in a conspiracy to fix rates and surcharges for water transportation of freight between the continental United States and Puerto Rico from at least as early as May 2002, until at least April 2008."  Horizon was agreed to pay a criminal fine in the amount of $45 million.

142.    In its February 24, 2011 press release, the Department of Justice stated that the charge to which Horizon agreed to plead guilty provided that "Horizon Lines LLC and co-conspirators carried out the conspiracy by agreeing during meetings and discussions to allocate customers of Puerto Rico freight services and to fix the rates and surcharges to be charged to purchasers

of water transportation of freight between the continental United States and Puerto Rico."

143.     In its plea agreement, Horizon has admitted that "[d]uring the relevant period [defined as starting "at least as early as May 2002 and continuing through at least April 2008"], [Horizon], through certain of its officers and employees, including high-level personnel of [Horizon], participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to customers for Puerto Rico freight services.   In furtherance of the conspiracy, [Horizon], through certain of its officers and employees, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services.   During these discussions and meetings, agreements were reached to fix the rates and surcharges to be charged to customers for Puerto Rico freight services."

144.     The Information filed against Horizon on February 24, 2011, to which Horizon pleaded guilty, provides that "various corporations . . . participated as co-conspirators" with Horizon and that "from at least as early as May 2002 and continuing until at least April 2008 . . . [Horizon] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services."   Horizon admitted that the conspiracy was carried out by Horizon and its co-conspirators by:

(a) "participating in meetings, conversations, and communications in the United States to discuss customers, rates, surcharges, and bids for the sale of Puerto Rico freight services;

(b) agreeing during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreeing during those meetings, conversations, and communications to fix, stabilize, and maintain rates and surcharges charged to customers of Puerto Rico freight services;

(d) agreeing during those meetings, conversations, and communications to rig bids submitted to government and commercial customers of Puerto Rico freight services;

(e) engaging in meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed-upon rates and surcharges;

(f) selling Puerto Rico freight services at collusive and noncompetitive rates and surcharges pursuant to the agreements reached;

(g) accepting payment for Puerto Rico freight services at collusive and noncompetitive rates and surcharges; and,

(h) concealing the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

145.     At its arraignment hearing on March 15, 2011, Horizon entered its plea of guilty to this Information before Judge Daniel R. Dominguez in the United States District Court for the District of Puerto Rico.  Horizon stated on the record and under oath that it "wishes to enter a plea of guilty to the charges contained in the information," and that "we accept the Government's assertion of facts and state that there was a factual basis for these charges."

**Guilty Plea of Sea Star Line**

146.     On November 17, 2011, the Department of Justice issued a press release indicating that Sea Star had entered into an agreement to plead guilty to a one count felony violation of the Sherman Act for engaging "in a conspiracy to fix rates and surcharges for water transportation of freight between the continental United States and Puerto Rico from at least as early as May 2002, until at least April 2008."   Sea Star agreed to pay a criminal fine in the amount of $14.2 million.

147.     In its November 17, 2011 press release, the Department of Justice stated further that the charge to which Sea Star agreed to plead guilty provided that "Sea Star and its co-conspirators carried out the conspiracy by agreeing during meetings and discussions to allocate customers of Puerto Rico freight services and to fix the rates and surcharges to be charged to purchasers of water transportation of freight between the continental United States and Puerto Rico."

148.     In its guilty plea agreement filed December 19, 2011 in the United States District Court for the District of Puerto Rico, Sea Star admitted that "[d]uring the relevant period [defined as starting "at least as early as May 2002 and continuing through at least April 2008"], [Sea Star], through certain of its officers and employees, including high-level personnel of [Sea Star], participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the rates and surcharges charged to customers for Puerto Rico freight services.   In

74

furtherance of the conspiracy, [Sea Star], through certain of its officers and employees, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services.  During these discussions and meetings, agreements were reached to fix the rates and surcharges to be charged to customers for Puerto Rico freight services."

149.     The Information filed against Sea Star on November 17, 2011, to which Sea Star has pled guilty, provides that "various corporations . . . participated as co-conspirators" with Sea Star and that "from at least as early as May 2002 and continuing until at least April 2008 . . . [Sea Star] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services."  Sea Star admitted that the conspiracy was carried out by Sea Star and its co-conspirators by:

(a) "participating in meetings, conversations, and communications in the United States to discuss customers, rates, surcharges, and bids for the sale of Puerto Rico freight services;

(b) agreeing during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreeing during those meetings, conversations, and communications to fix, stabilize, and maintain rates and surcharges charged to customers of Puerto Rico freight services;

(d) agreeing during those meetings, conversations, and communications to rig bids submitted to government and commercial customers of Puerto Rico freight services;

(e) engaging in meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed-upon rates and surcharges;

(f) selling Puerto Rico freight services at collusive and noncompetitive rates and surcharges pursuant to the agreements reached;

(g) accepting payment for Puerto Rico freight services at collusive and noncompetitive rates and surcharges; and,

(h) concealing the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

150.     At its allocution hearing on December 19, 2011, Sea Star entered its plea of guilty to this Information before Judge Daniel R. Dominguez in the United States District Court for the District of Puerto Rico.

**Guilty Plea of Crowley Liner**

151.     On August 1, 2012, the Department of Justice issued a press release stating that Crowley had agreed to plead guilty to a felony violation of Section One of the Sherman Act for its role in this conspiracy.  "Crowley Liner Services engaged in a conspiracy to fix base rates for water transportation of certain freight between the continental United States and Puerto Rico from as early as January 2006 until at least April 2008."  Crowley agreed to pay a criminal fine in the amount of $17 million.

152.     In its August 1, 2012 press release, the Department of Justice stated further that "Crowley Liner Services and co-conspirators carried out the conspiracy by agreeing during meetings and discussions to fix the base rates to be charged to non-government purchasers of water transportation of certain

freight between the continental United States and Puerto Rico. . . .  Crowley Liner Services and co-conspirators also engaged in meetings for the purpose of monitoring and enforcing adherence to the agreed-upon rates and sold Puerto Rico freight services at collusive and noncompetitive rates. . . .  By agreeing to fix prices for coastal shipping services to and from Puerto Rico, Crowley Liner Services and its co-conspirators thwarted the competitive process by forcing consumers to pay inflated rates for these services."

153.     In its plea agreement filed July 31, 2012 in the United States District Court for the District of Puerto Rico, Crowley admitted that "[d]uring the relevant period, [Crowley], through at least one of its officers, within high-level personnel of [Crowley], participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the base rates charged to non-government customers in particular contracts for certain Puerto Rico freight services.  In furtherance of the conspiracy, [Crowley], through at least one of its officers, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services.  During these discussions and meetings, agreements were reached to fix the base rates to be charged to non-government customers in particular contracts for certain Puerto Rico freight services."

154.     The Information filed against Crowley on July 31, 2012, to which Crowley pled guilty, provides that "[f]rom at least as early as January 2006 and continuing until at least April 2008, the exact dates being unknown to the United

States, [Crowley] and its co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by agreeing to fix base rates for certain Puerto Rico freight services.  The combination and conspiracy engaged in by Defendant and its co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among [Crowley] and its co-conspirators, the substantial terms of which were to suppress and eliminate competition by fixing base rates for certain Puerto Rico freight services."

155.    Crowley admitted in its guilty plea that the conspiracy was carried out by Crowley and its co-conspirators by:

(a) participating in meetings, conversations, and communications in the United States to discuss base rates for the sale of certain Puerto Rico freight services to non-government customers;

(b) agreeing during those meetings, conversations and communications to allocate non-government customers of certain Puerto Rico freight services between and among the conspirators;

(c) agreeing during those meetings, conversations, and communications to fix, stabilize, and maintain base rates charged to non-government customers of certain Puerto Rico freight services;

(d) agreeing during those meetings, conversations, and communications to rig bids submitted to non-government customers of certain Puerto Rico freight services;

(e) engaging in meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed-upon base rates;

(f) selling certain Puerto Rico freight services at collusive and noncompetitive base rates pursuant to the agreements reached;

(g) accepting payment for certain Puerto Rico freight services at collusive and noncompetitive base rates; and

(h) concealing the conspiracy and conspiratorial contacts through various means, including private e-mail accounts.

156.     At its allocution hearing on July 31, 2012, Crowley entered its plea of guilty to this Information before Judge Daniel R. Dominguez in the United States District Court for the District of Puerto Rico.

**Indictment of Frank Peake (Sea Star)**

157.     On November 17, 2011, the Department of Justice announced that former Sea Star President Frank Peake had been indicted by a federal grand jury in San Juan, Puerto Rico for conspiring with competitors to fix rates and surcharges for Puerto Rico freight services from at least as early as late 2005 through April 2008 in violation of Section 1 of the Sherman Act.   Peake is charged with carrying out the conspiracy with co-conspirators by:

(a) participating in meetings, conversations, and communications in the continental United States and Puerto Rico to discuss customers, rates, surcharges, and bids for the sale of Puerto Rico freight services;

(b) agreeing during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreeing during those meetings, conversations, and communications to fix, stabilize, and maintain rates and surcharges charged to customers of Puerto Rico freight services;

(d) agreeing during those meetings, conversations, and communications to rig bids submitted to government and commercial customers of Puerto Rico freight services;

(e) engaging in meetings, conversations and communications for the purpose of monitoring and enforcing adherence to the agreed-upon rates and surcharges;

(f) selling Puerto Rico freight services at collusive and noncompetitive rates and surcharges pursuant to the agreements reached;

(g) accepting payment for Puerto Rico freight services at collusive and noncompetitive rates and surcharges; and,

(h) authorizing and consenting to the participation of subordinate employees in the conspiracy.

## The Department of Justice's Investigation is Ongoing

158.     In its August 1, 2012 press release, the Department of Justice stated that Crowley's guilty plea "arose from an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the coastal water freight transportation industry."

159.     During the January 16, 2009 telephonic hearing with Judge Corrigan (Tr. at 18-19, 23)[1] in the individual criminal cases involving the Puerto Rico trade lanes, the lead lawyer for the Department of Justice, John Terzaken, made a number of statements on the record about the scope and status of the Department of Justice's investigation, as follows:

> "**What I can offer on the record this morning . . . is that there are numerous other individuals and entities who remain to be prosecuted for the charged offense that's currently pending against these defendants.**"

160.     At the May 12, 2009 sentencing hearing before Judge Corrigan in the United States District Court for the Middle District of Florida, lawyers for the

---

[1] The transcript was attached to a March 10, 2009 memorandum filed by Crowley in MDL 1960 [Docket No. 291].

Department of Justice repeatedly stated that there were a number of additional co-conspirators, both corporate and individual, that remained to be charged in the ongoing criminal investigation.  (See also May 4, 2009 Department of Justice briefs.)

## AFFIDAVITS OF ALEXANDER CHISHOLM (SEA STAR)

161.      In affidavits dated November 9, 2009 and March 10, 2010, that were filed with the MDL 1960 Court [Docket Nos. 540 and 696], Chisholm (former Sea Star Assistant Vice President of Yield Management) testified to his role in and first-hand knowledge of the price-fixing and customer allocation conspiracy involving Puerto Rican cabotage.   Chisholm testified that he "personally witnessed the Puerto Rican Cabotage cartel," that he "first became aware of the Puerto Rican Cabotage conspiracy in 2003, soon after I began working for Sea Star as a full-time employee," and that he has "personal knowledge of the exchange of pricing among Sea Star and its competitors."  (11/9/09 Affidavit ¶ 3, Docket No. 540.)

162.      Chisholm testified that "[a]s a pricing manager at Sea Star . . . . I oversaw pricing for approximately one third of Sea Star's customers on the Puerto Rico trade route, and I personally oversaw and calculated pricing for dozens of Sea Star's House Accounts, which are the company's largest Puerto Rican Cabotage customers."  Chisholm testified that "Sea Star's House Accounts were subject to Sea Star's price-fixing conspiracy."  (11/9/09 Affidavit ¶¶ 7-8, Docket No. 540.)

163.     Chisholm testified further that "Sea Star fixed the prices of accounts on the Puerto Rican trade routes whether or not they were House Accounts."   "Price-fixing the House Accounts impacted almost all pricing within each shipping category – i.e., non-vessel operating common carrier, retail, reefer, and not-in-container accounts – because the prices set for high volume House Accounts were always lower than the prices set for other, smaller customer accounts.   Consequently, Sea Star's agreements on pricing with its competitors inflated the prices of shipping services on nearly all Puerto Rican trade routes." (11/9/09 Affidavit ¶¶ 9-10, Docket No. 540.)

164.     Chisholm further testified that "Sea Star's Puerto Rican Cabotage customers paid artificially inflated surcharges, including bunker and intermodal surcharges, the values of which were also set based on price-fixing agreements among Sea Star and its competitors."   "Despite minor differences in the actual surcharges imposed by each Defendant, most of Sea Star's Puerto Rican Cabotage customers paid surcharges based on Sea Star's published announcements, which were issued after Sea Star reached agreements with its competitors on these rates."   In sum, Chisholm testified that "Defendants' conspiracy affected prices and surcharges across the board . . . ."   (11/9/09 Affidavit ¶¶ 12-13, Docket No. 540.)

165.     In a Supplemental Affidavit dated March 10, 2010, Chisholm clarified his initial affidavit by stating that Sea Star used the term "Hall of Fame accounts" and not "House Accounts."   (3/10/10 Affidavit ¶ 7, Docket No. 696.)

Chisholm reiterated his testimony that he has "personal knowledge based on my participation in the conspiracy . . . that defendant **Sea Star fixed prices with defendants Horizon and Crowley**." (Id. ¶ 5; emphasis added.)

## ADDITIONAL ALLEGATIONS REGARDING THE CONSPIRACY

### (a)    The Structure of the Puerto Rico Cabotage Market Facilitated the Conspiracy

166.    Ocean transport is a highly effective method for moving large quantities of nonperishable goods, perishable goods, and raw materials. The major commodities shipped through domestic ocean shipping include manufactured goods, food products, coal, crude petroleum, refined petroleum products and chemicals.

167.    The domestic ocean trade involved in this action is Puerto Rican cabotage, the noncontiguous ocean trade between ports in the continental United States and Puerto Rico.

168.    The Merchant Marine Act of 1920, 46 U.S.C. § 100, et seq., commonly referred to as the Jones Act, grants an exclusive privilege to certain U.S. flag vessels to engage in ocean shipping of merchandise or goods to or from U.S. territories, possessions, or non-contiguous states. This law is restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels from engaging in this trade.

169.    The purpose of the Jones Act is to protect American ocean shipping companies, but its restriction on the carriage of domestic ocean cargoes to U.S.-made, U.S.-flagged, predominately U.S.-crewed, and U.S.-owned ships,

combined with the relatively small size of these trade routes, has resulted in a heavily concentrated market on the Puerto Rico trade lane served by only four carriers.   According to a May 2006 report prepared by the Maritime Administration of the Department of Transportation ("MARAD"), the Puerto Rico trade lane is "concentrated."   (2006 MARAD Report at 46.)   The Puerto Rico cabotage market has a Herfindhal-Hirschman Index ("HHI") in excess of 2800.   A market with an HHI of 2500 or above is considered to be "highly concentrated" under the Horizontal Merger Guidelines of the U.S. Department of Justice and the Federal Trade Commission issued August 19, 2010 (at 19).

170.     The Jones Act provides no antitrust immunity to Defendants for collusion, customer allocation, bid-rigging or price-fixing, and the conspiracy at issue in this Complaint is illegal under Section 1 of the Sherman Act, 15 U.S.C. §1.

171.     During the conspiracy period, the Puerto Rican cabotage market was served by four carriers: Horizon Lines; Sea Star; Crowley; and Trailer Bridge.  The high degree of concentration facilitated the anti-competitive conduct at issue herein, as it made it easy for the limited group of carriers to reach agreement on customer allocation, bid-rigging, and prices, and to monitor adherence to their illegal agreement.

172.     Domestic ocean shipping services within the Puerto Rico trade route are fungible because carriers offer essentially the same service: transportation of cargo from a specified origin to a destination within a certain

time frame.  Crowley and Trailer Bridge are tug-barge carriers that compete amongst themselves and with the steamship/liner carriers Horizon and Sea Star. The 2006 MARAD Report stated that the "barge carriers are effective competitors to self-propelled vessels for much of the liner traffic between the U.S. Mainland and Puerto Rico," and that "[s]ince Puerto Rico is only about 1,000 miles from the U.S. Mainland, barge operators compete effectively with self-propelled operators."  (2006 MARAD Report at 34, 43.)

