## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ARROWPAC INCORPORATED, et al.,

               Plaintiffs,

    v.

Case No. 3:12-cv-1180-J-32JBT

SEA STAR LINE, LLC, SALTCHUK
RESOURCES, INC., TOTEM OCEAN
TRAILER EXPERSS, INC. and LEONARD
SHAPIRO,

               Defendants.

---

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT BY TOTEM OCEAN TRAILER EXPRESS, INC.

The motion of Defendant Totem Ocean Trailer Express, Inc. ("TOTE") to dismiss for lack of personal jurisdiction and Plaintiffs' Amended Complaint are like ships passing in the night.  The Amended Complaint provides specific *evidence* of TOTE's role in the admitted Puerto Rico Cabotage conspiracy.[1]  TOTE, however, ignores this evidence and instead wrongfully asserts that "the crux of Plaintiffs' jurisdictional argument" is simply that many TOTE employees worked in Jacksonville in 2002-2003.  (Mot. at 2).  While those facts (admitted by TOTE's affiants) are relevant to the question of jurisdiction and "minimum contacts," the "crux" of this Court's jurisdiction over TOTE is the conduct of TOTE's Vice President of Pricing, Leonard Shapiro; TOTE's President and CEO, Robert Magee; and, TOTE's consultant Tom Cowan in orchestrating and implementing the admitted conspiracy targeting this District.  Under any standard of review, this Court has specific jurisdiction over TOTE, and TOTE's motion must be denied.[2]

## I.  PLAINTIFFS' EVIDENCE AND UNREBUTTED ALLEGATIONS ESTABLISH THIS COURT'S JURISDICTION OVER TOTE

### A.  Testimony in the *Peake* Criminal Trial Regarding TOTE

Plaintiffs' Amended Complaint sets forth excerpts from the January 2013 *Peake* trial testimony of Peter Baci, former Sea Star Vice President of Yield Management, and Gabriel Serra, former Horizon Senior Vice President for the Puerto Rico Division.  Baci and Serra pled guilty to conspiring to fix rates and surcharges, rig bids, and allocate customers on the

---

[1] Plaintiffs did not have this evidence when they filed their initial complaint in October 2012, including, for example, the sworn testimony from the January 2013 felony criminal trial of Sea Star's former President Frank Peake in the District of Puerto Rico and other fact-based allegations that have now been admitted by the other Defendants and/or are not contested/rebutted by TOTE.

[2] Because TOTE rehashes many of the same jurisdictional and statute of limitations arguments raised in its first motion to dismiss, Plaintiffs incorporate herein by reference their July 17, 2013 brief in response to TOTE's initial motion to dismiss (ECF No. 101).

Puerto Rico trade during 2002-2008 and were sentenced by this Court in 2009. *Messrs. Baci and Serra both testified that a key ringleader and orchestrator of this conspiracy from the outset in early 2002 was TOTE's Vice President of Pricing Leonard Shapiro.*

### 1.    Baci's Testimony Regarding TOTE

Plaintiffs' Amended Complaint (¶¶ 29-31) sets forth the following testimony of Baci:

• "Mr. [Leonard] Shapiro was the Vice President of Pricing for Tote" and Shapiro "never worked for Sea Star." (**Ex. A**- Trial Tr. 1/17 at 152, 165, *United States v. Peake*, 3:11-cr-00512-DRD (2013) (ECF No. 160); **Ex. B**- Trial Tr. 1/18 at 74-79, *United States v. Peake*, 3:11-cr-00512-DRD (2013) (ECF No. 179)).

• Shapiro's office was located at TOTE in Tacoma, Washington, but Shapiro would come to Sea Star's offices in Jacksonville "very frequently." (**Ex. B** at 75).

• Shapiro "was extremely powerful within the Tote and Sea Star organizations," had "massive authority" within the Saltchuk enterprise, "inserted himself into the operations of Sea Star," and had "threatened and directed the termination of employment of others at Sea Star." (**Ex. B** at 52-53).

• Baci had "multiple meetings with Leonard Shapiro starting in 1998" through the summer of 2003 in Jacksonville. (**Ex. A** at 152; **Ex. B** at 67).

• Shapiro "was involved in the early days of the conspiracy." (**Ex. A** at 152).

• "Mr. Shapiro hatched the idea of collusion with the other carriers." (**Ex. B** at 53).

• Shapiro attended the April 2002 meeting with Horizon at the Park Hotel in Charlotte NC "where this conspiracy started." (**Ex. A** at 153).

- Shapiro "originated the idea for" and entered into the "market split" "illegal operational agreement" with Gabe Serra, the Senior Vice President of Horizon in charge of its Puerto Rico operations, to divide the ship trade volume between Florida and Puerto Rico on a 50/50 basis between Sea Star and Horizon.  Shapiro ordered Baci "to manage the business based on the 50/50 rule."  (**Ex. A** at 105-106, 154-155; **Ex. B** at 53, 67-68).