173.    The MARAD Report stated that the demand for ocean freight services is derived from the demand for the products purchased in Puerto Rico and is "price inelastic."  This means that increases in the Defendants' and their co-conspirators' prices for cabotage services – here artificially set at non-competitive levels by the conspiracy – will not cause a material decrease in the demand for those services.  The Defendants and their co-conspirators have recognized that they have a captive demand for their services in Puerto Rico as they carry cargo that is "vital to the basic needs" of the island and they provide a "lifeline for consumer staples and durables" for the island, such as food, clothing, shelter and other essentials.  (See, e.g., Horizon 8-K April 29, 2009; Horizon Presentation to Investors at Morgan Keegan Conference on September 17, 2009.)

174.    John McCown, CEO of Trailer Bridge, stated in a March 7, 2005 interview that "Puerto Rico is an island economy where the large majority of what

4 million people eat, wear, drive or otherwise buy comes to them by a vessel . . . we and our competitors move just about everything that goes to Puerto Rico."

175.    There are no viable economic substitutes for the cabotage services provided by the Defendants and their co-conspirators for moving cargo between the United States and Puerto Rico.  Shipping heavy, bulky goods via air freight is prohibitively expensive.   The lack of viable economic substitutes or alternatives to Defendants' ocean transport facilitated the conspiracy that is the subject of this action, because it enabled the Defendants and their co-conspirators to set supra-competitive prices without fear that customers could switch to other alternatives.

176.    Absent this conspiracy, the Defendants and their-co-conspirators would largely have competed on price for the business of purchasers of Puerto Rico cabotage.  They did not do so.  The MARAD Report stated that while overall demand is price inelastic or not price sensitive, "the elasticity of demand for the shipping services of an individual ocean carrier may be quite high."  (2006 MARAD Report at iv-v.)  This means that customers are and were price sensitive in their selection of a carrier from among the Defendants and their co-conspirators.   The carriers likewise have admitted that their customers purchase their services primarily based upon price.  For example, Trailer Bridge stated in its 10-K for 2007 (at 4, 8-9), "[t]he Company believes that price is the primary determinant in the freight lanes in which it serves" and "that Puerto Rico shippers select carriers based primarily upon price."

177.     There are substantial barriers to entry into the Puerto Rican cabotage market which facilitated the conspiracy.  These barriers to new entry include insulation from foreign-flagged, foreign-built, predominately foreign-crewed, and foreign-refurbished vessels.  John McCown, CEO of Trailer Bridge, stated in a March 2005 interview that the Puerto Rico cabotage market has "extraordinary barriers to entry."

178.     The conspiracy was also facilitated by the movement of a significant number of senior executives between and among the Defendants and their co-conspirators.  For example,

(a)     admitted conspirator Peter Baci was formerly employed at Crowley and had been the supervisor of conspirator Tom Farmer before Baci moved to Sea Star;

(b)     Frank Peake was formerly the head of Horizon's Alaska trade lane division (which competes with Defendant TOTE—Sea Star's affiliate – where Shapiro was, inter alia, in charge of pricing) before he became COO of Sea Star in July 2003;

(c)     Neil Perlmutter was formerly employed by Horizon in Strategic Planning before he became the Senior VP Finance of Sea Star in November 2004, then later became the VP Finance for Crowley Maritime in August 2011;

(d)     Alexander Chisholm was formerly employed by Crowley before he became a Pricing Director at Sea Star;

(e)   Mike Nicholson was a Crowley pricing director before he moved to Sea Star as a Pricing Director under Peter Baci;

(f)   Carl Fox had been employed by Crowley, then became VP Sales for Sea Star from 2003-2010, and is now back with Crowley;

(g)   David Miskowiec was formerly employed by Crowley (a co-worker with Baci and Farmer) before becoming VP Sales for Trailer Bridge;

(h)   Ev Trout, director of Saltchuk, and Bill Deaver, President of TOTE, were former Sea Land (predecessor of CSX and Horizon) executives. and,

(i)   Ralph van Dijk, Trailer Bridge's Vice President of Pricing, and Ralph Heim, Trailer Bridge's President and COO, had also formerly worked for Crowley.

**(b)   Further Allegations of Anti-Competitive Behavior**

179.   As evidenced by the above discussion of the corporate guilty pleas, individual guilty pleas, the criminal sentencing record, the affidavits of Chisholm, and information and materials provided by admitted conspirators discussed in detail above and below, beginning at least as early as May 2002 and continuing until at least April 2008, the Sea Star Defendants and their co-conspirators engaged in a continuing agreement, combination, and conspiracy to restrict competition by allocating customers, rigging bids, and fixing the rates, surcharges, and other fees paid by Plaintiffs for Puerto Rican cabotage.

## Sea Star/TOTE/Saltchuk and Horizon Agreements at the Park Hotel

180.      In early April 2002, Navieras, the fifth carrier on the Puerto Rico trade (then in bankruptcy), agreed to sell its assets to Sea Star.  Navieras owned four steamships and offered three weekly sailings to Puerto Rico, two from Jacksonville, FL and one Philadelphia, PA.  During April 2002, after the sale agreement was announced, Sea Star's President Mike Shea repeatedly told Sea Star's customers and the trade press that Sea Star intended to add the Navieras ships to its fleet and combine the three (3) Navieras sailings with Sea Star's two (2) sailings (from Jacksonville, FL) to offer a total of five (5) sailings.  By agreement among the conspirators, that did not happen.

181.      Chuck Raymond, CEO of Horizon (then called CSX Lines), publicly stated in early April 2002 that Horizon was also interested in bidding on the Navieras vessels.  But the only bid submitted was by Sea Star.

182.      On April 24, 2002, senior officers, principals, and agents of Sea Star, TOTE, and Saltchuk (including Baci and Shapiro) met with senior officers of Horizon (including Serra, Gill, Neil Perlmutter, and Joe McKenna) at the Park Hotel in Charlotte, North Carolina (right across the street from where the headquarters of Horizon were then located).  This meeting was organized by Shapiro, Robert Magee and Mark Tabbutt on behalf of Saltchuk/TOTE and by Raymond for Horizon.

183.      The objective and result of this meeting was to carve up the Puerto Rico steamship business, including the Navieras business, ships, and

sailings that Sea Star had agreed to and was about to purchase.  At this Park Hotel meeting, Sea Star/Saltchuk and Horizon agreed on major reductions of ship capacity, major reductions in the number of sailings, and orchestrated a division of the available ship sailings, including in particular to/from Jacksonville. Handwritten notes of the agreement prepared by Shapiro were initialed by Serra, Baci, and Shapiro.  Shortly after the meeting, the Horizon attendees were told to destroy these written notes.  As a result, no copies of these notes now exist in Horizon's files. Kevin Gill, however, retained a personal copy.

184.     Per the agreement reached with Horizon at the Park Hotel, Sea Star/Saltchuk acquired the four Navieras ships, scrapped three of the ships, and dropped its announced plans to continue with the three Navieras weekly sailings to Puerto Rico.  In return for Sea Star agreeing to buy and beach three of the Navieras ships and to drop all of the Navieras sailings, Raymond agreed (1) to buy the fourth ship from Sea Star for more than $5 million, and (2) to give Sea Star access to Horizon ships from all the ports served by Horizon at rock bottom rates, including from Jacksonville, FL and from two ports Sea Star did not serve (Houston, TX and Elizabeth, NJ).  Raymond told Gill that Horizon had agreed to buy the Navieras ship from Sea Star because Horizon "needed to have some skin in the game."

185.     The Park Hotel meeting resulted in an agreement to divide up the steamship business for the entire Puerto Rico trade in terms of ship capacity, ports, sailings, and market shares.  The agreements reached at the Park Hotel

meeting had to be and were approved at the highest levels of Saltchuk/TOTE and Horizon, including by Shapiro, Robert Magee, and Mark Tabbutt for Saltchuk.  Significantly, the two companies (Horizon and Sea Star) and three of the executives involved with the Park Hotel meeting (Baci, Serra, and Gill) pled guilty to the conspiracy and have admitted that the conspiracy started at least as early as May 2002.

186.     Days after the Park Hotel meeting, Raymond complimented his negotiating team for their success in reaching this agreement with Sea Star, calling it a "tremendous outcome" that set the stage for a "spectacular financial recovery."

### "The Illegal Operational Agreement" between Sea Star and Horizon

187.     Upon information and belief, it also was at this meeting that the "illegal operational agreement" was reached between Serra and Shapiro, as described by Baci in his Pre-Sentence Memorandum, which lead to direct and immediate coordination on rates, surcharges, customers, market shares, and market division.  At the Park Hotel meeting, when some attendees were taking a break, Shapiro (in front of Perlmutter) warned Gill, "Don't you f--k this up."   Gill understood Shapiro to mean that Gill had "better play ball" on rates with Baci.

188.     Less than a month after the Park Hotel meeting, Baci and Gill met in the Horizon Lines corporate apartment in Charlotte, NC to coordinate and orchestrate in full blown fashion the details of the conspiracy to fix rates for classes of trade and customers, surcharges, and customer allocation.

189.    On multiple occasions up through the arrival of Frank Peake at Sea Star in July 2003, Shapiro, on behalf of TOTE and Saltchuk, regularly visited Sea Star's offices in Jacksonville, FL to supervise and direct Sea Star management to address pricing in the Puerto Rico market, that is, to get Sea Star's prices up.  Baci had a "heavy dotted-line" reporting relationship to Shapiro during this period.   Before the conspiracy started in April/May 2002, Shapiro repeatedly criticized Sea Star managers for failing to work with their competitors to address the long, ongoing rate decline in the Puerto Rico trade.   Shapiro repeatedly touted the "Alaska model" where TOTE and Horizon each had about of half of the Alaska trade and there was price stability.   Shapiro repeatedly approached a Sea Star sales executive to direct that he find a partner at Horizon to work with on rates.  When rebuffed, Shapiro told this sales executive that if he "was too damned stupid to figure it out, I'll find someone else."   Shapiro did find someone else – Peter Baci.

190.    Shapiro repeatedly dressed down Baci and others for being "dumber than dirt" for not being able to raise rates.  Shapiro asked Baci why he never talked to Sea Star's competitors.   Baci clearly understood that Shapiro wanted him to coordinate rates with Sea Star's competitors and Baci did so. Indeed, Shapiro asked Baci to arrange lunch meetings with Baci's counterparts (and co-conspirators) Tom Farmer at Crowley and David Miskowiec at Trailer Bridge, and these meetings went forward.   Shapiro had already met Gill at the Park Hotel meeting, where he had told Gill not to "f--k up" the agreement.

Shapiro was fully aware of and endorsed Baci's rate and customer coordination with Gill, and he simply told Baci that he needed to be careful about concealing these discussions from others within Sea Star.

191.    Shapiro told Baci that he and Serra had agreed to divide the steamship trade out of Jacksonville on a 50/50 basis between Sea Star and Horizon, and that Baci was to implement and manage that agreement with Gill— his counter-part at Horizon.   In mid-September 2002, for example, Baci made notes of Shapiro's instructions on the 50/50 market split with Horizon.   All of Shapiro's actions to initiate and implement this conspiracy on the Puerto Rico trade were done as an officer, director and/or actual and apparent agent of Saltchuk and TOTE.

192.    On June 26, 2003, Shapiro, continuing to act on behalf of TOTE and Saltchuk, met with Gabe Serra at a Dallas-Fort Worth, TX airport hotel for four hours.  Shapiro had arranged the meeting after Serra had complained to him that Sea Star should be getting its rates up.  Shapiro called Serra and said he wanted to meet Serra in an off-site location. Serra was in Dallas for other meetings within Horizon.  Serra understood that Shapiro wanted to have a secret meeting to discuss competitive matters.  As a result, Serra switched hotels and went to stay at the Omni Hotel just to meet with Shapiro.  Serra brought with him a list of pricing issues prepared by Gill.  Shapiro and Serra met for 4 hours, but Shapiro did not want to get bogged down in the details of pricing to specific customers.   Instead, Shapiro wanted to focus on the division of the steamship

trade to Puerto Rico between Sea Star and Horizon.  At this meeting, Shapiro and Serra agreed to divide the steamship trade between Florida and Puerto Rico on a 50/50 basis between Sea Star and Horizon.  Shapiro noted that TOTE and Horizon on the Alaska trade lane had similar shares, stable prices, and that their competition had been amicable and profitable.  Baci and Gill (later Glova) were tasked with implementing this agreement.  There were, thereafter, numerous meetings, emails, and communications between Sea Star and Horizon on this 50/50 agreement.

193.    During their meeting, Serra gave Shapiro a "gripe list" pointing to "problematic" Sea Star rates with specific customers.  Throughout the conspiracy, the conspiring carriers (Sea Star, Horizon, and Crowley) frequently met or talked in order to address and resolve such "gripes" arising from perceived instances of "cheating" on the conspiracy.  Upon information and belief, Serra and Shapiro agreed not to compete on price, engage in rate wars, or target one another's customers.

### Crowley's Admitted Participation in the Conspiracy

194.    Crowley's role in this conspiracy is far broader than the conduct to which it pled guilty on July 31, 2012.  Crowley's participation in the conspiracy started at least as early as May 2002, Crowley's agreements with its co-conspirators included fixing of base rates, fuel surcharges, and other surcharges, and Crowley's agreements directly targeted a wide spectrum of customers and classes of trade including all Plaintiffs.

195.    During the course of this six-year conspiracy, through phone calls, meetings, faxes, and emails, Tom Farmer of Crowley had numerous communications and agreements with Baci at Sea Star, Gill and Glova at Horizon, and also David Miskowiec at Trailer Bridge, on broad rate increases for classes of trade, specific customer rates, and fuel and other surcharges.

196.    In May 2002, Baci wrote down a small group of important phone numbers that he wanted to have accessible.  Those numbers included Tom Farmer of Crowley, Kevin Gill of Horizon, David Miskowiec of Trailer Bridge, and the Seattle numbers for Leonard Shapiro.  From the early days of the conspiracy in May 2002 through April 2008, Baci had multiple and regular conversations and agreements with Tom Farmer of Crowley about customers, rates at customers, rates for broad classes of trade, and Crowley's detailed shipping volumes.  For example, Farmer provided both Baci and Glova with detailed breakdowns of Crowley's current and proposed rates and surcharges for Plaintiff Sears for its principal points of cargo origin in advance of a major contract renewal for Sears in November 2006.

197.    Upon information and belief, Farmer also had had close communications with Ed Pretre, who came over to Sea Star from Navieras after Saltchuk bought Navieras' assets in or about April 2002.  A lot of Crowley information and agreements on rates and customers came to Horizon through Tom Farmer's communication with the Sea Star conspirators.

198.     Upon information and belief, Farmer was informed of the Horizon and Sea Star agreement reached at the Park Hotel shortly after it occurred.  Crowley knowingly became a party to the conspiracy and aided in its execution.  Farmer knew that Crowley could aggressively increase prices without fear of counter-attack from either Sea Star or Horizon.  Farmer, Baci, Gill, and later Glova all regularly communicated and agreed to fix rates and surcharges to classes of trade and to specific customers at increased levels.  Farmer told Baci that he was having similar discussions with David Miskowiec, the Vice President of Sales at Trailer Bridge.  (Miskowiec, like Baci, had also worked with Farmer at Crowley.)

199.     During the six-year conspiracy, Farmer and Baci reached agreements on general rate increases (including reefers, FAK tiers, tanks, used cars, and others), rates to specific customers, and rigging bids (including purposefully higher bids).   Baci and Farmer also reached agreements on increasing bunker fuel surcharges, and on adopting and increasing port security surcharges and intermodal fuel surcharges, discussed in more detail below.

200.     During the six-year conspiracy, Farmer and Baci regularly communicated about rates to customers whose contracts were up for renewal, including, but not limited to, Plaintiffs Procter & Gamble, ConAgra, Sears, Payless ShoeSource, Coca-Cola, Caribbean Refrescos, PepsiCo/Frito-Lay, Baxter, Nestlé, ATEC, and others.

201.    Baci, Gill, and Glova reached agreements with Farmer of Crowley on general rate increases, customer specific rate increases and contract bids, bunker fuel surcharges, intermodal fuel surcharges, port security charges, and other matters.