Shapiro admits he attended the meeting at the Park Hotel in Charlotte, NC in April 2002: "Shapiro, along with others, met with representatives of Horizon at a hotel in Charlotte, North Carolina;" and, "Peter Baci, Leonard Shapiro and others met at a hotel in Charlotte, North Carolina in April 2002."  (Shapiro Answer ¶¶ 51, 119, ECF No. 149). Shapiro also admits he met in Jacksonville with Crowley's Tom Farmer, an indicted co-conspirator, and with Horizon's Kevin Gill, an admitted conspirator.  (*Id.* at ¶ 32(c)).

### 2.    Serra Testimony Regarding TOTE

Plaintiffs' Amended Complaint (¶ 124) sets forth the *Peake* testimony of Serra regarding the illegal agreement he made with Shapiro to divide the Florida shipping trade:

- Serra's "first role" and "initial contact" in the conspiracy was a meeting with Shapiro. (**Ex. C;** Trial Tr. 1/22 at 56-57, *United States v. Peake*, 3:11-cr-00512-DRD (2013) (ECF No. 180)).

- "My first contact was with Lenny Shapiro, who was not . . . a direct Sea Star employee."  (**Ex. C** at 72-73).

- Serra sent Shapiro a list of "specific accounts" where Horizon was complaining that Sea Star's "pricing of particular cargoes . . . were negatively impacting" Horizon.  (**Ex. C** at 73-74).

3

- Serra testified that "first I sent him an E-mail or a fax with a list of issues . . . and eventually . . . we met face-to-face in Dallas in June 2003." (**Ex. C** at 74).

- At this meeting Shapiro and Serra "struck a deal" and agreed to divide the vessel trade between Florida and Puerto Rico on a 50/50 basis. (**Ex. C** at 74-75; **Ex. D-** Trial Tr. 1/23 at 28, *United States v. Peake*, 3:11-cr-00512-DRD (2013) (ECF No. 182)).

- "We agreed that within the Florida ship market we would equally share the business." "[T]he basic agreement" was for "each company, Horizon and Sea Star, to have 50 percent of the Florida market." (**Ex. C** at 75).

While Shapiro was engaging in the conduct testified to by Baci and Serra, TOTE's Board minutes and Shapiro's tax returns confirm he was an officer of TOTE, his salary was paid by TOTE and his travel expenses to Florida, North Carolina, Texas, and other conspiracy venues, were paid by TOTE. (*See* **Ex. F** [Declaration of Sarah R. Sawvell submitted herewith], and Exhibits 1 and 2 to same [**"Ex. F.1 and Ex. F.2"**]). Shapiro was never a Sea Star employee. Shapiro concedes this: "Shapiro was the Vice President of Pricing for Totem Ocean Trailer Express, Inc. ('Totem Ocean') from before 1998 to approximately March 2004." (Shapiro Answer ¶ 23, ECF No. 144).

While highly unusual in a Complaint, Plaintiffs have provided this Court with *direct evidence* of TOTE's participation in the conspiracy in this District and targeting trade in this District. TOTE's response to this evidence is silence. TOTE's Motion makes no mention of Baci, Serra, or their *Peake* trial testimony, which show that Shapiro was a key player in fomenting and furthering this conspiracy as an officer of TOTE. TOTE's conduct through Shapiro was expressly aimed at raising the rates and surcharges paid by shippers in this

District (such as by Plaintiffs ATEC and ITL) and targeted the significant trade between the Port of Jacksonville and Puerto Rico.  Plaintiffs have exceeded the requirement of pleading "plausible allegations" under *Twombly* and *Iqbal* (even assuming they apply here).[3]  Further, Shapiro admits "that the Court has personal jurisdiction over Shapiro" and "that venue is proper in this district as to Shapiro."  (Shapiro Answer ¶¶ 7-8, ECF No. 144).  Because this Court has jurisdiction over the senior TOTE officer who was a major player in creating this conspiracy, jurisdiction and venue are *a fortiori* also proper as to his employer TOTE.

**B.     Plaintiffs' Allegations and Defendants' Admissions Regarding TOTE Consultant Tom Cowan**

In addition, Plaintiffs allege (Am. Compl. ¶¶ 37-39, ECF No. 129) that Tom Cowan, a TOTE-retained consultant, acted as an "effective facilitator" for TOTE in this conspiracy, particularly with Horizon, and was very active in this District on TOTE's behalf:

•      Tom Cowan was a former Senior VP for the Pacific-North America operations of CSX Lines (the predecessor of Horizon Lines), then Senior VP Marketing of CSX Lines, who had had responsibility for the Alaska trade of CSX Lines in "competition" with TOTE and its Vice President of Pricing Shapiro.