202.    During the six-year conspiracy, while Gill and Glova relied heavily on Baci's communication channel with Tom Farmer, both Gill and Glova also had frequent direct communications and agreements with Farmer relating to rates to broad classes of trade, fuel and other surcharges, and rates to specific customers.   Gill had transitioned Glova into the communication channel with Farmer by January 2006, and Glova had phone calls and a meeting with Farmer shortly thereafter.   When he was introduced into the conspiracy, Glova's boss, Serra, also told Glova that Horizon talked with Crowley about customers, rates, bids, and surcharges.

203.    Glova spoke to Farmer usually a couple of times a week and each conversation typically involved rates and surcharges for a couple of customers.   Whenever a major customer contract came up for renewal, Glova would coordinate with Baci and Farmer on what the carriers would agree to do with rates and surcharges.   Glova also coordinated with Farmer on FAK tier rates and reefer rates.   Glova and Baci also coordinated with Farmer to orchestrate bids so that losers would submit plausible but non-winning bids and protect the pre-determined winner.

204.     After Gill introduced Glova to the conspiracy by early January 2006, Glova hit the ground running.  For example, in the last week of January 2006, Glova was agreeing with Baci at Sea Star and Farmer at Crowley on the conspirators' rate quotes to Plaintiff P&G.  Baci provided Glova with Sea Star's detailed proposed rate sheet for P&G, as well as its internal analysis of Crowley's and Horizon's rate offers to P&G.  Farmer also provided Glova with Crowley's proposed rates for P&G's Fairburn and Augusta, GA routes.  Farmer and Glova also provided Baci with Crowley's rates and Horizon's rates for P&G.   On January 28, 2006, Baci sent a Gmail to Glova explicitly coordinating in detail Sea Star and Horizon's bids to P&G.  In his email, Baci asked what Horizon planned to do with bunker fuel, intermodal fuel, port security, and other surcharges because "this is important to bottom line calculation."  Baci advised that Horizon was below Sea Star on the Fairburn, GA route where Sea Star is "primary." Baci also noted that Horizon had room to increase rates on the Augusta, GA route because Sea Star was so much higher.  P&G's rates were carefully rigged by Sea Star, Crowley, and Horizon.

205.     Farmer actively conspired and agreed with Gill and Glova (and Baci), during the course of the six-year conspiracy, on rates and surcharges in general (such as FAK and reefer rates) and on rates, surcharges, and bids for specific customers.  Documents confirm during the 2006-2008 period, that Farmer and Glova discussed and agree on rates/bids for many customers including Plaintiffs ATEC, Baxter Healthcare, Coca-Cola, ConAgra, ITL, Nestlé,

New York Export, Payless, PepsiCo/Frito-Lay, P&G, Sears and YRCW, among others.

206.    Glova's Day-Timers for 2006 reveal an enormous volume of communications between Crowley, Sea Star, and Horizon in furtherance of this conspiracy.   These Day-Timers reflect frequent and detailed conspiratorial communications that Glova had with Tom Farmer of Crowley and Peter Baci of Sea Star about customers, current and proposed rates to customers, customer specific rate increases, broad rate increases (e.g., for reefers), plans for rate increases in 2007, increases in fuel surcharges and intermodal fuel surcharges, detailed volume numbers, cell and home phone numbers, rate setting meetings, etc.

207.    Starting in 2006, Glova appears to have averaged about 10 communications a month with Tom Farmer of Crowley in furtherance of the conspiracy.   Some examples of Glova's communications with Crowley in early 2006 (shortly after he had been brought into the conspiracy by Gill and Serra) are:

(a)    On January 18, 2006 Glova noted calls with Peter Baci ("Peter Lighthouse") and Tom Farmer ("Tom Lighthouse"), using Baci's personal email address name                         ) as cover;

(b)    On January 25, 2006, Farmer gave Glova his cell and home phone numbers;

(c)     On January 26, 2006, Glova called Farmer regarding tariff access and rates at Dow Chemical and H&H;

(d)     On January 30, 2006, Glova called Farmer at Crowley regarding rates for Coca-Cola; and

(e)     On February 2, 2006, Glova called Tom Farmer regarding rates at Office Max, Coors, and Exxon.

208.     Many other documents confirm that Farmer actively conspired and agreed with Gill and Glova (and Baci), during the course of the six-year conspiracy, on rates and surcharges in general and as to rates, surcharges, and bids for specific customers.  The purpose and effect of these innumerable rate exchanges and discussions between Farmer, Baci, Gill, and Glova, such as the sampling below, was to reach agreements on broad increases in rates, on increases on rates and surcharges to specific customers, and to rig bids:

(a)     In June 2002, Crowley provided its rates to Horizon for its bid to P&G;

(b)     In January 2003, Farmer provided Gill with Crowley's rates for Baxter;

(c)     In April 2004, Gill provided Karen Haines with detailed Crowley rates for Bac Plas, Inc.;

(d)     In June 2004, Gill knew that Crowley was going to customers with full 10% rate increases and full bunker fuel surcharge increases;

(e)     In December 2004, Gill provided Crowley's rates for Coca-Cola to Haines;

(f)     In April 2005, Crowley provided Horizon with its rate offer to Elizabeth Arden;

(g)     In April 2005 Haines had detailed Crowley rates for Cargill;

(h)     In May 2005, Gill and Farmer discussed Horizon's rates at Interra;

(i)     In July 2005, Farmer told Gill that Crowley was raising Packers Provisions rates by $250;

(j)     In July 2005, Gill gave Serra Crowley's rates for AJC and Interra;

(k)     In August 2005, Farmer discussed with Gill the new approach that Grune brought to Crowley, i.e., that Crowley intended to aggressively increase rates, including getting reefer rates up $300 a unit; that it would be taking other rates up at least 10%; and, that it would seek floating intermodal fuel surcharges;

(l)     In September 2005, Farmer told Gill that Crowley would adopt, the following week, major changes to Crowley's intermodal fuel surcharges and aggressive increases in those surcharges;

(m)     In September 2005, Farmer told Gill that Grune had issued marching orders to get rates up, and Farmer gave Gill very high assurances

regarding the details of Crowley's rates to AJC (a major NVO house account of Horizon) and that Crowley would be higher than Horizon's rate offer;

(n)     In January 2006, Gill told Glova to call Farmer to get Crowley's rates for a toy retailer and stated it would be a good ice breaker for Glova;

(o)     In January 2006, Farmer gave Glova rates for KB Toys and other customers.   Farmer also discussed with Glova Crowley's general rate increase plans for 2006, including $150 increase per container, minimum rates by container size, bunker fuel and intermodal add-ons, security and port surcharges;

(p)     In February 2006, Farmer provided detailed Crowley rates to Glova for Coca-Cola Bottlers;

(q)     In March 2006, Farmer and Glova discussed Crowley's proposed rate increases for Kraft;

(r)     In April 2006, Glova analyzed proposed rates from Crowley and Sea Star for Plaintiff YRCW;

(s)     In May 2006, Farmer emailed Glova the username and password for logging into Crowley's tariff web site—information Glova had been seeking for some time;

(t)     In May 2006, Glova prepared notes for/of a meeting with Farmer on reefer rate increases, FAK rates, and certain customers and their rates;

(u)     In August 2006, Farmer and Glova discussed Crowley's reefer plan for 2007, including an increase in reefer rates by $300 and discussed specific reefer rates for numerous major NVO customers due for renewal, including ITL and New York Export. Farmer and Glova also discussed Crowley's plan to increase bunker fuel surcharge;

(v)     In September 2006, Farmer provided Glova with Crowley's detailed customer contract log;

(w)     In September 2006, Farmer gave Glova Crowley's rates for distributor V. Suarez and Baci also provided Glova with Sea Star's rates for V. Suarez;

(x)     In October 2006, Farmer and Glova discussed rate increases for 2007, proposed rates with bunker fuel surcharges for Nestlé, surcharges for Coca-Cola, and rates for Goya, ADM, Interra, Caribbean Restaurants, and other customers.  Glova also had a printed spreadsheet with Crowley's current and proposed rates for Coca-Cola, noting that Crowley will add intermodal surcharges, that tank rates would increase $150, and that bunker fuel would be adjusted quarterly;

(y)     In November 2006, Farmer provided Glova with detailed Crowley rates for Nestlé's major points of origin for 2007;

(z)     In November 2006, Farmer provided Glova with Crowley's detailed printed pricing proposal to ConAgra for 2007 and with Crowley's pricing to Coca Cola;

(aa)    In December 2006, Farmer and Glova discussed rates for ATEC (along with Sea Star), Coca-Cola, ConAgra, and other customers;

(bb)    In January 2007, Farmer and Glova discussed Crowley rates to Ballester Hermanos;

(cc)    In February 2007, Farmer provided Glova with Crowley's rates for Mistolin Caribe;

(dd)    In March 2007, Farmer gave Glova Crowley's rates for Baxter, ATEC, and other customers.  Farmer and Glova also discuss Pfizer and Johnson & Johnson.  Farmer also sends Glova Crowley's Pricing Proposal for Kraft;

(ee)    In April 2007, Farmer provided Glova with Crowley's rates for Grande, Bacardi, Hills Pet Food, Toys R Us, and other customers;

(ff)    In April 2007, Farmer provided Glova with rate offers by Crowley to Office Max and Payless;

(gg)    In April 2007, Glova and Baci also exchanged emails about fixing the rates for Pfizer and J&J.  The next day, Farmer faxed Crowley's detailed  proposed rates for Pfizer to Glova;

(hh)    In May 2007, Farmer gave Glova Crowley's printed rate proposal for Kraft and Crowley's rates for Ashley Furniture and Office Max. Glova gave Farmer Horizon's rates for Armour;

(ii)    In July 2007, Farmer and Crowley discussed proposed rates for P&G and routes on which bidding and not bidding;

(jj)     In August 2007, Farmer and Glova discussed rates to specific customers like P&G and Del Monte and broad reefer rate increases;

(kk)     In September 2007, Farmer provided Glova with Crowley's rates for dry cargo for its major reefer customers up for renewal, including ITL and New York Export;

(ll)     In September 2007, Farmer gave Glova Crowley's rates for Bumble Bee and its reefer rates for major NVO customers AJC and Interra;

(mm)   In October 2007, Farmer gave Glova Crowley's rates for Coca-Cola;

(nn)    On October 8, 2007, Glova obtained from Farmer Crowley's rates for Coca-Cola, ConAgra, and Goya. Glova provided Farmer with Horizon's rates to the Caribbean Shippers Association (including Transnow/New York Export) and Western Auto;

(oo)     In November 2007, Farmer and Glova discussed their rate plans for 2008;

(pp)     In November 2007, Farmer gave Glova Crowley's proposed rate increases for Nestlé for 2008 including its printed rate proposal, and they discussed bids to Nestlé;

(qq)     In December 2007, Farmer provided Glova with Crowley's rate sheet for ATEC; and,

(rr)     In late March 2008, Farmer provided Glova with Crowley rates to Oatka.

209.   When Greg Glova took over Kevin Gill's role in the conspiracy for Horizon in December 2005, he actively used the Horizon-Crowley line of communications established by Tom Farmer and Gill.  In addition to hundreds of calls between Glova and Tom Farmer from December 2005 to April 17, 2008, there were, upon information and belief, a number of in-person meetings between Glova and Farmer, as detailed below:

(a)   Glova first met with Farmer in early 2006, shortly after taking over Gill's role as Horizon's Director of Marketing & Logistics for Puerto Rico. Glova traveled to Jacksonville for the meeting, the purpose of which was to assure Farmer that Glova understood his role in the conspiracy and that the transition from Gill to Glova would be as "seamless" as possible;

(b)   It appears that Glova may have met with Farmer on May 2, 2006 and again on May 18, 2006.  On May 18, Glova and Farmer discussed topics including reefer and FAK rates, rates for specific customers, and intermodal fuel surcharges;

(c)   Glova and Farmer appear to have met in Jacksonville in October 2006;

(d)   Glova and Farmer appear to have met for breakfast in Jacksonville on January 19, 2007;

(e)   Glova and Farmer appear to have met in Jacksonville on March 26, 2007; and

(f)     Farmer may have traveled to Charlotte for a meeting with Glova on August 15, 2007.

210.    Based on information provided by admitted conspirators and documentary evidence, Farmer's boss at Crowley for a large portion of the conspiracy from June 2005 through 2008, Rob Grune, also regularly spoke and met with Baci's boss at Sea Star, Frank Peake, Gill and Glova's boss at Horizon, Gabe Serra, as part of the conspiracy.   Based on information provided by an admitted conspirator, Peake and Grune regularly met for breakfast during this period.   Serra (Horizon), Grune (Crowley), Robert Magee (TOTE/Saltchuk), and John McCown (CEO of Trailer Bridge) met and were photographed together at the October 25-26, 2005 Puerto Rico Summit II in Jacksonville, FL.

211.    Grune (Crowley) and Serra (Horizon) met and/or had meals together in San Juan, Orlando, and Jacksonville starting before April 2006 and running through the end of the conspiracy, including, but not limited to, on April 11, 2006; July 12, 2006; January 8, 2007; June 21, 2007; September 16, 2007; and April 1, 2008.  When Serra forwarded his email with Grune about meeting for dinner in April 2006 to Gill and Glova, he asked them to "smile and delete" his email because of concerns about evidence of collusion.   Grune repeatedly assured Serra that Crowley wanted to see rates and surcharges increase and that Crowley would behave "responsibly" on rates to avoid price wars and seek rate increases along with Horizon.   As a result, Serra reported to Horizon management in April 2006 that Grune had given him "positive signals" on pricing

and that Crowley had followed up on those signals by more responsible actions at the negotiating table, i.e., Crowley was adhering to the conspiracy's push to raise rates and surcharges.

212.     Shortly before the FBI raid, Serra flew from San Juan to Orlando on March 31, 2008 solely to meet with Grune on April 1, 2008 in Orlando to discuss pricing to certain customers and avoiding a price war.   This meeting came about because Grune had confided to Frank Peake (President of Sea Star) that Grune was upset with certain Horizon pricing actions.  Peake discussed this with Serra. Serra was also upset with certain Crowley pricing actions.   Peake contacted Serra, and even offered to attend a 3-conspirator meeting between Grune, Serra, and Peake, to help mend fences and keep rate peace in the trade. At their April 1, 2008 meeting in Orlando, which occurred at a Starbucks in a strip mall, Serra and Grune exchanged detailed pricing information on customers. Grune and Serra also reached an agreement that Grune would allow Serra to take some Crowley business to make up for some business lost.  In April 2008, after meeting with Grune of Crowley in Orlando, Serra told Glova and Haines (at Horizon) that Crowley would not decrease its pending offer with Caribbean Restaurants

213.     On April 9, 2008, Grune emailed Horizon's President John Keenan to see if they could get together for a meal in Dallas (where Keenan worked).   Grune and Keenan agreed to meet for dinner in Dallas, TX on the evening of April 17, 2008.  Serra prepped Keenan for this meeting with Grune.

Grune cancelled the meeting after the Department of Justice and FBI raided Crowley's offices on the morning of April 17.

214.    Upon information and belief, Rob Grune also frequently met with Frank Peake of Sea Star, including over breakfast.  For example, Grune and Peake met over breakfast at the 3rd Street Diner in Jacksonville on January 25, 2007.

215.    Starting at least as early as 2003, Horizon was also coordinating rates with Crowley on the Puerto Rico trade through Chuck Raymond's communications with Thomas Crowley, Jr., Chairman of the Board, President, and CEO of Crowley Maritime.  Raymond (CEO of Horizon) would call and/or meet with Crowley Jr. to bring to his attention instances where Crowley was not fully adhering to the price-fixing and customer allocation conspiracy so that Crowley Jr. would bring his executives back into line.  For example, in early May 2003, Raymond directed Gill to prepare a list of pricing actions taken by Crowley that Horizon perceived had cost Horizon business in the Puerto Rico trade lane "for his meeting with Tom Crowley, Jr. [during the] week of 5/5/03."  Raymond did meet with Crowley Jr. during the week of May 5, 2003 in Washington, D.C.  Likewise, on April 1, 2008, Raymond asked Glova to prepare a list of pricing topics that he could discuss with Tom Crowley, Jr.  Raymond met with Crowley Jr. at the April 9, 2008 meeting of the Transportation Institute in D.C. and, the night before at the April 8 dinner for just the "Domestic Liner Council"—which consisted entirely of Raymond, Tabbutt (Chairman of Saltchuk), and Crowley Jr.

These were just two of several meetings between Raymond and Crowley Jr. for which Gill, and later Glova, provided Raymond with materials for pricing discussions with Crowley Jr.