---

[3] TOTE likewise did not rebut other allegations regarding Shapiro (Am. Compl. ¶¶ 31-32, 34.): "Baci stated in filings before this Court that Leonard Shapiro, as an officer of TOTE, initiated the conspiracy with Horizon Lines and other carriers in Jacksonville and indicated to Baci and others that he wanted them to conspire with Horizon and other competitors on rates, market division, and market allocation.  These communications occurred while Shapiro was in Jacksonville;"  "Shapiro asked Stallings on at least three separate visits to Sea Star's Jacksonville offices to find an executive at Horizon to partner with to discuss increasing rates.  After being rebuffed each time, Shapiro finally said, 'If you're too damn stupid to figure it out, I'll find someone else.'  He did—Peter Baci;"  "TOTE's VP Pricing Shapiro repeatedly dressed down Baci and others for being 'dumber than dirt' for not being able to raise rates.  Shapiro asked Baci why he never talked to Sea Star's competitors.  Baci clearly understood that Shapiro wanted him to coordinate rates with Sea Star's competitors and Baci did so.  Shapiro was fully aware of and endorsed Baci's rate and customer coordination with Gill, and he simply told Baci that he needed to be careful about concealing these discussions from others within Sea Star."

- TOTE's contract shows that Cowan was retained in 2002 by "**Totem Ocean Trailer Express, Inc. and its affiliates ('TOTE')**" in a Consulting Agreement executed by Robert Magee as "CEO" of TOTE to consult with TOTE expressly **with respect to Puerto Rico cabotage**.  The TOTE consulting agreement (and exhibits) refers to "TOTE" at least 75 times.[4]  (**Ex. F.3**).  The contract makes no mention of Sea Star.

- TOTE's contract specifically provided that Cowan's "Services and Deliverables" included recommending "**strategies to improve profitability given the new dynamics of competition in the Puerto Rico . . . Market**."  (*Id.* at 2).

- TOTE's contract provided further that Cowan was to "gauge . . . competitive reactions" on vessel deployments; to advise TOTE regarding "sell/purchase transportation between TOTE and CSXL [Horizon Lines];" and to advise regarding "rate strategies" **on the Puerto Rico trade**.  Cowan was also tasked with advising TOTE on—"Barge vs. ship pricing" and 'Natural' barge vs. ship mkt. split."  *Id.*

- The TOTE contract provided that TOTE would pay $6,000 a month for Cowan's services and would reimburse Cowan's expenses.  Cowan billed TOTE for his services and TOTE paid his fees and paid for his travel expenses to participate in negotiations with Horizon, including on Puerto Rico slot charter contracts in Orlando, FL and Charlotte, NC in 2004.  (*Id.* at 5).

- Cowan was also engaged in 2001 as a consultant by competitor CSX/Horizon Lines to provide similar advice on the Puerto Rico trade, including to "recommend appropriate pricing strategies in consideration of" TOTE's introduction of new ships.

---

[4] During the relevant time period and thereafter, Totem Ocean Trailer Express, Inc. consistently referred to itself as "TOTE" as did its parent and affiliate companies.  Plaintiffs will continue to use TOTE as well.

- Cowan participated in numerous meetings between the conspirators, including many in this District.  (Am. Compl. ¶¶ 40-42, 126).

In sum, in 2002, TOTE (through its CEO Magee) retained a former senior officer of its primary competitor, CSX/Horizon, to advise TOTE regarding a variety of competitively sensitive issues *expressly relating to the Puerto Rico trade*.  TOTE engaged Cowan specifically to address pricing, ship deployment, and capacity issues on the Puerto Rico trade—issues which lay at the core of this admitted six-year conspiracy.  On its face, TOTE's agreement with Cowan confirms TOTE's active "interest in the Puerto Rico trade," both financial and otherwise, in complete refutation of TOTE's contention that it "has no interest – financial or otherwise – in Puerto Rican cabotage."  (Mot. at 5).

Moreover, Sea Star *admits* in its Answer **"that Tom Cowan entered into a consulting agreement with Totem Ocean"** (Sea Star Answer at ¶ 37, ECF No. 145); "that **Totem Ocean initially paid for Tom Cowan's travel expenses pursuant to his consulting agreement for trips to Florida** and Charlotte, North Carolina" (*Id.* at ¶ 38); "that Tom Cowan participated in a meeting in Orlando, Florida with Frank Peake, Peter Baci and others to negotiate components of a Transportation Services Agreement" (*Id.* at ¶ 40); "that Cowan made visits to Sea Star's Jacksonville, Florida office" (*Id.*); and, "that Tom Cowan met in Orlando with Frank Peake and Gabe Serra in November 2005" (*Id.* at ¶ 42).