### Further Allegations re Saltchuk's Active Participation in the Conspiracy

216.     After Sea Star President Mike Shea resigned in December 2002, Robert Magee stepped in as Chairman and CEO of Sea Star even though he continued to work in the Seattle, WA offices of TOTE/Saltchuk as an officer, director and/or agent of TOTE and Saltchuk.  In early February 2003, Magee, John Keenan (then Horizon Lines' Vice President of Sales and Marketing), Serra, and at least one other person met over a round of golf in Puerto Rico where they "had a discussion on some rate issues and trade practices."

217.     Frank Peake left Horizon to become Chief Operating Officer of Sea Star in July 2003, and then President in November 2004.   Based on information from admitted co-conspirators, Peake and Serra (Horizon) regularly communicated by phone, in person, and by email to agree on rates, surcharges, and customers and to resolve pricing or market division/allocation issues between Sea Star and Horizon that Baci and Gill/Glova could not.  For example, in June 2005, Peake emailed Serra about a Sea Star customer that was visiting Horizon to make sure that any rates offered by Horizon were not close to Sea Star's rates.  Serra responded "do you have any doubt we'll hold the line?"  In September 2005, Peake emailed Serra he was going to have contract "negotiations" with a customer that Sea Star shared with Horizon.  When Serra

  
asked about Peake's use of the term "negotiations," Peake responded that he was just being "politically correct."  In other words, the conspirators purported to engage in "negotiations" with customers, but such negotiations were a sham as the rates and the winners were agreed to in advance by the conspirators.

218.    Tom Cowan, a former Senior VP for Pacific-North America for CSX Lines then Senior VP Marketing of CSX Lines (the predecessor of Horizon Lines), who had had responsibility for the Alaska trade lane of CSX Lines, had been retained by Raymond as a consultant to and "facilitator" for Horizon to communicate with Sea Star, TOTE, and Saltchuk.  Cowan also just happened to be a consultant for TOTE and Saltchuk.  On February 26, 2003, Cowan called Gill (Horizon) and told him he had talked to Raymond as part of his consulting role for Horizon, and that Raymond told Cowan to ask Gill for Sea Star's rates to two large retail customers on the Puerto Rico trade in preparation for a meeting Cowan was going to have the following day with Robert Magee in Seattle, WA (where TOTE and Saltchuk are headquartered).  Cowan resided in Seattle. Raymond wanted Cowan to pass along this customer pricing information to Magee as an example of how Sea Star's market approach had been hurting Horizon and needed to be corrected.

219.    On February 27, 2003, Raymond stopped by Gill's office to see if Tom Cowan had called Gill to get this Sea Star rate information.  Gill told Raymond that he gave Cowan the requested customer pricing information.

Raymond expressed satisfaction and told Gill: "Good, I wanted Tom to pass that along to our good friends in Seattle."

220.     On February 28, 2003, Cowan called Gill and said he had met with Magee (and another person--either Shapiro or Tabbutt) of TOTE/Saltchuk about the two customers and the pricing issues.  Magee said he would "make sure those old practices [like NPR pricing (a reference to price competition by Navieras in the decade before May 2002)] would stop."  Cowan told Magee "to focus on better business practices, including their pricing approach to the market."  Magee told Cowan that Horizon was pushing too hard to increase bunker fuel surcharges to $250 (announced on February 19, 2003) and that Horizon should focus on getting rates up instead as fuel prices may come down. Magee also told Cowan that there had been a meeting in Puerto Rico two weeks earlier over a round of golf involving Magee, John Keenan (then Horizon VP Sales and Marketing), Serra (Horizon), and another person during which they discussed similar "rate issues and trade practices."

221.     On February 28, 2003, Gill and Serra discussed the conversations Gill had had with Cowan.  Serra told Gill he would try to set up another meeting between Horizon and Sea Star/Saltchuk in Florida in mid-March 2003, and was going to call Cowan to see who could come out from Saltchuk. Serra told Gill he was going to mention it to Raymond as well.  Gill expressed to Serra his concerns about engaging in this illegal conspiratorial behavior.

222.     Not only was Tom Cowan a paid consultant for Horizon during the conspiracy period, he was also a paid consultant and agent for TOTE, Sea Star, and Saltchuk at the same time.  Both Horizon and Sea Star/TOTE/Saltchuk viewed Cowan as "facilitator" of their communications between the upper management of Saltchuk and Horizon on vessel/trade lane capacity, rates, market "stability," and other competitive issues.

223.     On June 17, 2003, Magee (who held many positions within the Saltchuk companies) wrote a handwritten note on his personal TOTE note paper addressed to "Chuck" [Raymond, the CEO of Horizon] to pass on shipping data regarding Crowley on the Puerto Rico trade lane that he had verified with 2 of 3 carriers outside Sea Star.  The attached analysis, prepared by Baci, showed gains in market share for Sea Star and Horizon during the period after their agreement at the Park Hotel.  Magee wrote that "[i]f we conclude that the share enjoyed by [Crowley] is too high," there are various target customer groups they could go after, including Sears, K-Mart, Frito-Lay, and Nestlé.

224.     On December 11, 2003, Horizon CEO Raymond sent a handwritten note to Serra, Gill, and others within Horizon on Raymond's personal note stationary as Chairman of Horizon.  Raymond wrote that he "had a recent discussion with the Saltchuk folks, telling me Len Shapiro is moving from an employee of TOTE to the Board of Saltchuk."  Raymond stated that "I was reassured that this has no impact whatsoever on their Corporate pricing philosophy."  Raymond was clearly telling Serra and Gill that the price collusion

between Sea Star and Horizon on the Puerto Rico trade lane, previously coordinated by Shapiro for TOTE/Saltchuk, would continue as before.  At the top of his note, Raymond wrote, "Please read and destroy."   Raymond knew Horizon's rate collusion with Saltchuk on the Puerto Rico trade was illegal and wanted the evidence of his conduct destroyed.

225.    Magee (Sea Star, TOTE and Saltchuk) continuously urged the other carriers in the Puerto Rico trade to avoid rate competition and to raise their rates.  Magee repeatedly called on Defendants and their co-conspirator to more effectively collude and manipulate the market.  These invitations to collude were agreed to and followed by the conspirators.  For example, on August 21, 2003, Magee made a presentation to the trade at the Puerto Rico Summit in Jacksonville, FL bemoaning the consistent decline in rates on the Puerto Rico trade from 1992 to 2002, laying out market shares, and urging the need to increase rates by $900 a container or 50%.

226.    On February 9, 2004, Sea Star issued a press release containing a Magee letter to the Puerto Rico trade lauding the 11% rate increases obtained in 2003, but clearly urging his competitors that they must continue to raise rates another 22%.

> The Puerto Rico trade needs investment in ships, cranes, terminals and rolling stock. What has prevented asset rebuilding is that freight rates were driven to all time lows by a long rate war that drew owner equity out of the market.  Lately, there are signs of recovery.  In 2003, rates rose by 11 percent.  They need to rise another 22 percent to provide returns adequate to support asset renewal.

227.     Magee reiterated his insistence that the Puerto Rico carriers avoid price wars and raise rates in his speech at the April 11-12, 2005 Domestic Maritime Conference hosted by the Journal of Commerce in Hilton Head, SC. Magee criticized himself and senior management at the other carriers for earlier price wars that caused rates to fall more than 40%.  Magee stated it was time for the carriers to have a run of rate growth in Puerto Rico.  Also at the April 2005 JOC conference, John Douglass of Crowley reported on average rate increases from 2002 to 2004, growth in inland costs, and current net to vessel revenue per load SB and NB.  The trade had their rate benchmarks and their marching orders to get rates up.

228.     On March 10, 2004, Raymond (CEO of Horizon) faxed Magee and Mark Tabbutt (the President of Saltchuk).  Later that day, Magee responded to Raymond also by fax (copying Tabbutt), writing: "Trust me . . . reading anything into this is more than we all deserve."  Magee attached a February 10, 2004 TOTE 6.6% increase in its fuel surcharge for the Alaska trade and a February 13 identical 6.6% fuel surcharge increase by Horizon for the Alaska trade.

229.     In mid May 2004, Cowan participated in a meeting in Orlando, Florida on behalf of Saltchuk/TOTE, along with Peake, Baci and Bates of Sea Star, to discuss with Horizon executives Serra, Gill and Perlmutter, the status of contract negotiations between Sea Star and Horizon for slot charter agreements.

These agreements (starting with the Park Hotel agreement) enabled the companies to manipulate rates and capacity on the trade.

230.     On June 22, 2005, Serra emailed Raymond that he had learned from Frank Peake that Sea Star was thinking of bringing a third ship into the Puerto Rico trade.  The third ship was a TOTE vessel that Saltchuk wanted to move from Alaska and put into the Puerto Rico trade.  Serra reported to Raymond that he had advised Peake that bringing in additional capacity "would unconstrain the market and put pressure on the high-end rates" and "be very expensive" to the Defendants and their co-conspirators.  Serra asked Raymond to "emphasize our feeling that their actions are putting at risk the huge strides we've made in making this trade profitable for BOTH" in an upcoming "outing" (likely golf) that Raymond was going to have with Sea Star/Saltchuk on Sunday (June 26).

231.     On July 26, 2005, Raymond met Magee in Washington, D.C. Raymond told Magee that Saltchuk's introduction of the TOTE ship into the Puerto Rico trade would risk the good progress that had been made on the trade. Magee said Horizon and Sea Star need to share more equally in the benefits going forward.

232.     On August 19, 2005, Magee (TOTE/Saltchuk) sent Raymond (Horizon) a lengthy email justifying Saltchuk's desire to bring the TOTE ship into the to Puerto Rico trade out of Jacksonville.

233.     In mid-October 2005, Peake reported to the senior management team of Sea Star that Raymond had approached Magee about vessel deployment and capacity issues and that Raymond and Keenan were to meet with Magee and Tabbutt (President of Saltchuk) on October 26, 2005.

234.     On October 14, 2005, Raymond emailed Mark Tabbutt (cc Magee) continuing to argue against Saltchuk's deployment of the third ship, stating that over the period from May 2002 through today the Puerto Rico trade has "stabilized."

235.     Magee and Tabbutt met with Raymond and John Keenan in Ponte Vedra, FL on October 26, 2005 to continue to discuss capacity issues on the Puerto Rico trade lane and Horizon's concerns that the introduction of additional capacity by Saltchuk (the 3rd ship) would cause their conspiracy, that had effectively generated higher rate and profit for the carriers, to fall apart and cause rates to decline.  Upon information and belief, Raymond also raised with Magee and Tabbutt that Sea Star had been engaging in some irresponsible pricing behavior.

236.     On October 25-26, 2005, Tabbutt and Magee were in the St. Augustine area to attend the JAXPORT Puerto Rico Summit II at the Renaissance World Golf Village Resort.  Magee had a group photograph taken with co-conspirators Serra (Horizon), Grune (Crowley), and McCown (Trailer Bridge) at this event.



Taking part in the Jacksonville Port Authority's Puerto Rico Summit II
(L to R) Gabe Serra – Horizon Lines, Robert P. Magee Jr. – Sea Star Line, Raul Alfonso
– JAXPORT, John D. McCown – Trailer Bridge., Robert B. Grune – Crowley Liner

237.    On October 28, 2005, Raymond emailed Magee (copying Tabbutt), that "Sea-Star's press release is very specific, commiting (sic) to 35 weeks per year.  This announcement surprises us and forces us to alternatives." Horizon was upset that Sea Star was announcing that it would introduce the additional ship (the El Faro) into the Puerto Rico trade, because adding capacity would inevitably lead to price competition for customers.   Serra called Peake about the press release and emailed Raymond about his discussion with Peake. Thereafter Raymond emailed Magee that "Bob--we are seeing and hearing something entirely different from Frank Peake than you are telling us."  Magee then called Raymond and Raymond emailed Serra that "Bob says Frank [Peake] is just negotiating."   Magee also emailed Raymond stating that nothing had

changed since their Ponte Vedra meeting.  Serra responded that Raymond's "involvement was needed, and may still be needed."

238.    Tom Cowan continued to be used as an "effective facilitator" between Magee and Tabbutt (President of Saltchuk) and Raymond and Keenan of Horizon to discuss pricing and capacity issues on the Puerto Rico trade. Cowan met with Magee and Tabbutt on November 14-15, 2005 to discuss Horizon's continuing and vehement concern that Saltchuk's adding a third vessel to the Puerto Rico trade would lead to Horizon cancelling their capacity sharing agreement, "would result in market share shifts," "require market share incursion and a strong potential for rate instability/erosion," and "trigger traditional and historical price pressures from other carriers in the trade."

239.    Cowan, as agent for TOTE and Saltchuk, met in Orlando with Peake and Serra to try to work out the differences on November 22, 2005. Cowan participated at the request of Bob Magee (Sea Star/TOTE/Saltchuk) and John Keenan (Horizon).

240.    Shortly after that, Magee and Tabbutt also met with Crowley executives on January 3, 2006.

241.    Saltchuk did have Sea Star add the third vessel, the El Faro, to serve the Puerto Rico trade out of Jacksonville in early 2006.  However, the ship was withdrawn after just 2 months of service.

242.    In May 2007, Horizon, Crowley, and Trailer Bridge all announced identical increases in fuel surcharges, but Sea Star did not.

Raymond sent an email to Magee criticizing him because Sea Star was not following the increase.  The following day Sea Star joined the increase.

243.    On November 2, 2007, Chuck Raymond (CEO) and John Keenan (President) of Horizon met Mark Tabbutt (Chairman of Saltchuk) for lunch in New York.  Keenan had coffee with Bob Magee (TOTE/Saltchuk) the following day.

244.    On March 2, 2008, Raymond and Keenan had dinner with Mark Tabbutt, Bob Magee, and Tim Engle of Saltchuk in Seattle, WA.  Tabbutt suggested the dinner be at Tabbutt's house because Tabbutt stated that "we certainly would avoid any raised eyebrows from a possible Alaska customer."

245.    In March 2008 Serra emailed Peake to complain that a major reefer/NVO customer had told Horizon (Serra and Keenan) that its rates were higher than Sea Star.  Serra said that it would be easy for Horizon to retaliate and that Peake needed to do a reality check. Peake responded that Sea Star had not cut rates to that customer, that he was offended by Serra's tone and implication, and that Peake assumed he had built up a level of trust with Serra based on "his/our performance in the market over the last 4 ½ years."  Peake said further that Magee is often told similar things by Sea Star customers, but that Magee relies on Peake to handle the "competitive element of the market," i.e., manage the conspiracy.

246.    On March 15, 2008 (one month before the FBI raids), Raymond and Gill discussed the possibility of Horizon serving Puerto Rico only from the

port of Jacksonville and dropping Horizon's service from the ports of Elizabeth, NJ and Houston, TX.  Gill told Raymond that he thought this would be too risky and that competitors might grab market share and customers from Horizon. Raymond assured Gill that it would be "all right" with Crowley and Sea Star/Saltchuk, because (1) he had just spent hours in a car with Tom Crowley, Jr. on February 7, 2008 driving to a ski trip in Aspen, Colorado, and (2) he also had had dinner meetings with Mark Tabbutt (now Chairman of the Saltchuk Board) in Renton, WA (where Saltchuk is headquartered) and Anchorage, Alaska. Raymond had received assurances from both Crowley Jr. and Tabbutt that they would not attack Horizon if Horizon moved to consolidate its Puerto Rico service down from 3 ports to 1 port.

247.     Tim Engle, the new President of Saltchuk, met with Rob Grune of Crowley in Ft Lauderdale, Florida on April 12, 2008. Bob Magee was also present.

248.     On April 15, 2008—just two days before the FBI raids—Serra (Horizon) had breakfast in San Juan with Peake, Magee, and Tim Engle, Saltchuk's new president.  The purpose of the meeting was to introduce Serra and Engle to one another.

249.     Bill Deaver, the Chief Operating Officer and later President of TOTE from 2000-2009 (which includes the conspiracy period), stated in a pleading filed in state court in King County, Washington in 2010 that TOTE and Saltchuk had engaged in "myriad . . . illegal activities and/or unethical practices .

. . some of which were under active government investigation."   Deaver clearly was referring to the illegal conspiracies by Saltchuk and TOTE to manipulate rates, surcharges, and customers on the Jones Act markets they served.