As with the testimony of Baci and Serra, TOTE's Motion is silent regarding TOTE consultant Tom Cowan.  TOTE does not contest Plaintiffs' fact-based allegations or the Sea Star admissions about Cowan which, like the testimony relating to Shapiro, establish specific jurisdiction in this District over TOTE.  *See U.S. v. Elmes,* No. 06-61617, 2007 WL 521878,

at \*3 (S.D. Fla. Feb. 14, 2007) (unrebutted allegations are accepted as true and deemed to state a *prima facie* case).

### C. Plaintiffs' Allegations regarding TOTE's President and CEO Bob Magee

Plaintiffs also allege that the most senior management of TOTE knew of, directed, and approved Shapiro's conduct <u>and</u> also directly participated in the conspiracy:

• "With the knowledge, direction, and approval of TOTE's Chairman and CEO, Bob Magee, Shapiro spent significant amounts of time in Sea Star's Jacksonville office on a regular and periodic basis to assist in and oversee Sea Star's turnaround, including, in particular, to significantly increase Sea Star's rates and surcharges." (Am. Compl. ¶ 25).

• Magee orchestrated the Park Hotel meeting in April 2002 with CSX/Horizon as the "Chairman and CEO of TOTE." (*Id.* at ¶ 44(a)).

• "On June 17, 2003, Magee wrote a handwritten note **on his personal TOTE note paper** addressed to "Chuck" [Raymond, the CEO of Horizon] to pass on shipping data regarding Crowley on the Puerto Rico trade lane that he had verified with 2 of 3 carriers outside Sea Star. The attached analysis, prepared by Baci, showed gains in market share for Sea Star and Horizon during the period after their agreement at the Park Hotel." (*Id.* at ¶ 127).

• Likewise, it was as the "Chairman and CEO of TOTE," that Magee "repeatedly called on the Puerto Rico carriers to more effectively collude and manipulate the market. These invitations to collude were agreed to and followed by the conspirators. For example, on August 21, 2003, Magee made a presentation at the 'Puerto Rico Summit' hosted by the Port

of Jacksonville in which he strongly urged the other carriers to get their rates up by almost 50%." (*Id.* at ¶¶ 21, 44(c)).

- In October 2005, Magee, as Chairman and CEO of TOTE, met in Ponte Vedra, FL with senior officers of Horizon "to discuss market division, capacity manipulation, rates, the plan to introduce a third ship from TOTE for Sea Star (the El Faro) into the Puerto Rico trade (and how this affected the 50/50 allocation scheme), and Horizon's concerns that the introduction of additional capacity by Saltchuk (the 3rd ship) would cause their conspiracy, that had effectively generated higher rate and profit for the carriers, to fall apart and cause rates to decline." (*Id.* at ¶ 44(d)).

- "In May 2007, Horizon, Crowley, and Trailer Bridge all announced identical increases in fuel surcharges, but Sea Star did not. Raymond sent an email to Magee criticizing him because Sea Star was not following the increase. The following day Sea Star joined the increase." (*Id.* at ¶138).

TOTE's recently produced Board minutes confirm that Robert Magee was the President, CEO and a Director of TOTE throughout the conspiracy period. (**Exs. F.1 & F.4**). TOTE does not contest any of the above allegations as to TOTE CEO Magee, which also gives this Court specific jurisdiction over TOTE.

### D.    TOTE Was a Guarantor of Sea Star's Debt

Relying on and quoting the affidavit of TOTE's current President John Parrott, TOTE asserts that Plaintiffs' allegations that TOTE had a "financial motive to participate" in the admitted conspiracy are "based on factual misconceptions" and "simply incorrect." (Mot. at

18-19).  However, TOTE Board minutes just produced to Plaintiffs (as materials that Parrott "reviewed and relied on") prove that this is false.

Precisely as Plaintiffs allege (Am. Compl. ¶¶ 19-20), TOTE's Board minutes confirm that TOTE had a direct financial interest in Sea Star's financial performance from 1999 through the conspiracy period that gave TOTE a motive to orchestrate the conspiracy in 2002.  REDACTED

REDACTED

REDACTED

REDACTED **(Ex. F. 4)**.

REDACTED

REDACTED

- REDACTED

REDACTED **(Ex. F.4 at 1)**.

- REDACTED

REDACTED

10

- **REDACTED**

REDACTED

- **REDACTED**

**REDACTED**

(**Ex. F.4 at 107-168**). **REDACTED**

These TOTE documents utterly refute TOTE's representations to this Court and TOTE President Parrott's sworn statement (after having reviewed these very TOTE documents) that TOTE "has never been a guarantor of any Sea Star loans.  In fact there is no connection between the finances of Totem and Sea Star."  (Parrott Aff. at ¶ 13).