### Further Allegations regarding the Implementation and Documentation of the Conspiracy

250.      Baci (Sea Star) recorded Defendants' and their co-conspirators' pricing agreements in his numerous notebooks and annual Yield Plans, which he regularly consulted when (1) advising management of broad price increase plans for the upcoming year, and (2) advising his pricing managers as to the specific prices to charges to various customers.  When asked by a manager whether the pricing contained in his notebooks violated the antitrust laws, Baci said "not to worry because Sea Star had their backs."  Sea Star employees feared that if they deviated from the pricing agreed to by Baci, they would be summarily terminated from the company.  These threats emanated from the highest ranking officers of Sea Star and Saltchuk, including Shapiro.

251.      Baci's Yield Plans actually set forth the increases for rates and surcharges (and the schedule for such increases) for various equipment and classes of trade for the upcoming year that Sea Star had agreed upon with Crowley, Horizon, and Trailer Bridge (in whole or in part).  For example,

(a)      Baci's Yield Plan for 2004 reflected the following items agreed upon by Sea Star with Horizon, Crowley, and Trailer Bridge, in whole or in part: the carriers would (1) eliminate exceptions given to some customers to the floating bunker fuel surcharge; (2) increase the tier rates for FAK (freight all

kind) customers (such as Plaintiffs Arrowpac, SEFL, and YRCW) by 10% by May 15; (3) increase used car rates by $100 by February 1; (4) increase reefer (refrigerated containers) rates by $300 by September 1 (to customers such as Plaintiffs ATEC, ITL, and Transnow); (5) increase other contract rates by 10%; and, (6) increase tariff rates by $200 per 40' container.

(b)     Baci's 2005 Yield Plan likewise sets forth similar increases and schedules agreed upon among all the carriers, in whole or in part, for that year: the carriers would (1) continue to eliminate BSF exceptions; (2) increase tank rates $275 on January 1; (2) increase used car rates $50 and other cars (SUVs) $100 by February 1: (3) increase the Port Security Charge (PSC) by $25 a container by April 1; (4) increase tier rates 5% for FAK and 7.5% for cargo NOS (not otherwise scheduled) by May 15; (5) increase reefer rates by $300 by September 15; (6) increase 40' dry units tariffs for $150 by March 1; and (7) increase all other contract rates by 10%.

(c)     Baci's 2007 Yield Plan also reflects agreements with Crowley and Horizon, including agreements reached between Baci and Frank Peake for Sea Star and Glova and Serra for Horizon at their October 24, 2006 meeting at the Hyatt Regency hotel at the airport in Orlando FL, upon increases in reefers ($150), FAK tiers ($110), intermodal rate structures ($110 plus inland charges), and port security charges ($20).  The participants at this Sea Star-Horizon meeting also discussed issues relating to the implementation of their 50/50 Florida market share division agreement (including detailed review of

market share and customer data) and conspiracy enforcement issues relating to pricing to specific customers through a review of "hit lists."  Glova used a version of Baci's Yield Plan to prepare Horizon's 2007 Plan.

252.     In addition to regular contacts and agreements with Horizon and Crowley, upon information and belief, Baci (Sea Star) also had illegal discussions and agreements with David Miskowiec, the Vice President of Sales for Trailer Bridge.  Miskowiec had authority over Trailer Bridge's prices. Upon information and belief, Farmer told Baci that he also was having similar discussions with Miskowiec.  These discussions extended back at least as early as May 2002. Upon information and belief, Trailer Bridge participated in the conspiracy through at least David Miskowiec.  Baci, Farmer, and Miskowiec were well acquainted with each other having all worked at Crowley.  Upon information and belief, Baci and Miskowiec discussed on a regular basis rates for classes of trade (including, but not limited to, cars and not-in-container loads), rates for specific customers including, but not limited to, FAK customers (such as C&F Worldwide, Xpress Freight, and Magic), retail customers (such as Walgreens, Footstar, Sealy, and Serta), and fuel surcharges.  Trailer Bridge's rates, surcharges, and profits increased at the same dramatic rate as the other co-conspirators.

253.     Upon information and belief David Miskowiec, Vice President of sales for Trailer Bridge was placed on administrative leave for a period of time with respect to the conspiracy at issue in this Complaint.

254.     Defendants and their co-conspirators implemented their agreement by sharing pricing information and other competitively sensitive materials, including customer contract rate information that the carriers had agreed in those contracts were confidential and not to be disclosed to third parties.  On numerous occasions, the specific dates being known only to the conspirators, Horizon executives visited Sea Star offices for this purpose.

255.     Additionally, beginning in 2002 and continuing until at least April 2008, Baci met with his counterparts at Horizon to discuss pricing at so-called "TSA Meetings."  These meetings were ostensibly held to discuss buying container space in competitor vessels.  However, the meetings were often also used to discuss price-fixing.  The meetings took place on a quarterly, and sometimes monthly, basis.  The conspirators often used the term "TSA meetings" to conceal the real reason for meeting with competitors.

256.     On many occasions, the specific dates being known only to the conspirators, Defendants and their co-conspirators met at restaurants and hotels to discuss specifics of the conspiracy.

257.     For example, in January 2006, Baci (Sea Star) met with Gill and Glova (Horizon) at the Lodge Alley Inn in Charleston, SC to introduce Glova to Baci and the conspiracy.  Gill, Glova, and Baci reviewed in detail the allocation of customers among the conspirators, and discussed rates and the collusion process.  Baci and Glova had a second conspiracy meeting in Charleston, SC at the Holiday Inn at a later date.  Likewise, in 2007, Baci, Ed Pretre, and Chisholm

of Sea Star had a breakfast meeting at the University Diner in Jacksonville, FL with Tom Farmer of Crowley. On information and belief, at the end of the breakfast, Baci and Farmer discussed and exchanged pricing.

258. Upon information and belief, the Defendants and their co-conspirators coordinated over the contract renewal of every major customer. Crowley, Sea Star and Horizon exchanged their contract logs with customer volumes and contract expiration dates that enabled the conspirators to coordinate bid rigging for contract renewals. Typically, the conspirators allowed the established or largest volume carrier with a customer to be the "lead" or "driver" on rates with that customer and the secondary carriers would coordinate to overbid or not undercut. Glova and his pricing managers frequently marked up lists of the top volume customers to note which carriers had the "lead." There were customers where Sea Star, Crowley, and Horizon all shared business and the conspirators agreed to maintain their respective volume shares. As a result, they had to closely coordinate their rate bids as to each point of cargo origin so that each of the three conspiring carriers maintained its share.

259. Defendants and their co-conspirators also agreed to fix the prices charged for Puerto Rican cabotage to non-vessel operating common carriers ("NVO") and carriers of Freight of All Kinds ("FAK") and Cargo Not Otherwise Scheduled ("NOS"), which customers contracted for space on the carriers' vessels, such as Plaintiffs Arrowpac, ATEC, ITL, SEFL, Transnow/New York Export, and YRCW, at in-person meetings held every year in December or

earlier since 2002.  Sea Star and Horizon handled the vast majority of the NVO and FAK business.  Sea Star, Horizon, and their co-conspirators agreed to adopt a tier rate structure for NVO and FAK/NOS customers in late 2002 and thereafter agreed on the amount of the annual increases in those tier rates through 2008. In order to make it easier to push through these increases, Sea Star, Horizon, and their co-conspirators agreed that NVO/FAK contracts should (1) be for one year only and (2) expire at a common time (either in May or September) so that Defendants and their co-conspirators could more effectively fix and raise rates. These fundamental contract changes were implemented by agreement among the conspirators to facilitate their rate fixing.

260.    Contracts for Puerto Rican cabotage for most customers, including many of the Plaintiffs herein, are renewed annually.  During the relevant time, most NVO (non-vessel operating common carrier) and FAK (freight all kind) accounts were renewed in May, but the largest NVO/reefer accounts were renewed in September.  Since at least 2003, for most NVO and FAK accounts, the tier rates per unit for each port were posted on the internet in April for the current and following year.  Baci met with Gill or Glova in or before December every year to agree upon the increases of the NVO and FAK tier rates for the coming year.  Baci then provided certain Sea Star employees with the agreed-upon rates for the upcoming year and instructed them to publish these rates on the internet.  The NVO, FAK, and Cargo NOS tier rates increased by at least $100 per container every year through May 2008.  Upon information and belief,

Farmer of Crowley also participated in the fixing of FAK tier rates with Baci and Glova. For example, Famer emailed Baci Crowley's all-in FAK tier rates on April 17, 2006, and Baci then forwarded them to Glova on April 18, 2006.

261.    Defendants and their co-conspirators also conducted their conspiracy through the extensive use of e-mail. Sea Star, Crowley, and Horizon used email (and faxes) to exchange spreadsheets with customers' rates so that they could agree upon rates to be bid or used when renewing contracts with Plaintiffs and other customers. Defendants and their co-conspirators exchanged pricing information, often a daily basis, by e-mail.

262.    Defendants and their co-conspirators concealed these discussions by opening separate personal e-mail accounts outside of their companies under pseudonyms used to disguise their true identities. For example, Gill shared pricing information using Google e-mail accounts created under the names                    and                          (a former girlfriend), which accounts were later taken over by Glova. Baci emailed customer rate information using the name                        . Glova also emailed Farmer using either his Horizon email or his personal Yahoo email account

263.    Defendants and their co-conspirators used these non-company e-mail accounts to regularly fix the bids of Puerto Rican cabotage services to numerous customers, including Plaintiffs. For example, on January 23, 2006, Baci and Glova emailed (using the                    ' and                        Gmail

accounts) to discuss fixing the rates at Plaintiff Baxter, and Baci also advised Glova of his discussions with Farmer at Crowley about Baxter.  Another example, on November 26, 2007, Glova sent e-mails to Tom Farmer at Crowley using his Yahoo email account to exchange their rate information and to coordinate bidding on contracts for Plaintiffs PepsiCo, Frito-Lay, ConAgra, ATEC, and other customers.  Glova requested Crowley's current and proposed rates and indicated that Frito/Pepsi was most urgent.  Glova noted that Crowley was "lead" on ConAgra and several other customers.  Glova noted where Horizon was "lead" and gave Farmer Horizon's proposed rates.  Upon information and belief, they exchanged information about what rates Horizon and Crowley were going to bid and who was going to win the bid, and they subsequently used this information in the bidding and contract renewal process.  The purpose and effect of these e-mails was to fix prices and allocate these Plaintiffs and other customers among Defendants and their co-conspirators.

264.     Glova would frequently email Baci (Sea Star) Horizon's rate spreadsheets for customers, often titling his spreadsheets as "for PB", i.e., for Peter Baci.  For example, in January 2008, Glova e-mailed a spreadsheet titled "Office Furniture Market Analysis 1/18/08 for PB" to Baci, which detailed Horizon's pricing and surcharges on its office furniture accounts.  Sea Star analyzed these data and created its own spreadsheet to compare its own pricing with Horizon's, titled "Office Furniture Market Analysis 1/21/08."  Similarly, Glova emailed Baci a spreadsheet of Horizon proposed rates for Sara Lee/Hanes on or

about January 18, 2008 entitled "Sara Lee Hanes Rates 1-17-08 for PB."  Baci and Farmer likewise sent Glova rate spreadsheets for Sea Star and Crowley. The purpose and effect of such e-mails was to fix prices for and allocate these customers among Defendants and their co-conspirators.

265.    Defendants and their co-conspirators used their non-company e-mail accounts to fix the rates for their major customers.  They then used the rates fixed for their major customers to establish the rates to be charged to all other customers within the same category.  For example, the agreed-upon price for a major national retail customer would be used to fix the prices of smaller retail customers.

266.    Prior to establishing the personal e-mail accounts to secretly communicate, Defendants and their co-conspirators exchanged their pricing information by phone and/or fax.  These faxes were exchanged on a monthly, if not weekly, basis.  For example, Farmer faxed Crowley rates for Pfizer to Glova in April 2007.  The purpose and effect of this fax was to fix prices and allocate customers among Defendants and their co-conspirators.

267.    Defendants and their co-conspirators also agreed to rig bids for major national accounts.  These bids were rigged to ensure that rates were maintained at artificially high levels, and that each Defendant and their co-conspirators maintained an agreed-upon share.  Bids were often set during telephone conversations.

268.     Defendants and their co-conspirators fixed their prices for Puerto Rico cabotage services by sharing information either through e-mails, faxes, telephone calls, or in-person meetings for many accounts, specifically including, but not limited to, the Plaintiffs in this lawsuit.

269.     Defendants and their co-conspirators exchanged contract renewal rates that they intended to give customers for purposes of rigging bids, so that the rigged loser would quote a deliberately higher rate than the rigged winner – typically the "lead" carrier with that customer – so the lead carrier would win the renewal bid.

270.     For example, after Baci communicated with Gill, Glova or Farmer about proposed contract renewal rates for certain customers, Baci told his pricing managers, including Chisholm, Ed Pretre and Mike Nicholson, the rates at which to offer contract renewals.  Likewise Gill and Glova, after getting rate information from Baci or Farmer, would set the rates for customers to be used by their pricing directors, Karen Haines, Adriano Conti, and Thomas Lorenzo.  Similar instructions were given by the supervisors of the conspiracy at the offices of the other corporate Defendants and their co-conspirators to those employees actually implementing the conspiracy.  These quotes were not given to genuinely solicit business, but were instead used to conceal Defendants' illegal price-fixing conspiracy.

271.     As noted above, Chisholm has testified in his affidavits that, as a result of the agreements between Sea Star, Crowley, and Horizon to fix the rates

of their major accounts, their smaller customers also received inflated rates for their Puerto Rico cabotage services, because their rates were set even higher than those fixed for the major accounts.

### Monitoring and Enforcement of the Conspiracy

272.    The Defendants and their co-conspirators kept close tabs on the adherence of their conspirators to the conspiracy though careful review on the weekly volume data provided the PIERs, part of the Journal of Commerce. These data broke out unit volume by carrier and customer.  But those PIERs data did not come fast enough or (at times) accurately enough for the conspirators.  As a result, Baci, Farmer, Gill, and Glova regularly provided each other with their companies' volume data in real time (weekly).  These data allowed the conspirators to determine if there had been any shifts in volume or market share that would indicate a conspirator might be engaging in some "cheating" or competition in violation of the conspiracy.

273.    Defendants and their co-conspirators took measures to enforce the conspiracy.  "Who Shot John" was code for one such effort to police the implementation of agreed-upon pricing.  For example, Sea Star kept a running list of accounts where it lost volume, which it used for purposes of discussions with Defendants and their co-conspirators to ensure that each Defendant and their co-conspirators maintained its allocated customers and/or agreed-upon market share or volumes, despite occasional customer movement of volume from one company to another.  At their October 24, 2006 meeting, Baci and

Peake provided Glova and Serra with an email from Chisholm to Baci (cc Nicholson and Pretre) subject "Who Shot John," which summarized the combined input of the Sea Star's pricing managers on customer pricing issues they had with Horizon. Glova at Horizon likewise kept "Hit Lists" of accounts for discussions with Sea Star and Crowley to address perceived pricing issues.

274.    If pricing issues were not resolved by agreement between Baci, Gill/Glova, and/or Farmer, the issues would be bumped up the chain of command to be addressed and resolved by more senior executives such as Peake (Sea Star), Serra (Horizon), and Grune (Crowley).  On occasion, these pricing matters were elevated to the most senior levels of Sea Star/Saltchuk (Magee/Tabbutt), Crowley (Crowley Jr.), and Horizon (Raymond).

275.    After communicating with his competitor counterparts, Baci often instructed his pricing managers Chisholm, Ed Pretre, and Mike Nicholson that Sea Star would not offer competitive bids for particular customers since it "owed" a particular account to another Defendant due to deviations from their agreed-upon shares.  Gill and Glova did the same.

276.    Sea Star (Baci and Peake) and Horizon (Gill, Glova, and Serra) also regularly exchanged and met to discuss the steamship volume and market share data for cargo between the Florida ports and Puerto Rico as part of the implementation of their 50/50 market division agreement.  If the market shares became unbalanced, then Horizon and Sea Star would endeavor to fix that imbalance by agreeing on further customer or volume allocations.   They also

regularly reviewed and monitored volume data for particular customers as part of this process.

277.     When Sea Star lost volume or a customer and fell below the agreed upon shares, Horizon agreed to and did endeavor to make up the volume lost by Sea Star by allowing Sea Star to take an Horizon customer or some volume at some Horizon customers through further bid coordination at the next contract renewal.  Glova and Horizon referred to those customers as "sacrificial lambs."  Glova and his pricing managers would identify potential "lambs," and Peake and Serra would ultimately work out which lambs would be sacrificed.