In addition, TOTE does not contest Plaintiffs' allegation (Am. Compl. ¶ 19) that *Peake* Trial Ex. 266 (**Ex. E**) shows that Sea Star had accumulated a deficit of more than $43 million by the end of 2002.  **REDACTED**

There can be no dispute that TOTE **REDACTED** had a very strong financial incentive to set up the conspiracy in this District starting in 2002 which completely reversed Sea Star's fortunes (as also confirmed by *Peake* Ex 266).

**E.      TOTE'S Affiants Were in Jacksonville, Florida as TOTE Officers/Employees at the Beginning of the Conspiracy**

TOTE's affiants admit that TOTE officers, managers, and employees spent large amounts of time assisting Sea Star in Jacksonville in 2002-03.   (Armstrong Aff. ¶¶ 1-2). Shapiro, as Vice President of Pricing for TOTE, admits that from early 2002 to 2004 he "consulted at Sea Star" and made "recommendations to Sea Star's management regarding," among other things, "changes to rate structure" and "the like," and "negotiated" the TSA, all while "continu[ing] to manage" his "Totem duties."  (Shapiro Decl. ¶¶ 1-4).  Shapiro and the other TOTE managers (including TOTE's Director of Pricing) working at and with Sea Star never deny they remained employees of TOTE and were paid by TOTE. Sea Star gave Shapiro as an officer of TOTE its Navigator Award for his service. (Am. Compl. ¶27.) TOTE does not attempt to explain why the officers and managers of the supposedly independent and disinterested TOTE devoted such large resources to its sister company.

**F.      There is No Dispute that this Conspiracy Impacted Trade in this District**

Plaintiffs' Amended Complaint also sets forth testimony that this six-year conspiracy targeted the Puerto Rico trade centered in this District.  TOTE does not contest this evidence.

•      Baci testified that the conspiracy affected "all services involving Puerto Rico" and "all the components of rates," including ocean and inland."  (Am. Compl. ¶ 115).

•      Chisholm (former Sea Star Assistant Vice President of Yield Management) also testified that "Sea Star's Puerto Rican Cabotage customers paid artificially inflated surcharges, including bunker and intermodal surcharges, the values of which were also set based on price-fixing agreements among Sea Star and its competitors;" and that "Defendants' conspiracy affected prices and surcharges across the board."  (*Id.* at ¶ 148).

- As noted, Serra testified that he agreed with Shapiro, as TOTE's VP Pricing, "for each company, Horizon and Sea Star, to have 50 percent of the Florida market."

## II.    ARGUMENT

### A.    This Court Has Specific Personal Jurisdiction over TOTE

*TOTE concedes* (Mot. at 16) *that if TOTE participated in this conspiracy then this Court has jurisdiction over TOTE.*[5]   TOTE does <u>not</u> contest that this Court's exercise of personal jurisdiction over TOTE comports with the Fourteenth Amendment's Due Process requirements.  Plaintiffs' allegations establish "minimum contacts" with the forum, and the exercise of personal jurisdiction here would not otherwise offend "traditional notions of fair play and substantial justice."[6]   TOTE does not challenge the "fairness" or "burden" of hauling it into this District to litigate this matter.  TOTE in fact has "periodically" sent employees to Jacksonville, Florida.  (Parrott Aff. ¶ 4).  TOTE's own public statements extoll its operations as reaching into the entire "lower 48" states.  *TOTEM OCEAN TRAILER EXPRESS*,     TOTE     History     (Feb.     27,     2014), http://web.archive.org/web/19970118105128/http://www.totemocean.com/ (**Ex. F.5**).

TOTE admits it was physically present in Florida during the conspiracy period and participated in what Plaintiffs allege were seminal events in the conspiracy.  Plaintiffs'

---

[5] *See* Fla. Stat. § 48.193(1)(b), authorizing courts to exercise specific jurisdiction over persons who commit tortious actions, including antitrust violations, in this State: "(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts: . . . (b) Committing a tortious act within this state."  *See also* Plaintiffs' discussion on the applicability of the Florida long-arm statute in Joint Response Opposing Totem's [First] Motion to Dismiss ("First Joint Response") at 17 (ECF No. 101), incorporated herein.

[6] As TOTE does not raise Fourteenth Amendment concerns, Plaintiffs incorporate by reference its discussion of same in First Joint Response at 17 (ECF No. 101).

specific jurisdiction allegations as to TOTE are direct, detailed, and supported by the evidence:  TOTE sent officers and directors to Florida to participate directly in fomenting and maintaining the admitted conspiracy as TOTE officers and directors.  TOTE's Motion utterly avoids and instead (once again) simply repeats its mantra of implausibility.[7]  But since TOTE offers no rebuttal, TOTE's Motion must be denied.