**Further Examples of Rate Fixing**

278.     The Defendants and their co-conspirators agreed to impose annual increases on shippers (primarily NVOs) of refrigerated containers ("reefers"), including, but not limited to, agreed upon $300 increases per year per 40-foot reefer in September 2003, 2004, and 2005, and slightly smaller increases of $150 per reefer per year in September 2006 and 2007 – $1,200 per unit over 5 years.   These increases carried over to and impacted other classes of merchandise carried by NVOs and other customers, such as grocery store merchandise (GSM) and department store merchandise (DSM).  Impacted reefer shippers included, but are not limited to, such Plaintiffs as ATEC, ITL, Coca-Cola, ConAgra, Nestlé, PepsiCo, Transnow/New York Export, among others.

279.     The Defendants and their co-conspirators also agreed to fix and increase the rates for tank units at least several times during the conspiracy.  For

example, Sea Star, Crowley, and their co-conspirators agreed to raise rates for tanks by $275 per tank effective January 2005, by 8% effective February 2006, and by $100 per tank effective February 2007.

280.    Sea Star, Horizon, and their co-conspirators also coordinated and agreed upon the adoption and implementation of a tier rate pricing structure (with fixed rates depending on certain annual volume tiers) for FAK (freight all kinds), NOS (cargo not otherwise scheduled), and NVO (non-vessel operating common carrier) customers in 2002 taking effect in May 2003, and with coordinated rate increases in those tier rates in excess of $100 per 40 foot unit every year through 2008.  This pervasive tier rate coordination throughout the conspiracy directly impacted and increased the rates paid by many customers, including, but not limited to, by Plaintiffs Arrowpac, ATEC, ITL, SEFL, Transnow/New York Export, and YRCW, among others.

281.    The conspiracy broadly affected not only the base rates charged by the Defendants and their co-conspirators across dry units, refrigerated units, tanks, cars, and various classes of merchandise, but it also (as admitted by Horizon, Sea Star, and the individual conspirators) fixed and increased numerous surcharges imposed by the carriers.

### Fixing of Bunker Fuel Surcharges

282.    Defendants and their co-conspirators coordinated and agreed upon the implementation of increases in bunker fuel surcharges throughout the conspiracy.  For example, Bob Magee, acting on behalf of Saltchuk, TOTE, and

Sea Star, frequently communicated with Chuck Raymond, directly or through intermediaries, to agree upon and implement increases in bunker fuel surcharges as well as rates.

283.     Given that the Defendants and their co-conspirators (a) used different types of fuel (diesel in tugs versus bunker fuel in ships), (b) purchased in different locales (e.g., Houston, TX; Jacksonville, FL; and Elizabeth, NJ), and (c) that were used in vessels that had significantly different fuel consumption rates and/or distance to cover, the carriers' adoption of bunker fuel surcharge increases at the same times and in the same amounts cannot be explained except by the conspiracy.  Through their guilty pleas, Horizon and Sea Star have admitted that they and their co-conspirators agreed upon and fixed fuel and other surcharges at collusive and non-competitive levels.

284.     Since 2002, all of the carriers have changed bunker fuel surcharges, often within only a few days' notice, and the bunker fuel surcharges to Plaintiffs have been increased nearly simultaneously in almost the same amounts by each of Sea Star, Crowley, Horizon, and Trailer Bridge.  These surcharges often became profit centers for the conspirators.

285.     The timing and amount of the increases in bunker fuel surcharges was discussed in advance by the Defendants and their co-conspirators.   Defendants and their co-conspirators not only insulated themselves from rising fuel costs but, through their coordinated increases in bunker fuel surcharges, increased revenues and profit margins in a declining

market.   The imposition of a bunker fuel surcharge per container did not necessarily reflect actual costs incurred, because any increase in the cost of fuel consumed may be largely independent of the number of containers transported. Instead, the imposition of bunker fuel surcharge increases resulted in enhanced revenues and profits for the Defendants and their co-conspirators that increased as their bunker fuel surcharges increased and as freight volume decreased, as the SEC filings and quarterly webcasts of Horizon repeatedly confirm.   Horizon stated that twelve percent (12%) of its revenue in 2006 and 2007 was from fuel surcharges.   Upon information and belief, Sea Star enjoyed profits, or what it called "net fuel activity" (surcharges collected less actual fuel costs), from these fixed bunker fuel surcharges of about $4-5 million a year from 2004 through 2008.

286.     In August 2007, Sea Star and Horizon coordinated and agreed upon separating out and increasing bunker fuel surcharges for the ports of Houston, TX and Elizabeth, NJ from the surcharges for Jacksonville, FL.  Prior to that time, the carriers had used one bunker fuel surcharge number that applied equally to all ports.  Thereafter, customers using the non-Jacksonville ports paid even higher bunker fuel surcharges.

### Fixing of Intermodal Fuel Surcharges

287.     Defendants and their co-conspirators also coordinated and discussed the adoption and implementation of an intermodal fuel surcharge (surcharges for fuel for truck transport of freight from the customers' inland points

of origin to the ports) in/around May 2004.   Upon information and belief, Baci discussed the concept of breaking out and charging for intermodal fuel surcharges ("IFS") with Gill (Horizon) and Farmer (Crowley) before Sea Star moved forward. All the carriers thereafter adopted the IFS by mid-2004.   Prior to this time, the only fuel surcharge imposed by the carriers had been for bunker fuel.   This new surcharge would become very costly for customers.   The Defendants and their co-conspirators thereafter regularly coordinated broad increases in those intermodal fuel surcharges and adopted similar changes to their IFS systems.   The IFS, adopted by means of and a result of the conspiracy, imposed substantial additional costs on Plaintiffs.   For example, by December 2007, the Defendants were charging IFS on units shipped from South Carolina of about $240.

### Fixing of Port Security Charges

288.    Defendants and their co-conspirators discussed, coordinated and agreed upon the adoption and implementation of a port security surcharge and thereafter coordinated on a number of increases in those surcharges. Effective at the beginning of April 2003, Sea Star, Crowley, Horizon, and Trailer Bridge all for the first time imposed an identical $30 "Port Security Charge" per container.   This simultaneous imposition of the identical security fee was the result of the conspiracy between the Defendants and their co-conspirators. Thereafter, the Defendants and their co-conspirators discussed and agreed upon

the amount and timing of subsequent increases in the Port Security Charge to $50 in April 2004, to $75 in April 2005, and to $95 per container in April 2007.

**Further Allegations re Customer Allocation**

289.   Among many flagrant examples of the illegal conspiracy to fix prices and allocate customers is the conduct of the Sea Star, Horizon, and their co-conspirators towards Plaintiff ITL.   ITL's cargo consisted of refrigerated products that benefitted from the faster transit times offered by the liners of Sea Star and Horizon.   During the conspiracy, Baci and Peake for Sea Star and Serra, Glova, and Gill for Horizon repeatedly discussed and agreed upon significant increases in ITL's rates.   Further, Horizon agreed, as part of the conspiracy, not to carry any of ITL's refrigerated containers ("reefers") except at prohibitively high rates, thereby allocating ITL's reefer business to Sea Star. Horizon accomplished this allocation primarily by keeping its rate quotes to ITL significantly and consistently higher than Sea Star's rates.   For example, Horizon's contracts for 2004 through 2006 provided that it would carry only 3 ITL reefers a week, and only at rates that were more than $500 higher per reefer than the rates offered by Sea Star.  These Horizon contracts further provided that any additional ITL reefers carried by Horizon would be at rates at least another 20% higher than Horizon's already prohibitive rates for the first 3 reefers.  Co-conspirators maintained a keen interest in Sea Star's pricing to ITL, and repeatedly pressed it to further increase ITL's rates.  With Horizon's collusion,

Sea Star was able to raise ITL's rates so high that ITL could no longer continue to profitably operate.

290.     In October 2005, Peake informed ITL via letter that Sea Star would no longer ship ITL's (newly refurbished) 45' reefers on its vessels effective September 19, 2006.   Sea Star contemporaneously apprised Horizon of its decision not to accept ITL 45' reefers going forward.   Both Horizon and Sea Star wanted to eliminate ITL as a 45' reefer NVO and they did so through their coordinated rate manipulation.   The same month that Sea Star introduced its own 45' reefers into service, Horizon Lines began offering shipments on its own newly acquired 45' reefers.   ITL was forced to sell off its entire 45' reefer fleet at a substantial net loss.

### Further Allegations regarding Capacity Manipulation and/ or Suppression and Maintaining Stable Market Shares

291.     Defendants and their co-conspirators also increased rates to supra-competitive or artificially high levels by, among other things, agreeing to carry each other's containers when demand intensified.   Absent this agreement, Defendants and their co-conspirators would have increased their own capacity. For example, after Sea Star acquired Navieras' vessels in 2002, Sea Star beached three of the ships (took them out of service) and discontinued the Navieras' service out of Philadelphia, PA, and Jacksonville, FL, and, in return, Horizon provided Sea Star with a very low cost slot charter arrangement on its vessels out of Elizabeth, NJ; Jacksonville, FL; and Houston, TX.

292.     Upon information and belief, Defendants' and their co-conspirators' conspiracy, starting at least with the 2002 agreement to pull the Navieras ships from serving the Puerto Rico trade lane, also involved agreements aimed at stabilizing capacity and maintaining market shares.  As a result, the Defendants and their co-conspirators were able to keep their market shares stable throughout the conspiracy period, including from 2005 to 2008 when market volume declined almost 20%.  Trailer Bridge estimated the 2003 market shares of the Defendants and their co-conspirators on the Puerto Rico trade lane as follows: Horizon 35%, Crowley 32%, Sea Star 20%, and Trailer Bridge 13%.  (MARAD Report at 46.)  Four years later, Trailer Bridge estimated (in its 10-K for 2007 filed March 28, 2008) market shares for 2007 which indicate that shares remained basically unchanged as follows: Horizon 34 %, Crowley 31%, Sea Star 21%, and Trailer Bridge 14%.

293.     On February 24, 2006, during its 2005 fourth quarter earnings webcast, Horizon's CEO Raymond stated:

**We are comfortable with our share and we are comfortable with the assumption that our rates are going to continue to grow there on a reasonable basis going forward.**

294.     On July 28, 2006, during Horizon's 2006 second quarter earnings call, Horizon Executive VP John Handy stated:

**All competitors have reacted responsibly to the economic slowdown in Puerto Rico by taking an estimated 15% tonnage decrease so far this year**.

295.     On Horizon's March 2, 2007 earnings call, Raymond stated the

carriers were all reducing capacity:

> **I think the way we would answer that is it looks like all the carriers were pretty responsible in terms of tonnage in the trade last year**.  As the market softened, we of course withdrew a vessel for a period of time.  I think 1 or 2 of the barge lines did the same.  One of the other competitors, Sea-Star, actually pulled a vessel out.
>
> The available capacity more represented the demand in the marketplace and as a result of that, the pricing I don't think suffered.  **I believe we're still gaining in terms of real dollar increases in our prices in Puerto Rico.  I don't see that stopping.  I believe we still have a little bit of a ways to go there.**

296.     During Horizon's April 26, 2007 earnings call, John Handy, then

Executive Vice President of Horizon. stated:

> **In terms of a competitive update in light of those revenue and volume comments, overall market shares in all the trades remain very, very stable.  Puerto Rico carriers, as we've mentioned before, have continued to withhold seasonal tonnage due to that slow economic growth. We're doing the same thing.**

In this call, Raymond also stated:

> **I think number one, we have stability.   The supply-demand relationship in the trades is stable.**

297.     During Horizon's July 27, 2007 earnings call, Raymond stated:

> **Let me again emphasize that our business is characterized by stable markets with only a handful of competitors.  …  And fortunately, we haven't seen major market share rating (sic--raiding) as a solution to earnings softness.  We in particular can point to our market shares in the trades where we compete as being stable.**

298.     The Defendants and their co-conspirators did not waiver from their conspiracy in the face of the dramatic decline in volume on the Puerto Rico trade starting in 2005.  Total volume on the Puerto Rico trade declined almost 20% from 2004 to 2008.  Instead, the Defendants and their co-conspirators remained "responsible" on rates and disciplined in not cheating on the conspiracy in any substantial way to take customers.  As market volumes contracted, the conspirators' communications at the highest levels with the carriers increased to prevent cheating, price wars, and "rocking the boat."  As a result, Defendants' market shares remained stable, and rates continued to artificially soar.

### Further Allegations re Opportunities to Conspire (that were used)

299.     Sea Star, Crowley, Horizon, and Trailer Bridge have participated in trade association activities that fostered the conspiracy that is the subject of this action. Sea Star, Crowley, Horizon, and Trailer Bridge have all been members of the Maritime Cabotage Task Force ("MCTF"), which was founded on September 27, 1995, ostensibly to protect the U.S. maritime cabotage laws.  The MCTF's Board of Directors has included Chuck Raymond of Horizon and senior executives from the other carriers.    The MCTF enable Defendants to communicate in person with the other carriers and to exchange pricing and other competitive information directly or under the guise of benchmarking exercises

300.     The most senior executives of Saltchuk, Crowley, and Horizon would also meet in Washington, D.C. as Directors of a trade association/lobbying group called the Transportation Institute.  There were and are only 3-4 other

members of the Board of this association/group.   At these meetings, Mark Tabbutt of Saltchuk, Tom Crowley, Jr. of Crowley, and Chuck Raymond of Horizon would discuss Jones Act issues, but, upon information and belief, they would also discuss trade lane issues, including pricing issues.  For example, on May 1, 2003, Gill provided Raymond, at Raymond's request, with a list of pricing issues with Crowley that Raymond could discuss with Tom Crowley, Jr. at a meeting he was going to have during the week of May 5.  Raymond met with Crowley Jr. at the Transportation Institute meeting in D.C. on May 6, 2003 and likely for dinner the night before.  Likewise, on April 1, 2008, Raymond asked Glova to prepare a list of pricing topics that he could discuss with Tom Crowley, Jr.   Raymond met with Crowley Jr. at the April 9, 2008 meeting of the Transportation Institute in D.C. and, the night before, at the April 8 dinner for just the "Domestic Liner Council"—which consisted entirely of Raymond, Tabbutt, and Crowley.  This "Institute" and "Council" provided a perfect forum for the most senior executives of the Defendants to discuss key competitive issues and they did so.

301.     The senior executives of the Defendants, their co-conspirators, and their delegates regularly communicated by phone, in person, by facsimile, and through email to facilitate, implement, and monitor this conspiracy. Defendants and their co-conspirators routinely exchanged among themselves confidential information about customer contracts (often by way of email with

attached spreadsheets) to facilitate their bid rigging, rate fixing, and customer allocation.

302.     In forming and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

(a)     agreeing to allocate customers of Puerto Rican cabotage;

(b)     rigging bids to customers for Puerto Rican cabotage;

(c)     fixing rates, surcharges, and other fees for Puerto Rican cabotage;

(d)     marketing and selling Puerto Rican cabotage at agreed-upon prices;

(e)     exchanging confidential information on customers, bids, rates, surcharges, fees, volumes, and capacity;

(f)     agreeing to eliminate, rationalize, reduce, and allocate capacity, and

(g)     implementing, monitoring, and enforcing the conduct of the conspiracy members.

303.     Defendants and their co-conspirators engaged in the above conduct to facilitate their agreements concerning customer allocation, bid-rigging, price-fixing, and other anticompetitive conduct concerning Puerto Rican cabotage.

**(c)     Antitrust Injury—Effect of the Conspiracy**

**Before The Conspiracy**

304.     As a direct and proximate result of the conspiracy at issue herein, Plaintiffs have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined.

305.     On April 12, 2012, the Department of Justice stated that this was a "price-fixing conspiracy that victimized every customer that shipped freight by water between Puerto Rico and the mainland United States for nearly six years."

306.     Defendants' and their co-conspirators' conspiracy enabled them to reverse a more than decade-long decline in rates on the Puerto Rico trade lane.  According to the May 2006 report by MARAD (using Defendants' and their co-conspirators rate data), the Defendants' rates on the Puerto Rico trade had been in a significant period of decline before the start of the conspiracy in 2002. "Over the 1991-2003 period, after adjusting for inflation, average revenue per FEU [forty foot container] in the Puerto Rico trade declined by nearly 39 percent." (2006 MARAD Report at vii.)  The report stated further that "[o]ver the 1991-2003 period, there have been significant declines in real freight rate levels.  For the overall Puerto Rico trade, average rates declined at an average annual rate of 4.0 percent, after adjusting for inflation." (Id. at 48.)