### 1.   TOTE does not meet its burden in challenging personal jurisdiction

The plaintiff need only establish a *prima facie* case of personal jurisdiction to defeat a Rule 12(b)(2) motion.  *See Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1268-69 (11th Cir. 2002).  The factual allegations in the complaint are accepted as true.  *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1360 (11th Cir. 2006); *see also Amerifactors Fin. Grp., LLC v. Enbridge, Inc.,* No. 6:13-cv-1446, 2013 WL 5954777 (M.D. Fla. Nov. 7, 2013).  A motion to dismiss under Rule 12(b)(2) will only be granted if "it is clear from the face of the Complaint that there is no basis for the exercise of personal jurisdiction over the defendants."  *Franklin v. Anderson Media,* 8:10-CV-2935-T-33MAP, 2011 WL 3875519, at *3 (M.D. Fla. Aug. 31, 2011).

---

[7] As previously addressed in Plaintiffs' First Joint Response at 4-5 (ECF No. 101) and the 11th Circuit cases cited therein, the Rule 12(b)(6) *Twombly/Iqbal* plausibility standard is separate from and not applicable to the Rule 12(b)(2)  *prima facie* standard.  At least one court has commented on the "inappropriateness" of applying the "plausibility" standard in a Rule12(b)(2) setting.  *See Tripoli Management, LLC v. Waste Connections of Kansas, Inc.,* 2010 WL 845927, at *5 n.9 (D. Colo. 2010).  While minority courts in other jurisdictions that do apply "plausibility" in a Rule 12(b)(2) context appear to do so without comment, at least one court in "mixing" the standards, focused on the contacts with the forum, not the merits of the claim.  *See StrikeForce Technologies, Inc. v. WhiteSky, Inc.,* CIV.A. 13-1895 SRC, 2013 WL 3508835, at *2 (D.N.J. July 11, 2013) ("[c]onstruing all facts regarding in personam jurisdiction in favor of StrikeForce, as it must on WhiteSky's Rule 12(b)(2) motion, the Court finds that it is both plausible and proper to conclude that the regular communications by WhiteSky directed at New Jersey . . . demonstrate WhiteSky "purposefully avail[ed] itself of the privilege of conducting activities within the forum State").  But regardless of the standard applied here, TOTE's presence and conduct in the forum is not only "plausible" on its face, it is confirmed by the evidence.

TOTE contends its affidavits "shift the burden" of showing personal jurisdiction back to the Plaintiff.  Yet, TOTE and its affiants make no effort to address, much less overcome, any of the testimony and fact-based allegations regarding Shapiro, Magee, and Cowan which more than suffice to give this Court specific jurisdiction over TOTE.  There is no "burden shifting" here.[8]

TOTE's *own* recently produced Board Minutes show that TOTE *was* a guarantor of Sea Star and was "connected" to its sister company's financial fortunes.  *See Meier ex rel. Meie,* 288 F.3d at 1269, *citing Madara,* 916 F.2d at 1514 (where "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.")  In sum, TOTE does not even try to meet *its* burden of refuting Plaintiffs' testimony, exhibits, admissions, and Plaintiffs' allegations (which must be accepted as true), establishing this Court's personal jurisdiction over TOTE.

### 2.  TOTE's manufactured legal arguments are meritless

TOTE tries to gin up "issues" that have no bearing on the jurisdictional allegations against it.[9]  It seeks to blend and misapply a variety of legal arguments which have no relevance to Plaintiffs' core allegations against TOTE detailed above.

---

[8] *See Louis Vuitton Malletier, S.A. v. Mosseri,* 736 F.3d 1339, 1350 (11th Cir. 2013) *citing Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1360 (11th Cir.2006) (the burden does not "shift back" if  the affidavits "contain only conclusory assertions that the defendant is not subject to jurisdiction"); *Posner v. Essex Ins. Co., Ltd., 178 F. 3d 1209, 1215 (11th Cir. 1999)* (Conclusory statements "do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction.").

[9] TOTE argues at length the "implausibility" of Sea Star serving as TOTE's "alter-ego."  Yet, nowhere in the Amended Complaint do Plaintiffs assert any theory of vicarious liability as to TOTE.  Plaintiffs allege TOTE acted through its officers, including Shapiro *et al.  See McGee v. Sentinel Offender Servs., LLC, 719 F.3d 1236, 1244 (11th Cir. 2013)* ("A corporation can only act by its agents, yet for such acts it is responsible and a simple direct statement that it committed a tortious act by the agent makes the corporation responsible.")