307.     The rate data underlying the MARAD report's findings and charts came from a June 2004 report of Reeve & Associates that was

commissioned by Sea Star, Crowley, Horizon, TOTE, and Matson.  (Id. at n. 44.)
This Reeve & Associates report was prepared for and based upon proprietary
pricing data obtained from the Defendants and their co-conspirators.  (Id. at iii, n.
2.)  The Reeve & Associates report noted that there had been a "high level of
competition" among the carriers on the Puerto Rico trade before 2002.  That
"competition" ended in when the conspiracy started in 2002.

308.    Even though the container volume shipped on the Puerto Rico
trade steadily increased during this period (Id. at 40, Figure 18), the "high level of
competition" appears to have resulted in these rate declines prior to 2002.  The
MARAD Report stated that "[a]ccording to Reeve & Associates, over eighty-five
percent of cargoes in the trade are shipped under confidential contracts."  (Id. at
48.)



Figure 18

U.S. Mainland/Puerto Rico
Liner Shipping Market

Source:  Reeve and Associates, based on Carrier data and Journal of Commerce Port Import Export Reporting Service (PIERS)

Figure 22

**Trend in Real Revenues per FEU in the U.S.-Mainland/Puerto Rico Ocean Shipping Market**

Source: Reeve & Associates analysis of ocean carriers' proprietary data. Separate southbound and northbound data not available for the 1991-1995 period. Revenues per FEU are calculated on a "net to ocean" basis that excludes the pass through of inland transportation charges that may vary substantially between years

### During the Conspiracy

309.     The above chart in the MARAD Report shows that in 2002, however, the rate declines came to an end and Defendants' and their co-conspirators' Puerto Rico rates started to increase.  (Id. at 48, Figure 22.)  This rate turn-around starting in 2002, and the subsequent significant rate increases obtained by the Defendants and their co-conspirators through 2008, were due to the rate-fixing conspiracy among the Defendants and their co-conspirators that began by at least May 2002.

310.     Even while the volume of freight on the Puerto Rico trade lane in fact declined more than 20% during the last half of the conspiracy, the rates,

surcharges, and fees charged to Plaintiffs by all Defendants and their co-conspirators were significantly increased as a result of the conspiracy.

311.    Unlike the "pre-conspiracy" era, where the Defendants' and their co-conspirators' rates declined even though their unit volumes increased, the exact opposite happened during most of the conspiracy period.   From 2004 through 2008, Defendants' and their co-conspirators' freight volume sharply declined, but their freight rates and profits still dramatically increased.

(a)    In its filings with the SEC and in its webcast earnings presentations, Horizon stated that it obtained significant increases in both its revenues and profits every year from 2002 through 2008.  Indeed, Horizon stated in a September 17, 2009 presentation that it had obtained a compound annual growth rate ("CAGR") in its revenues of at least 8% and a compound annual growth rate in its earnings of in excess of 15% during the conspiracy period.

(b)    The SEC filings of Crowley Maritime also reflect similar results.   From stagnant or declining revenues in 1999-2001, Crowley's liner business revenues increased every year from 2002 to 2006 (the last year of Crowley's SEC filings), so that its annual revenues were up 35%.  Crowley also had five straight year–by-year increases in its liner services' net income during 2002 to 2006.

(c)    Sea Star is privately held and does not file with the SEC. But, Sea Star internal analyses (which were shared with Tom Farmer at Crowley) indicate that, from the first quarter of 2003 to the third quarter of 2007, Sea Star's

per container yield increased more than 45%, with the bulk of the increases coming _after_ demand started to drop in 2005.  Upon information and belief, Sea Star recorded sizeable profits from 2003 to 2008.

(d)     The SEC filings of Trailer Bridge likewise demonstrate that its annual revenues declined each year from 2000 through 2002, but its revenues thereafter increased every year from 2003 through 2008.  Trailer Bridge's revenue in 2002 was $73.8 million and it increased year by year to $133 million in 2008—up 80%.

312.     Significantly, the Defendants' and their co-conspirators' rate increases during much of the conspiracy were obtained when demand for their freight services to Puerto Rico was dropping and the Defendants' and their co-conspirators' unit volumes were declining.

(a)     The SEC filings of Crowley, Horizon, and Trailer Bridge, show that their unit volume declined every year after 2004. Notwithstanding this decline in volume and demand, Crowley, Horizon, and Trailer Bridge were able to obtain significant increases in their freight rates through April 2008.

(b)     For example, Crowley stated in its March 1, 2007 10-K SEC filing (at 35) that its liner service revenues increased in 2006 because of a 10.8% increase in revenue per container, even though its volumes decreased 6.4% over the same period.  Likewise, Crowley stated in an 8-K filed with the SEC on April 25, 2007, that it obtained rate increases of 6.4% in the first quarter of 2007 even though its liner services volume continued to decline another 4%.

(c)     Trailer Bridge stated in each of its 10-K filings for 2005 (at 15, 17), 2006 (at 15), and 2007 (at 21) that: "The increase in core container and trailer revenue, and other revenue is primarily due to increases in accessorial charges and freight rates partially offset by volume decreases."

(d)     In an April 23, 2010 Horizon webcast (transcript at 5), Horizon COO John Keenan stated: "Since 2004 the total US container volume flowing into Puerto Rico has contracted by some 18% or by approximately 51,000 40 foot equivalent units."

(e)     PIERs data confirm that the Defendants' and their co-conspirators' total southbound market volume dropped in excess of 20% from 2004 through 2008.  Yet rates steadily increased during that period.

313.     The declaration of Dr. Russell Lamb, submitted to the MDL 1960 Court by class counsel on November 2, 2010 (MDL Docket No. 837), sets forth an analysis of the sales volumes and revenues per container for Sea Star and Horizon from the sales/rate databases provided to class counsel by Horizon and Sea Star.

(a)     Per Dr. Lamb, Horizon's unit volume declined 20.5% and Sea Star's unit volume declined by 18.5% from 2004 to 2008.  (See, MDL Docket No. 837, Table Nos. 1 and 3.)

## Table 1. Analysis of Horizon Revenue Loads
**U.S.-Puerto Rican Trade Route**
*(Total revenue loads)*

**Annual Horizon Revenue Loads**

| Year | Total |
|------|-------|
| 2002 | 114,036 |
| 2003 | 116,685 |
| 2004 | 130,195 |
| 2005 | 126,761 |
| 2006 | 118,648 |
| 2007 | 108,662 |
| 2008 | 103,411 |

Source:

Horizon Average Rate Numbers.xls.

## Table 3. Analysis of Sea Star Units Shipped
**U.S.-Puerto Rican Trade Route**
*(in FEUs)*

**Annual Sea Star Units Shipped**

| Year | Northbound | Southbound | Total |
|------|-----------|-----------|-------|
| 2002 | 10,664 | 46,677 | 57,342 |
| 2003 | 16,021 | 67,949 | 83,971 |
| 2004 | 14,602 | 67,357 | 81,959 |
| 2005 | 14,637 | 69,977 | 84,615 |
| 2006 | 14,377 | 62,298 | 76,675 |
| 2007 | 14,370 | 55,110 | 69,480 |
| 2008 | 13,017 | 53,785 | 66,803 |

Source:
SSL Rev 2002.2008.xlsx.

(b)      However, even during this period of sharp volume declines, the base rates (or "revenue per load") of Horizon and Sea Star (which does not include the significant bunker fuel and intermodal fuel surcharges, which were also fixed) actually increased by 20.4% and 21%, respectively.   (See, MDL Docket No. 837, Table Nos. 2 and 4.)[2]

## Table 2. Analysis of Horizon Average Revenue per Load
U.S.-Puerto Rican Trade Route

| | Annual Horizon Average Revenue per Load | | | |
| Year | Revenue ($US millions) [a] | Total Revenue Loads [b] | $US/Revenue Load | Percent Change in $US/Revenue Load from Previous Year |
| --- | --- | --- | --- | --- |
| 2002 | 225.8 | 114,036 | 1,980 | |
| 2003 | 243.8 | 116,685 | 2,089 | 5.54% |
| 2004 | 289.1 | 130,195 | 2,221 | 6.29% |
| 2005 | 300.0 | 126,761 | 2,367 | 6.58% |
| 2006 | 296.1 | 118,648 | 2,496 | 5.45% |
| 2007 | 284.5 | 108,662 | 2,619 | 4.92% |
| 2008 | 276.4 | 103,411 | 2,673 | 2.07% |
| Average | 273.7 | 116,914 | 2,349 | 5.14% |

Sources and Notes:
Horizon Average Rate Numbers.xls.
[a] Equals Horizon's Transportation Revenue, net of Fuel and Bad Paper.
[b] From Table 1.

---

[2]  Plaintiffs do not in any way adopt any of the opinions offered by Dr. Lamb in his declaration, but simply cite, as a rough but directional yardstick, to his factual analysis of the historical sales and rate data provided by Horizon and Sea Star.

## Table 4. Analysis of Sea Star Revenue per FEU
U.S.-Puerto Rican Trade Route

**Annual Sea Star Revenue per FEU**

| Year | Revenue ($US millions) [a] | FEUs [b] | $US/FEU | Percent Change in $US/FEU from Previous Year |
|------|------|------|------|------|
| 2002 | 104.0 | 57,342 | 1,814 | |
| 2003 | 158.3 | 83,971 | 1,885 | 3.90% |
| 2004 | 163.4 | 81,959 | 1,993 | 5.73% |
| 2005 | 176.6 | 84,615 | 2,087 | 4.73% |
| 2006 | 171.5 | 76,675 | 2,237 | 7.17% |
| 2007 | 161.9 | 69,480 | 2,331 | 4.17% |
| 2008 | 161.1 | 66,803 | 2,411 | 3.45% |
| Average | 156.7 | 74,406 | 2,108 | 4.86% |

Sources and Notes:
SSL Rev 2002.2008.xlsx.
[a] Equals Sea Star's Base Ocean Revenue and Total Assessorial Charge (i.e. security and terminal handling). Does not include Bunker Surcharge or Intermodal Fuel Surcharge.
[b] From Table 3.

314.     The Defendants' and their co-conspirators' increases in rates and surcharges, when freight volumes and demand were steadily declining during the conspiracy, were because of the conspiracy.  Due to this conspiracy, the Defendants and their co-conspirators knew that their rate increases would not be undercut even in a declining market.

315.     Through this period of the conspiracy, with all of the conspirators' rates increasing as the market volume declined, the co-conspirators' market shares remained virtually the unchanged.  The carriers did not price compete in any material way to gain customers or market share, even

though they were all losing substantial volumes of freight year after year during 2005-2008.

316.    Horizon internal assessments during the 2005-2008 period repeatedly extolled its success in raising rates and surcharges while maintaining market share in a soft or declining market with excess capacity.  This success was due to the conspiracy.

317.    Defendants' conspiracy injured Plaintiffs by eliminating, suppressing, and reducing price competition in Puerto Rican cabotage, which had the effect of raising, maintaining or otherwise stabilizing rates, surcharges, and other fees for Puerto Rican cabotage at artificially high levels through the conspiracy period and beyond April 2008.  In their guilty pleas, both Sea Star and Horizon admitted that they "sold Puerto Rico freight services at collusive and noncompetitive rates."

318.    Horizon held its first quarter 2006 earnings conference call on April 28, 2006.  During that call, Horizon VP Brian Taylor stated:

> Despite the volume challenges we experienced in the first quarter, we did achieve our revenue growth plans through significant improvements in all trades. . . . **In Puerto Rico we continue to negotiate rate increases into our customer contracts, as they come up for renewal.  We believe that the competitive environment right now continues to be stable enough to support reasonable and ongoing rate increases.**

319.    Horizon's CEO and Chairman, Chuck Raymond, touted Horizon's continued success in increasing rates during a period where he acknowledged Horizon's Puerto Rico volume continued to decline.  As Raymond

stated in Horizon's earnings call on April 26, 2007: "In the case of Puerto Rico,
**even though that market is a little light, we're continuing to get rate
increases that are slightly ahead of what our inflationary costs are. So in
terms of real rate benefit in the Puerto Rico trade, that march we've been
on now since 2002, continues.**"

320.     On July 27, 2007, during the Horizon's second quarter 2007
earnings call, CEO Raymond stated that the Puerto Rico trade "had a 10%
market contraction in 2006." Yet COO John Handy and SVP/CFO Mark Urbania
stated on that call that Horizon was continuing to get rate increases and "higher
revenues per container," and that "rates are up."

321.     Notwithstanding the continued shrinking of the Puerto Rico trade
and the negative volume outlook for the Puerto Rico market in 2007-2008,
Horizon was still comfortable predicting that rates would continue to increase in
2008. Horizon's SVP/CFO Mark Urbania stated in Horizon's November 19, 2007
revised earnings guidance call:

> We do incorporate some price increases [in Puerto Rico] as we've
> communicated in the past. **There's been good discipline in the
> market between ourselves and our competitors.   Price
> increases have come through even though volume softness
> has existed in 2007.  There's no reason for us to believe that
> that will change in 2008 and we're factoring between 3 and 4%
> in terms of real rate improvement.**

322.     During Horizon's February 1, 2008 earnings conference call, the
last before the FBI raids, Horizon President/COO John Keenan discussed the
Company's volume decreases during 2006 and 2007, stating: "If you look at '05

to '06, [Puerto Rico cabotage] volume's down 7.7%; '06 to '07 down 4.1%, so a total 13% in volumes."  Yet Keenan stated that Horizon's revenue per container increased by almost 7% "predominantly driven by our general rate increases."  CFO Urbania stated that Horizon continued to expect "very reasonable rate increases" going forward.

323.     In the Horizon earnings call on April 25, 2008, just days after the FBI raids, Horizon's President Keenan stated that even though the volume on the Puerto Rico trade continued to decline, Horizon achieved almost 9% growth in revenues per container in 2007 due to "our general rate increase and contract renewal rate increases."

324.     In addition to the above, this conspiracy's impact on the prices, rates, surcharges, and other fees paid by Plaintiffs and others is further demonstrated by presentations made by Horizon during its quarterly earnings webcasts to investors (which only started in the fall of 2005).  Horizon reported its revenue per container increased significantly every year from 2005 through the first quarter of 2008 (the later report just days after the FBI raids), even though the Puerto Rico trade lane volume declined significantly every year of this period.  Horizon reported the following increases in its revenues per container (rates and surcharges combined): in 2006 up $317 or 10.4%; in 2007 up $212 or 6.3%; in 2008 up $320 or 8.9%.  Horizon's revenue per container in 2005 was $3,049, but that number increased to $3,907 in 2008.  Horizon's revenues per container

increased $858 or 28.14% during the last three years of the conspiracy, which were also years of sharply declining volume.

## After the Conspiracy Came to Light

325.     Because prices, rates, surcharges, and other fees for Puerto Rican cabotage were fixed at, maintained at, imposed, or increased to a level above where they otherwise would have been in a competitive market, Plaintiffs paid higher rates and surcharges for Puerto Rican cabotage than they would have paid had the Defendants and their co-conspirators not conspired in violation of the antitrust laws.   In addition, it is likely that this conspiracy resulted in Plaintiffs continuing to pay such artificially high rates and surcharges long after the April 17, 2008 FBI raids, including, but not limited to, by those Plaintiffs that had contracts that continued to run beyond that date.  For example, one Crowley contract entered into during the conspiracy period in January 2008 extended the contract through October 2010, and provided for rate increases in each year.

326.     This conspiracy's impact on the rates paid by Plaintiffs also is demonstrated by what happened to the rates that many Plaintiffs paid the Defendants and their co-conspirators after the conspiracy was made public in 2008.   During the years after the Defendants and their co-conspirators were raided by the FBI, and this conspiracy was forced to break apart, rate competition slowly began to resume on the Puerto Rico trade.   Defendants and their co-conspirators began to significantly cut their rates to try to retain customers and market share.  As evidence of the impact of the conspiracy on Plaintiffs' rates

during the conspiracy period (and thereafter), many Plaintiffs saw the rates they were charged by Sea Star and its co-conspirators substantially decline.

## **FRAUDULENT CONCEALMENT**

327.     Throughout the conspiracy period, Defendants and their co-conspirators affirmatively and wrongfully concealed their unlawful conduct from Plaintiffs.

328.     Plaintiffs had no actual or constructive knowledge until April 18, 2008, at the earliest, of the illegal contract, combination or conspiracy that is the subject of this Complaint, or of any facts that might have led to the discovery of the conspiracy in the exercise of reasonable diligence.