TOTE's cases are easily distinguished and have no bearing here.  *Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 857 (10th Cir. 1999) involved an effort to hold a parent vicariously (and not directly) liable for the conspiratorial conduct of its subsidiary.  Plaintiffs here allege that TOTE is liable because the evidence shows TOTE directly participated in the conspiracy through its officers and agents.  *Yellow Pages Photos, Inc. v. Ziplocal, LP,* No. 8:12-cv-755, 2012 WL 5830590, at *3 (M.D. Fla. Nov. 16, 2012), another parent-subsidiary case standing for a proposition not implicated here, that the "relationship of parent-subsidiary is insufficient alone to confer personal jurisdiction over the foreign parent corporation."[10] This Court has specific jurisdiction over TOTE not because it is a sister company of Sea Star, but because of TOTE's conduct through its officers/agents in and targeting Florida.

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08- CV-42, 2011 WL 7053807, at *27 (E.D.N.Y. Jan. 4, 2011), simply held that Plaintiffs failed to allege sufficient facts linking defendant to the conspiracy, i.e., "[t]he Complaint [was] silent as to how, when, or where."  Likewise, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007), under Rule 12(b)(6), the court merely rejected the conclusory allegations of "anticompetitive wrongdoing by certain defendants in Europe," which in sum pled that "if it happened there, it could have happened here."  TOTE does not and cannot argue that the

---

[10] TOTE protests that its employees, officers, and consultant's actions in creating and maintaining the conspiracy cannot be used to establish its direct liability against it, because they "changed hats" from TOTE to Sea Star.  But TOTE offers no evidence that its employees, which it sent to Jacksonville, "reported" to anyone at or were employed by Sea Star.  An agent has but one hat when he holds a position with a single company within a corporate family. *United States v. Bestfoods,* 524 U.S. 51, 71 (1998); *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 2005 WL 5660476,  at *7 (M.D. Fla. Mar. 22, 2005) *aff'd,* 463 F.3d 1201 (11th Cir. 2006).
REDACTED
REDACTED

Amended Complaint (while 100 pages shorter than the original) does not set forth the "how, when, and where" as to TOTE. *See Mosseri,* 736 F.3d at 1357 (finding that personal jurisdiction reached to out-of-state Defendant under the Florida long-arm statute, where the minimum contacts set forth in "the unrebutted allegations of the complaint" establish that Defendant purposefully availed himself of the Florida forum by selling counterfeit goods to Florida residents by soliciting and receiving orders over a website).

Similarly, *In re Fla. Cement and Concrete Antitrust Litig.*, 746 F.Supp.2d 1291 (S.D. Fla. 2010) addressed only whether Plaintiffs adequately pleaded an antitrust price-fixing claim against certain co-conspirators based solely on "parallel conduct." 746 F.Supp.2d at 1319. The case had nothing to do with jurisdiction. Regardless, here Plaintiffs have specifically alleged *evidence* of TOTE's direct involvement in the admitted conspiracy.

Finally, *In re Plasma-Derivative Protein Therapies Antitrust Litig.,* 764 F.Supp.2d 991 (N.D. Ill. 2011), the court rejected arguments remarkably similar to TOTE's persistent cry that this Court should not exercise personal jurisdiction over it because it ships "only in Alaska" (and its participation in a Puerto Rican cabotage conspiracy is thus "implausible"). Foreign Defendant CSL Limited submitted an affidavit contending "that it did not participate in the manufacture of plasma therapies" that were the subject of Plaintiffs' antitrust claims. *Id.* at 1004. The court found that CSL Limited's affidavit was not relevant, because Plaintiffs' allegations "suggest that CSL Limited participated in the antitrust conspiracy which was directed at controlling the supply of plasma therapies in the U.S. market," and "according to the complaint, CSL Limited's activities" were directed at the forum and "plaintiffs' injuries arose out of those activities." *Id.*

Because TOTE's officers and agents engaged in conspiratorial conduct in and targeting this District, the Court has specific jurisdiction over TOTE.

**B.      TOTE's Request for "Jurisdictional Discovery" and/or an "Evidentiary Hearing" is without Merit and Should be Denied**

TOTE has offered no grounds that would remotely justify "jurisdictional discovery" or an evidentiary hearing.  TOTE has been a Defendant in this case for more than 18 months (longer if one counts the South Carolina action), and *TOTE* controls the facts/documents as to its officers and consultants who engaged in the conspiracy.  Notwithstanding this, TOTE's Motion does not contest or rebut, Plaintiffs' allegations regarding Shapiro, Magee, Cowan *et al.*  Having not met Plaintiffs' allegations, TOTE failed to meet its burden and no discovery or hearing is warranted.