329.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence, which they in fact exercised, the potential existence of the conspiracy that is the subject matter of this Complaint until April 18, 2008, when it was publicly disclosed that the Department of Justice was investigating Puerto Rican cabotage for potential antitrust violations, because the Defendants and their co-conspirators actively and wrongfully concealed the existence of their conspiracy.

330.     Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence, which they in fact exercised, that the conspiracy at issue herein started at least as far back as May 2002 until October 1, 2008, when the Department of Justice issued a press release

announcing several individual guilty pleas admitting the conspiracy started in May 2002.

331. Because Defendants' conspiracy was actively concealed and kept secret by Defendants and their co-conspirators, Plaintiffs were unaware of Defendants' unlawful conduct that is the subject of this Complaint and did not know that they were paying artificially high prices for Puerto Rican cabotage.

332. Sea Star, Horizon, Crowley, Baci, Gill, Glova, and Serra have all pled guilty and admitted to "conceal[ing] the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

333. Chisholm (Sea Star) pled guilty to "corruptly alter[ing], destroy[ing], and conceal[ing] records and documents" relevant to the grand jury's investigation of antitrust violations in the Puerto Rican cabotage industry.

334. Chisholm admitted to active acts of concealment in his May 5, 2009 pre-sentence memorandum

> "Following the execution of the search warrant at Sea Star's office on April 17, 2008, and knowing that there was a federal grand jury investigation of the coastal shipping industry, Mr. Chisholm, later that night, used a computer in his home to access a remote server and delete files that were relevant and material to the grand jury's investigation." (at 2)

> [During a 2 day session with DOJ in April 2009] Mr. Chisholm identified approximately I00 hot button documents, including some incriminating documents that had been concealed behind more innocent
> ones." (at 3-4)

335. In its May 4, 2009 pre-sentence memorandum regarding Chisholm (at 2-3), the Department of Justice stated that "[o]n or about April 17,

2008, after becoming aware of the grand jury investigation, [Chisholm] corruptly altered, destroyed, and concealed records and documents with the intent to impair the availability of the records and documents for use in the federal investigation."

336.     At the May 12, 2009 sentencing hearing, the Department of Justice stated that Baci called Chisholm on April 17, 2008 and told him to "take down" Baci's Google email account, and Chisholm did so.   (May 12, 2009 Hearing Tr. 102.)   Baci used this account to communicate directly with competitors.   Chisholm, after being confronted by the FBI, went home and also deleted incriminating files off his personal Mac computer.   (Id.)

337.     Chisholm and the Department of Justice indicated that much of the implementation and "policing" of the conspiracy was done by the secret email circulation of spreadsheets, using non-company email accounts, containing "detailed" customer specific contract rate and surcharge data.   "This was a conspiracy that was conducted in significant part through emails and spreadsheets."   (Id. at 104-105.)   Data provided by Chisholm made the conspiracy work.   "Based on the numbers in those spreadsheets, the decision makers made the decisions about the steps that the conspiracy would take. . . . he provided the information that allowed the decision makers to operate and make informed decisions."   (Tr. 105.)   These emails and spreadsheets were carefully concealed from Plaintiffs.   These emails and spreadsheets were also

concealed from co-workers by limiting circulation and using terms like "barge" for Crowley and "vessel" or "market" for Sea Star.

338.    The affirmative acts of Defendants and their co-conspirators at issue in this Complaint, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

339.    Defendants and their co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

340.    Defendants and their co-conspirators met and communicated secretly concerning customers, bid-rigging, rates, surcharges and other fees so as to avoid detection.  For example, Sea Star and Horizon participants falsely described conspiracy meetings as "TSA meetings."

341.    Defendants and their co-conspirators pretended to engage in negotiations with customers, when such negotiations were a mere sham.  Frank Peake referred to his use of the term "negotiations" with customers allocated to other carriers as merely "politically correct."

342.    By its very nature, Defendants' conspiracy was inherently self-concealing, and the success of the conspiracy depended upon its self-concealing nature.  Horizon has conceded that a price-fixing conspiracy is by its very nature "a secret undertaking."

343.    From 2002 through April 2008, Defendants and their co-conspirators submitted bids in such a manner as to prevent Plaintiffs from

learning or suspecting that Defendants and their co-conspirators were rigging contract renewal bids.   Chisholm testified that the Defendants and their co-conspirators routinely used bids that a Defendant and their co-conspirators knew were too high, in order to create the false impression that Defendants and their co-conspirators were in fact competing.

344.     During the conspiracy period, the Defendants and their co-conspirators repeatedly and routinely attributed their increases in rates, bunker fuel surcharges, intermodal fuel surcharges, and other surcharges to such things as oil price increases, demand, changes in cargo mix, or cost increases.   These statements were a pretext to conceal Defendants' conspiracy to allocate customers, rig bids, and fix rates, surcharges and fees.

345.     Defendants and their co-conspirators also falsely told customers that they could not handle their freight or quote on their business because they lacked sufficient capacity, when they had the capacity and their refusal to carry the freight was part of the customer allocation conspiracy.

346.     Defendants' and their co-conspirators' purported reasons for rate and surcharge increases for Puerto Rican cabotage were materially false, misleading and pretextual, and were made for the purpose of concealing Defendants' anti-competitive scheme.

347.     Plaintiffs reasonably relied on the materially false or misleading explanations by Defendants and their co-conspirators for the rate and surcharge increases for Puerto Rican cabotage, which lulled Plaintiffs into believing that the

rate and surcharge increases were the normal result of competitive market forces, rather than the product of anti-competitive agreements among Defendants and their co-conspirators.

348.    Defendants' and their co-conspirators' public statements about the reasons for the rate and surcharge increases were designed to, and did, cause Plaintiffs to accept the increases without undertaking further inquiry.  Even if such an inquiry had been undertaken, however, it would have proven futile because Plaintiffs did not have access to contemporaneous information that would have allowed them to evaluate whether Defendants' and their co-conspirators' claimed justifications for the increases were valid.  Likewise, for any inquiry by Plaintiffs to be successful, they would have had to have access to the secret files and communications of Defendants and their co-conspirators, which would have been refused.

349.    At the time, Plaintiffs considered Defendants' and their co-conspirators' articulated reasons for their rate and surcharge increases to be both normal and legitimate, and, accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' and their co-conspirators' increases in rates, bunker fuel surcharges, other surcharges, or fees.

350.    Likewise, the SEC filings, earnings reports, and earnings presentations of Horizon, Crowley, and Trailer Bridge gave no indication that the

Defendants' and their co-conspirators' rate, surcharge, and revenue increases were due to anything other than the normal functioning of the market.

351.    Indeed, the U.S. District Court for the District of Delaware (Judge C.J. Bartle) in City of Roseville Employees' Retirement System, et al. v. Horizon Lines Inc., et al., Civil Action No. 08-69, a securities suit against Horizon, held in an Order filed November 13, 2009 (at 22-24), that the repeated explanations offered by Horizon executives to its shareholders for Horizon's ability to increase its revenues and rates, particularly as its Puerto Rico volumes declined, fell "below the level of honesty required by the securities laws" and that Horizon's failure to disclose the conspiracy as the cause for Horizon's profitability was "misleading."

352.    The conspirators also fraudulently concealed their conspiracy from customers and Plaintiffs through a host of a methods, including, but not limited to:

(a)    engaging in pretextual or sham "negotiations" with customers allocated to a co-conspirator (e.g., Sea Star discussions with Arrowpac as to which Horizon was the "lead") to give the false impression to customers that the carrier was actually competing for their business when it was not;

(b)    telling customers that the reasons for rate increases were needed for cost recovery (part of a "recovery program") when the increases were agreed upon by the conspirators to further enhance their profits;

(c) telling customers that they needed bunker fuel and intermodal fuel surcharges to cover the costs of fuel paid, when they were actually making significant profits on these surcharges;

(d) announcing fuel and other surcharge increases at different times to avoid creating the impression that the timing and amount had in fact been agreed upon;

(e) telling customers that the reasons for increases in the Port Security Charge were due to increases in security fees and costs, when they were actually making profits on this surcharge;

(f) telling customers the reason for their adoption of FAK/NOS tier rate system was to make rates fair within classes of trade, when the true purpose of the tier system was to facilitate annual collusive rate increases;

(g) agreeing to quote rates with slight differences among the conspirators to falsely give the impression of competition;

(h) agreeing to adopt tier rates on an annual basis with significant increases, but with slight differentials among the base rates to give the false impression of competition, when their surcharges made the carriers' "all-in" rates virtually identical;

(i) submitting fake, complementary bids to Plaintiffs knowing that their bids would be too high versus the "lead" conspirator, but intending to give customers the false impression of competition;

(j)      creating (Sea Star) a new grouping for surcharges called the Total Accessorial Charge or TAC, by which Sea Star grouped all its non-fuel surcharges, allegedly to "simplify billing", but in reality to hide that Sea Star's surcharges, such as the Port Security Charge, were being illegally agreed to and increased in parallel with the conspirators:

(k)      shifting from using corporate email to using Google email (or "gmail") or other personal email accounts to hide their conduct;

(l)      using language in internal emails designed to cover-up and conceal the conspiracy, e.g., Glova would send internal emails within Horizon with competitor supplied pricing, but he would falsely state he "heard in the market" or obtained the information from customers;

(m)      Gill, Glova, and their pricing managers would generate analyses of Horizon's rates in comparison to the rates provided by Sea Star and/or Crowley, but without using their competitors' names.  Instead, their emails and spreadsheets would use "vessel" or "market" to refer to Sea Sear and "barge" to refer to Crowley;

(n)      falsifying expense reports to falsely claim expenses for meetings with competitors as meetings with customers or slot charter meetings;

(o)      destroying and deleting documents reflecting illegal communications and agreements with competitors, as Gill routinely did, or directing recipients of such documents to destroy or delete them with phrases

like "please read and destroy" or "smile and delete," as Raymond and Serra did; and,

(p) using throw away cell phones unconnected with their corporate or personal phone numbers.

353. Plaintiffs could not have discovered this conspiracy at a date earlier than April 18, 2008, by the exercise of reasonable diligence, because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and wrongfully conceal, their conspiracy.

354. It was not until April 18, 2008, the date on which it was first publicly disclosed that the Department of Justice was investigating Puerto Rican cabotage for antitrust violations, that Plaintiffs became aware, or could have become aware with the exercise of reasonable diligence, of Defendants' and their co-conspirators' possible anti-competitive conduct regarding Puerto Rican cabotage. Until this time, there had been no public indication of potentially illegal practices on the Puerto Rico trade lane that could have put Plaintiffs on notice of the Defendants' and their co-conspirators' illegal agreements or their injury. Likewise, prior to this time, there was no source of information accessible to the public and Plaintiffs which they could have accessed to discover the illegal conduct.

355. It was not until the October 1, 2008 Department of Justice press release announcing the five individual guilty pleas, discussed above, that

Plaintiffs could have become aware that a conspiracy actually existed and that it began to operate at least as far back as May 2002.

356.    The bulk of the details of the conspiratorial conduct still remains within the hands of the Defendants and their co-conspirators.  The Department of Justice grand jury investigation has been and continues to be shrouded in secrecy.  The overwhelming majority of the evidence, details, and facts regarding the conspiratorial conduct of the Defendants and their co-conspirators has not yet been made public, remains within the Defendants' control, and generally is inaccessible to Plaintiffs.

357.    The conspiracy that is the subject of this action was fraudulently and wrongfully concealed by Defendants and their co-conspirators by various means and methods, including, but not limited to: (a) secret meetings; (b) misrepresentations to their Puerto Rican cabotage customers concerning the reasons for increases in rates, surcharges and other fees; and (c) surreptitious communications among Defendants and their co-conspirators by the use of the telephone or in-person meetings and through private e-mail accounts in order to limit the existence of written records, minimize access to any written records, and conceal from non-conspirators the existence and nature of their discussions regarding customer allocation, bid rigging, and price fixing.

358.    Because this conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until April 18, 2008, Plaintiffs had no knowledge of the conspiracy that is the subject of this

action nor of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

359.    None of the facts or information available to Plaintiffs prior to April 18, 2008, if investigated with reasonable diligence, could or would have led, nor did lead, to the discovery of the conspiracy that is the subject of this action.

360.    Upon information and belief, it was only because a senior executive of one of the Defendants "blew the whistle" on the conspiracy to the Department of Justice that the conspiracy would ultimately (many months later) become public.

361.    Indeed, even though senior officers and managers of Sea Star pled guilty to the conspiracy in October 2008, Sea Star continued to perpetuate their ongoing fraud on customers by denying in motions, briefs, and pleadings that any conspiracy had existed or that they had participated in it.

362.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been equitably tolled as to any claims of Plaintiffs arising from Defendants' and their co-conspirators' anti-competitive conduct that is the subject matter of this Complaint.

363.    The filing of the putative class actions in and after April 2008 relating to the Puerto Rico cabotage conspiracy (consolidated in MDL 1960) tolled the running of the Clayton Act statute of limitations. *See*, e.g., Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345 (1983).   The ongoing Department of

Justice criminal investigation of the conspiracy (including the indictment and prosecution of former Sea Star President Frank Peake) has tolled and continues to toll the running of the Clayton Act statute of limitations.  *See*, 15 U.S.C. § 16(i); Leh v. General Petroleum Corp., 382 U.S. 54, 62-63 (1965); Zenith Radio Corp. v. Hazeltine Research Inc., 401 U.S. 321, 335-37 (1971).

## CLAIMS

## COUNT ONE

364.    Plaintiffs incorporate by reference as if fully set forth the allegations in Paragraphs 1 through 363 of this Complaint.

365.    Beginning at least as early as May 2002 and continuing until April 17, 2008, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, consultants, and/or other representatives, entered into a continuing agreement, understanding, combination, and/or conspiracy in restraint of trade to restrict competition, *inter alia*, by allocating customers, rigging bids, and/or fixing the prices, rates, surcharges and/or other fees for Puerto Rican cabotage in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

366.    Defendants' and their co-conspirators' conspiracy resulted in artificially high, supra-competitive, and non-competitive rates and surcharges being charged by Defendants and their co-conspirators to Plaintiffs for Puerto Rican cabotage during the conspiracy period and thereafter.

367.　　Sea Star and Horizon have admitted that the conspirators sold freight services "at collusive and non-competitive rates and surcharges." Plaintiffs paid more for Puerto Rican cabotage than they would have paid in a competitive market unfettered by Defendants' and their co-conspirators' unlawful anti-competitive activity.

368.　　Plaintiffs seek to recover for their overcharge damages and any other damages caused by this conspiracy. Upon information and belief, these damages continued to be incurred by Plaintiffs well after April 2008, because of the lingering effect of the six-year conspiracy on the rates and surcharges and/or because of pre-existing contracts entered into during the conspiracy.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues asserted in this Complaint so triable.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiffs seek judgment that:

A.　　The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.　　Judgment be entered for Plaintiffs against Defendants, jointly and severally, for three times the amount of the damages sustained by Plaintiffs as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

C.     Defendants, their parents, subsidiaries, affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy that is the subject of this action, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

D.     Plaintiffs have such other, further and different relief, including prejudgment interest, as the case may require and the Court may deem just and proper under the circumstances.

Respectfully submitted,

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By: _____

Charles P. Pillans, III
Florida Bar No. 0100066
Patrick P. Coll
Florida Bar No. 0084670
The Bedell Building
101 East Adams Street
Jacksonville, Florida 32202
Telephone: (904) 353-0211
Facsimile: (904) 353-9307
E-mail: cpp@bedellfirm.com
E-mail: ppc@bedellfirm.com

**Counsel for Plaintiffs Arrowpac Incorporated, et al.**

David C. Eddy *(Pro Hac Vice Application Forthcoming)*
Marguerite S. Willis *(Attorney Admission Application Forthcoming)*
Dennis J. Lynch *(Pro Hac Vice Application Forthcoming)*
Travis C. Wheeler *(Pro Hac Vice Application Forthcoming)*
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, South Carolina 29201
Telephone: (803) 771-8900
Facsimile:  (803) 253-8277
E-mail: deddy@nexsenpruet.com
E-mail: mwillis@nexsenpruet.com
E-mail: dlynch@nexsenpruet.com
E-mail: twheeler@nexsenpruet.com

Counsel for Plaintiffs Arrowpac Incorporated, et al.

October 29, 2012
Jacksonville, Florida