**C.      Plaintiffs' Allegations and Evidence Also Support This Court's General Jurisdiction over TOTE**

Plaintiffs' allegations in the Amended Complaint and TOTE's own documents (and affidavits) produced after the filing of the Amended Complaint demonstrate that TOTE had continuous and systematic contacts in this District.[11]  REDACTED

**(Ex. F.6;** *see also* **Ex. F.5** [TOTE reaches into the entire "lower 48" states]).  TOTE affiants acknowledge TOTE employees' regular presence in Jacksonville in 2002-2004, and TOTE and Sea Star documents reflect TOTE's presence in Florida continued at Sea Star sales and pricing meetings and at major customer conferences during and after the conspiracy period **(Ex. F.**

---

[11]  TOTE's general contacts with the forum were certainly more pervasive than the mere "purchases, visits, and advertising" that comprised the insufficient contacts for general jurisdiction in the case on which TOTE relies. *See Fraser v. Smith,* 594 F.3d 842, 848 (11th Cir. 2010).

17-21; Am. Compl. ¶15).  A court can exercise general personal jurisdiction over a foreign defendant by virtue of its continuous and systematic" contacts with the forum state.  § 48.193(2), Fla.Stat.; *see also Daimler AG v. Bauman,* 134 S.Ct. 746, 754 (2014).  Because TOTE's contacts with the state of Florida, as evidenced by its own public statements and documentation of its operational reach into Florida, are "substantial and not isolated," it is appropriate to hold TOTE subject to the Court's authority under general jurisdiction.  *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d at 1361.  (**Exs. F.7-30**).

### D.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations

TOTE rehashes the same meritless arguments on the Clayton Act statute of limitations that Plaintiffs debunked in their prior brief.  (Pl.s' Joint Resp., at 24-28, ECF No. 101).  TOTE cannot show that this purported affirmative defense is apparent on the face of the Amended Complaint.  *See La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).  Plaintiffs' Amended Complaint confirms that the statute of limitations relating to Plaintiffs' claims arising out of the six-year conspiracy to fix rates and surcharge, rig bids, and allocate customers on the Puerto Rico trade has been tolled, under 15 U.S.C. § 16(i), by the criminal proceedings brought by the United States arising out of the exact same conspiracy which were pending when Plaintiffs' action was filed.[12]  Those proceedings include the trial and conviction of Sea Star's President Frank Peake for his role in this conspiracy by a jury in the District of Puerto Rico in January 2013—3 months <u>after</u> Plaintiffs filed their suit in this Court.  The role of TOTE's VP of Pricing Shapiro (an admitted "target"

---

[12] It is well established that "[a] private party who brings suit for a conspiracy against which the Government has already brought suit is *undeniably* basing its claim in whole or in part upon the matter complained of in the Government suit, *even if the defendant named in the private suit was named neither as a defendant nor as a co-conspirator by the Government*." *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 335 (1971) (emphasis added).

in the government's investigation) in orchestrating this conspiracy was testified to and established by two key government witnesses (Baci and Serra) in the *Peake* trial.  In addition, co-conspirator Tom Farmer, a former senior officer of Crowley Liner (who pled guilty), has been indicted and will be tried in May 2014 for his role in this same conspiracy.

As this Court recognized at the November 25, 2013 hearing, the conspiracy which the United States continues to prosecute is the identical conspiracy underlying Plaintiffs' claims here.   (MTD Hearing Tr. 109:21-23, Nov. 25, 2013).   Contrary to TOTE's baseless assertions, Plaintiffs are not asserting a broader or separate or different conspiracy.  The fact that TOTE was not named in the "charging documents" is irrelevant as a matter of law and fact, particularly since no co-conspirator was ever identified by the United States in any indictment or information.  In any event, controlling Supreme Court precedent (Pl.s' Joint Resp., at 24-28, ECF No. 101) confirms that the Clayton Act statute of limitations has been and remains tolled as to TOTE, a direct participant in this Puerto Rico conspiracy through Messrs. Shapiro, Magee, and Cowan.

## CONCLUSION

For the foregoing reasons, TOTE's Motion to Dismiss Plaintiffs' Amended Complaint should be denied.

Dated: April 4, 2014

Respectfully submitted,


/s/ David C. Eddy
David C. Eddy (Admitted Pro Hac Vice)
Marguerite S. Willis
Florida Bar No. 188950
Dennis J. Lynch (Admitted Pro Hac Vice)
Travis C. Wheeler (Admitted Pro Hac Vice)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina  29202
Telephone:     803.771.8900
Facsimile:     803.253.8277
Email: deddy@nexsenpruet.com
Email: mwillis@nexsenpruet.com
Email: dlynch@nexsenpruet.com
Email: twheeler@nexsenpruet.com


Charles P. Pillans, III
Florida Bar No. 0100066
BEDELL, DITTMAR, DeVAULT, PILLANS &
COXE, P.A.
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
Telephone:     904.353.0211
Facsimile:     904.353.9307
Email: cpp@bedellfirm.com

Attorneys for Plaintiffs